**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WISCONSIN**

COMMODITY FUTURES
TRADING COMMISSION

      Plaintiff,

v.

Edward S. Walczak,

      Defendant.

**Civil Action No. 20-75**

**ECF Case**

**JURY TRIAL DEMANDED**

### COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, AND OTHER EQUITABLE RELIEF

Plaintiff Commodity Futures Trading Commission (the "CFTC" or "Commission"), by and through its undersigned attorneys, hereby alleges as follows:

### I. SUMMARY

1. From at least November 2014 through February 2017, Edward Walczak misled investors in the Catalyst Hedged Futures Strategy Fund (the "Fund"). Walczak was the portfolio manager and the public face of the Fund. He repeatedly led investors or investment advisors to believe that the Fund was a safer investment than it actually was—to their detriment. Ultimately, the Fund lost at least $500,000,000 when risks Walczak purported to have managed instead materialized.

2. The Fund's strategy—Walczak's strategy—relied heavily on selling call options on S&P Futures contracts. Selling a call option is an inherently risky trade because the potential losses are unlimited. Walczak, however, repeatedly assured investors or investment advisors (who had discretionary authority over client accounts) that he used sophisticated options

portfolio software to manage risk. Specifically, he said he used a software program, called OptionVue, to stress test the portfolio daily against 5% and 10% increases in the price of the underlying S&P Futures. He said that if and when any one of the stress tests indicated that the Fund would lose more than 8% of its value, he traded to eliminate that risk before it could materialize.

3.    These statements were false or misleading and are belied by the way that Walczak actually managed risk.

4.    Indeed, from at least November 2014 through February 2017 (the "Relevant Period"), OptionVue or similar options analysis software would have frequently showed Walczak that a 5% rise in S&P Futures market would result in losses to the Fund that far exceeded 8%. On several occasions during the Relevant Period, such software would have shown that even a mere 2%-3% market increase would cause the Fund to breach that 8% loss threshold. Yet, contrary to what he told investment advisors he did, and would do, under these circumstances, Walczak often did not act to neutralize this risk. Instead, he consciously and repeatedly chose to accept risk of loss above 8%, betting that the market would retreat to the benefit of the Fund's positions.

5.    Despite the disconnect between Walczak's words and actions, for most of the Relevant Period he was lucky that the market did not rise so dramatically as to cause such risk of loss to materialize. On July 15, 2016, for example—a day when OptionVue or similar software would have shown that an approximately 2% rise in the S&P Futures market would result in an approximately 14% loss to the Fund—Walczak's assistant portfolio manager wrote to him: "We got lucky today with a down market."

6.    In February 2017, however, Walczak's luck ran out:

2

7.      On February 1, 2017, the Fund was short over 49,000 call options on S&P Futures contracts expiring in less than three weeks.  It was short another 25,000 call options on S&P Futures contracts expiring at the end of the month.  Because the underlying S&P Futures price, at the time, was above or close to the strike price of these options, this was a particularly high-risk position—it stood to decline significantly in value if the market were to continue to rise just a few percentage points.  Indeed, on or about February 1, 2017, internal company documents predicted that the Fund, as a whole, would lose 3.3% for every 1% increase in the S&P.  In other words, the company's own analysis projected that the Fund would decline approximately 10% if the market were to rise just 3%.  An OptionVue stress test on that date would have predicted a similar decline.  (*See* ¶ 102, *infra*.)

8.      Walczak had told investors that in this situation, he would "jump in" to neutralize the risk of the Fund losing more than 8%.  (*See* ¶ 83-89, *infra*.)  Yet, from February 1, 2017, through February 8, 2017, Walczak did not execute a single trade on behalf of the Fund.  And the magnitude of risk only increased over that period.  Indeed, by February 8, the company's internal analysis projected that the Fund would lose 4.7% for every 1% increase in the S&P.  (Again, an OptionVue stress test would have revealed similar exposure, *see infra* ¶ 104.)  Rather than reduce risk—as he told investors he would—Walczak had chosen to gamble that the market would decline.

9.      The risk that Walczak chose to ignore soon materialized.  From February 9 to February 28, 2017, the market did not decline; it rose approximately 3%.  Over that same period, the Fund's share price plunged almost 18%.

10.      This decline translated into at *least* $500,000,000 in investor losses.

11.    After Walczak's risk management failures were exposed, one advisor fumed that Walczak had ignored his risk parameters and "chose to gamble with mine and my clients' money."  Another lamented, "we trusted you and believed you when you said . . . that you had risk management protocols in place. . . . [A]ll these statements were simply inaccurate and I have a hard time believing you didn't know that at the time."

* * * * *

12.    Walczak's conduct alleged herein violated the following anti-fraud provisions of the Commodity Exchange Act (the "Act") and Commission Regulations ("Regulations"): Sections 4*o*(1)(A), 4*o*(1)(B), and 6(c)(1) of the Act, 7 U.S.C. §§ 6*o*(1)(A)-(B), 9(1) (2018), and Regulation 180.1, 17 C.F.R. § 180.1 (2019).

13.    Plaintiff CFTC brings this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2018), to enjoin Defendant's violative acts and practices and to compel Defendant's compliance with the Act.  In addition, Plaintiff CFTC seeks civil monetary penalties and such other equitable relief, including but not limited to disgorgement and restitution, as this Court deems necessary and appropriate.

## II.  JURISDICTION AND VENUE

14.    This Court has jurisdiction over this action under 28 U.S.C. § 1331 (2018) (federal question jurisdiction) and 28 U.S.C. § 1345 (2018), which provides that district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress.  Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a) (2018), authorizes the Commission to seek injunctive relief against any person whenever it shall appear to the Commission that such person has engaged, is engaging, or is about to engage in

any act or practice constituting a violation of any provision of the Act or any rule, regulation or order thereunder.

15.    Venue properly lies with this Court, pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e) (2018), because the Defendant is an inhabitant in this District, transacted business in this District and acts and practices in violation of the Act occurred in this District.

## III.  PARTIES

16.    **Plaintiff Commodity Futures Trading Commission** is an independent federal regulatory agency that is charged by Congress with the administration and enforcement of the Act and the Regulations promulgated thereunder.

17.    **Defendant Edward Walczak** has served as the Portfolio Manager of the Catalyst Hedged Futures Strategy Fund since that mutual fund was created in September 2013.  Walczak has been registered with the CFTC as an Associated Person of Catalyst Capital Advisors LLC since August 28, 2013.  From September 2006 to August 2015, Walczak was registered with the CFTC as an Associated Person of Harbor Financial LLC and listed as its Principal.  Harbor Financial was registered as a Commodity Pool Operator from September 2006 to February 2014 and as a Commodity Trading Advisor from September 2006 to August 2015.

## IV. OTHER RELEVANT ENTITY

18.    **Catalyst Capital Advisors LLC** ("Catalyst"), was founded in 2006.  It has been registered with the CFTC as a Commodity Pool Operator since August 28, 2013.  Catalyst is a New York Corporation headquartered in Huntington, New York.

## V. FACTS

*Background*

19.    In the 1990s and early 2000s, Walczak worked in supply chain management.

20.    In or about the mid-2000s, he decided he would try to earn a living trading.

5

21.    His options trading experience to that point was, at most, trading options on certain commodity futures for his personal account.

22.    In October 2005, Walczak formed Harbor Assets, LLC, a limited partnership organized under the laws of the state of Delaware.

23.    In or about 2006, Walczak formed Harbor Financial, LLC, as the general partner of Harbor Assets, responsible for Harbor Assets' trading.

24.    Walczak was the managing member of Harbor Financial.

25.    From inception through December 31, 2006, Walczak was the only investor in Harbor Assets.

26.    Harbor Assets first accepted outside investments in 2007.

27.    At the end of 2008, Harbor Assets had approximately $3 million under management.  Approximately one-third of the assets under management were Walczak's.

28.    Catalyst was founded in 2006.

29.    Catalyst started as one mutual fund.

30.    From 2008 to the present, Catalyst launched and/or acquired dozens of additional funds.

31.    In or about 2012, Individual A was retained by Catalyst to seek out fund acquisition opportunities.  Specifically, Catalyst's CEO and Individual A discussed seeking out "hedge fund managers" who might be interested in using their investment strategies in the mutual fund space.

32.    In 2012, Walczak was approached by Individual A.  Individual A and Walczak discussed converting Harbor Assets into a "'40 Act" mutual fund under the Catalyst umbrella.

33.    In April 2013, Walczak entered into a Portfolio Management Agreement with Catalyst.

34.    The Portfolio Management Agreement contemplated "convert[ing] existing investors" in Harbor Assets into new investors in a Catalyst fund called the Catalyst Hedged Futures Strategy Fund.

35.    The Portfolio Management Agreement stated that Walczak would be the Portfolio Manager for the Fund.  In return for his services, Walczak would receive fifty percent of the net advisory fees paid to Catalyst in connection with the Fund.

36.    In September 2013, Harbor Assets was officially converted into the Fund.

37.    The Fund, like Harbor Assets before it, traded almost exclusively options on S&P Futures.

38.    At its inception, the Fund had approximately $6.2 million under management.

39.    To grow the assets under management, Catalyst employed or contracted with dozens of sales persons across the country.  The sales force learned about the Fund's strategy and management from Walczak himself, through phone calls and email communications.

40.    Armed with this information and marketing materials drafted, at least in part, by Walczak, the sales force marketed the Fund to investment advisors.

41.    Growth was rapid.  By the end of 2014, the Fund had over $500 million in assets under management ("AUM").  By the end of 2015, AUM was over $2 billion, and by November 2016, it reached over $4.2 billion.

*Market Fundamentals*

42.    An S&P Futures contract is a financial derivative traded on the Chicago Mercantile Exchange ("CME"), a designated contract market and registered entity pursuant to the Act.

43.    If the buyer of an S&P Futures contract holds the contract to expiry, the buyer receives $250 x (multiplied by) the Final Settlement Price calculated by the CME.  The Final Settlement Price is based on the opening prices of the component stocks in the S&P 500 index on the third Friday of the expiry month.

44.    At any given time, there are S&P Futures contracts listed for eight different expiry months:  March, June, September, and December, for the following two years.  For example, in April 2016, S&P Futures contracts were listed for June 2016, September 2016, December 2016, March 2017, June 2017, September 2017, December 2017, and March 2018.

45.    Options on S&P Futures are also listed for trading on the CME.

46.    "Standard" options are listed for quarterly expiry (March, June, September, December), and expire the same day as the corresponding underlying S&P 500 Futures contract. Standard options may be exercised at any time before or on the expiration date.

47.    "End of Month" options are listed for the nearest six consecutive calendar months.  Each expires on the last business day of the month. End of Month options may only be exercised on expiration day.

48.    "Weekly" options are listed for at least the nearest three consecutive calendar months.  Each expires on Friday of the named week.  Weekly options may only be exercised on expiration day.

49. Subject to the above parameters, the buyer of a call option on an S&P Futures contract is entitled to purchase one underlying S&P Futures contract at a predetermined strike price.

50. The seller of a call option on an S&P Futures contract is obligated, upon exercise, to deliver one underlying S&P Futures contract at a predetermined strike price to the purchaser.

51. All of the above types of options may be traded prior to expiration.

52. A call option whose strike price is below the current price of the underlying S&P Futures contract is referred to as "in the money."

53. A call option whose strike price is above the current price of the underlying S&P Futures contract is referred to as "out of the money."

54. All else being equal, the more "in the money" an option is, the more valuable it is.

55. Selling, or "shorting" a call option, by itself, exposes the seller of the call option to potentially unlimited losses. This is because there is no upper limit to the value of the underlying asset, forcing the seller of the call option to pay an ever-increasing amount to purchase the asset and deliver it to the purchaser of the option upon exercise.

56. Selling a call option without hedging the exposure is commonly referred to as a "naked" or "uncovered" short.

*Fund Strategy and Positioning*

57. Walczak, as the Fund's Portfolio Manager, traded call and put options on S&P Futures contracts, almost exclusively.

58. From at least 2014 through February 2017, his primary investment strategy for the Fund involved entering "call ratio spreads."

59.    A call ratio spread entails buying a certain number of call options and simultaneously selling two or three (or more) times as many call options with the same expiry date but with a higher strike price.

60.    In 2014, Walczak typically entered 1x2 call ratio spreads (i.e., selling 2 call options for every call option he bought) for the Fund.  For example, the Fund would buy 100 call option contracts at a particular strike and expiry and simultaneously sell 200 call option contracts with the same expiry but with a strike price 25 points higher.  Walczak typically entered the spreads by buying and selling options that expired approximately three months in the future.

61.    The potential losses associated with these call ratio spreads are unlimited.  As described above, *supra* ¶ 55, selling a call option exposes the seller to ever increasing losses as the market rises.  In the 1x2 example above, the loss exposure from selling the 200 call option contracts is only partially offset by the purchase of 100 call option contracts.  The sale of the additional 100 call option contracts is, effectively, a "naked" or "uncovered" short.

62.    In or around July of 2014, Walczak dramatically increased the size of the 1x2 call ratio trades.  Whereas earlier in the year, he typically bought 100 call options and sold 200, by the end of the summer he was executing trades ten times that size.  These larger positions, put on in the summer of 2014, consisted of option contracts expiring in the fall of 2014.

63.    In or around December 2014, Walczak increased the *ratio* of short to long calls as well.  Instead of selling two call options for every one purchased, Walczak would sell three. (Hereafter referred to as "1x3 call ratio spreads.")

64.    From December 2014 to November 2016, the Fund routinely bought 1000 call options at a particular strike and expiry and simultaneously sold 3000 call option contracts with the same expiry but with a strike price approximately 50 points higher.

10

65. These changes dramatically increased the risk associated with the Fund's positions. Not only were the potential losses associated with these positions still unlimited; the increased size of the positions and the increased ratio of short to long calls meant that, as the underlying S&P Futures price increased above the level of the short strikes, losses would accumulate faster.

66. The payoff profile for a 1x3 call ratio spread, where the Fund was long 1000 option contracts and short 3000 option contracts and the difference between the long and short strikes is 50 points, is as follows:

67. Scenario 1: If, at expiry, the underlying S&P Futures contract price is below the level of the long strike, the payoff at expiry is $0.

68. Scenario 2: If, at expiry, the underlying S&P Futures contract price is above the level of the long strike but less than 25 points above the short strike, the payoff is positive. The maximum payoff is achieved if, at expiry, the S&P Futures contract price is exactly at the level of the short strike.

69. Scenario 3: If, at expiry, the underlying S&P Futures contract price is greater than 25 points above the short strike, the payoff is negative. In this scenario, as the Futures price increases, the payoff becomes more negative.

70. In Scenario 3, above, for *every* point increase of the S&P Futures contract at expiry, the position loses $500,000.

71. By the end of March 2016, the Fund's 1x3 call ratio spread strategy had resulted in the accumulation of a *net* short position of 50,150 call option contracts *in July expiries alone*. This consisted of 25,075 long call contracts (at strikes ranging from 2120-2140) and 75,225 short contracts (at strikes ranging from 2170-2190).

72.    Three months later, on June 30, 2016, the portfolio was net short 61,150 contracts expiring in July alone; the portfolio as a whole was net short a whopping 137,000 call contracts across all expires.

73.    In the latter half of 2016, the Fund continued to purchase 1x3 call ratio spreads on a large scale.  At the end of November 2016, the Fund was net short 75,000 call option contracts on S&P Futures.  This position was exclusively in December 2016, January 2017, and February 2017 expiries.  The Fund was net short 40,000 call option contracts in the February 2017 expiries alone.[1]

74.    From June 1, 2015 through December 31, 2016, the Fund was net short over 50,000 call contracts on over 80% of trading days.

_Misrepresentations About Risk Management_

75.    The above strategy carried significant risk of loss, particularly as the market[2] approached the strike prices of the Fund's short call options positions.

76.    Throughout the Relevant Period, however, Walczak touted a robust risk management system to investors or investment advisors.  Risk management, he said, was "the key . . . as opposed to really chasing returns."  As alleged below, Walczak represented that he took specific steps to prevent the Fund from losing more than 8% of its value.

77.    Throughout the Relevant Period, however, Walczak's actions were inconsistent with the representations he made.  As alleged below, Walczak routinely, and consciously, failed to take the steps he told investors he would take to limit risk.  Instead, during times of heightened exposure, Walczak chose to gamble on the market's decline.

---

[1] At the time, the Fund also had approximately 10,000 put option contracts on its books:  5,000 long and 5,000 short.

[2] All references to the "market" refer to the price of the S&P Futures contract underlying the relevant options.

*Walczak Said He Took Steps To Limit Losses to 8%*

78.     In November of 2014, Catalyst began arranging "Open House" (also known as "National") phone conferences on which Walczak would speak to dozens, sometimes hundreds, of investment advisors about the Fund.

79.     From 2014 through 2016, Walczak repeatedly told the investment advisors that he used sophisticated options software—called OptionVue—to manage the Fund's risks. Specifically, he said he input all the portfolio's positions into the software and the software would tell him "how the portfolio *is going to behave* as the market moves back and forth in price." (Emphasis added.) He referred to this as "stress testing" the portfolio.

80.     Specifically, Walczak told investors that he performed these stress tests to see how the portfolio would react to the following conditions: market up 5%, market up 10%, market down 5%, market down 10% and market down 15%.

81.     Most significantly, Walczak told investment advisors that if any of the stress tests showed the portfolio losing more than 8% of its value, he would eliminate that risk before it materialized.

82.     Examples of such statements include the following:

83.     On a November 4, 2014, Open-House call, an investment advisor asked Walczak how he performed his stress testing. Walczak responded:

> I use risk management to control losses to roughly 8%;
> that's the number I use in stress testing . . . I have very
> sophisticated options pricing models. I plug the portfolio
> into these models each day. I stress the portfolio for a
> series of price movements up to 10%. I stress the portfolio
> for volatility movements, . . . I stress it for price movement,
> and then I look over five different time frames . . . . I'll
> vary those time frames to match up to different times that

are important to options—expirations for part of the
portfolio, for example. So I . . . identify what's the impact
on the portfolio value at these stress points, and *if the
impact is greater than my 8% limit, then I'll go in and I'll
hedge the portfolio to bring it back in line.*

84.    On information and belief, the "time frames" that Walczak used to stress the

portfolio ranged from T+0 (i.e., simulating an immediate change in market price) to T+14 (i.e.,

simulating a price movement over two weeks).

85.    On an October 13, 2015, Open-House call, Walczak stated:

On a daily basis . . . the portfolio in aggregate is plugged
into our options modeling software and we'll stress price
moves of +5 and +10% on the S&P and -5, -10 and -15%
on the S&P . . . .  We'll have snapshots of the portfolio
value at those P&L . . . at those stress points  . . . . .  We
look at that across 5 different time frames and what we're
looking for is a drawdown of greater than 8% in the
portfolio value.  If we find that at any one of those price
and volatility stress points . . . *we'll model the most
effective alternative to remove that risk excursion and
then we'll implement that position on the portfolio.*  That's what
we do internally to manage the portfolio; we've done that
basically since I've run the fund.  So, over its entire life.

86.    On a June 7, 2016, Open-House Call, Walczak stated:

[Using the software] we can see a curve that says, here's
how the portfolio is going to behave as the market moves
back and forth in price . . . .  We do pick stress points.  And
what we look at is a plus or minus 5 and 10% price
excursion and also a minus 15% excursion . . . so we look
at all these stress points on those curves across time for
places in which the portfolio value would cause us an
unacceptable drawdown.  So when we identify that there's
an unacceptable risk against our 8% parameter, we now use
that same modeling software to figure out what to do about
it.

87.    On the same June 7 call, Walczak further explained that "when we find an out of

bounds situation, so to speak, then we then jump right back in," using a "whole tool set" of

14

options contracts "until that risk goes away." While Walczak also said that "there's no guarantees [sic] in the world, especially in markets," he was unequivocal about what he would (and did) *do* to limit the Fund's risk.

88.     On a September 13, 2016, Open-House call, Walczak stated that "we would flatten the portfolio" at roughly an 8% loss, but then went on to emphasize that his risk management process prevented that situation from occurring in the first place:

> As we look ahead and stress the portfolio we identify a condition that is out of bounds, *we will hedge that right now . . . we're never in a situation where we have sort of a hard stop loss and we're just sitting waiting for that 8% to get triggered . . . .*

89.     On an October 25, 2016, Open-House Call, Walczak stated:

> We [look at the software graph] and say where do we get in trouble? . . . Trouble is down 8%. So we now look, where are we down 8%? . . . And look to see what does it take . . . do we need to take action? . . . We have some rules around this. Are we down 8% if the market moves 1% next week? Well that would be a big problem. *We would jump in right away and adjust the portfolio whatever extent we had to take that off the table.* . . . How do we protect against an up market? We buy call options. . . . We can use straight option purchases, we can use options spreads, we can use all sorts of combinations to give us just the right hedging exposure *to bring that portfolio back in line where we take that 8% risk off the table.*[3]

90.     The above statements, taken together, gave investment advisors and Catalyst sales personnel (whose job it was to convince investment advisors to invest their clients' money in the Fund) the impression that the Fund's maximum loss was 8%.[4]

---

[3] Emphasis in the quotations above is added.

[4] On multiple calls, Walczak clarified that, for these purposes, he was referring to "peak to valley" losses—i.e., 8% below the Fund's high water mark.

91.   For example, on November 7, 2014, a Catalyst salesperson noted to Walczak that "you have mentioned in the past that you have the portfolio positioned/hedged for a max drawdown of 8%."

92.   On June 29, 2016, an investment advisor emailed a Catalyst salesperson, noting that Walczak "has mentioned that . . . his risk model is stress-tested and has a max drawdown limit of 8%."

93.   In a January 26, 2017, email to the assistant portfolio manager, another salesperson cited "measures in place to 'protect' from any more than an 8% drawdown from the highwater mark."

94.   The Fund's quarterly investor presentations reinforced the impression that stop-loss measures were in place.

95.   The 2015 and 2016 versions of that presentation stated that the Fund employed a "risk management strategy explicitly focused on limiting losses by hedging individual positions at initiation . . . and aggregate portfolio stop loss measures."

96.   Walczak provided this language to Catalyst for use in these presentations.

*Walczak's Actual Risk Management Was Not Consistent with His Statements*

97.   From at least November 2014 through February 2017, if Walczak were using OptionVue or similar software to stress test the Fund against 5% and 10% market increases, those stress tests would have frequently shown the Fund losing well over 8% of its value.  On numerous occasions, even stressing the Fund against a more modest 2%-3% market increase would have shown the Fund exceeding his purported 8% loss threshold.  Yet, Walczak failed to

take steps to eliminate—or even mitigate—these risks in the way he told investment advisors he did, and would.

98.    Indeed, in sworn investigative testimony before Division staff, Walczak conceded that "there is no stop loss or hard number that we go after."

99.    Moreover, Walczak testified that he did not look at OptionVue every day: "essentially, I turn OptionVue off as we come into roughly a two-week window around expiration period."  This directly contradicts what he told investment advisors: that he used OptionVue on a "daily" basis to evaluate and address the portfolio's risk of loss.

100.    Analysis of the Fund's trading records reveal, in detail, Walczak's failure to take steps to limit risk when the aforementioned stress testing would have shown losses in excess of 8%.

**February 2017**

101.    The starkest example was in February 2017, when the Fund was short tens of thousands of call option contracts expiring at the end of the third week of the month, and short tens of thousands more expiring at the end of the month.  (*See supra* ¶ 7.)

102.    On February 1, 2017, stress tests using OptionVue or similar options portfolio software would have shown the following:  that a mere 2% increase in the underlying S&P Futures would cause over a 10% decline in the value of the portfolio; and that a 5% increase in the S&P Futures would cause approximately a 24% loss to the portfolio, even if that 5% increase were to occur over the course of a week.

103.    Yet, Walczak did not execute a single trade from February 1 through February 8th.  And the Fund's risk over the course of those eight days only increased.

104.    On February 8, 2017, stress tests using OptionVue or similar software would have shown that a 2% market increase would cause approximately a 14% decline in the value of the Fund.  The stress tests would have shown that approximately 14% loss, even if the 2% move were to occur over the course of a week.  A stress test on that day would also have shown that a 5% market increase would cause a loss of approximately 27%, even if the 5% rise were to occur over a week.

105.    Moreover, Catalyst personnel emailed daily "exposure summaries" to Walczak over this February 1 – February 8th period showing the "delta" of the portfolio—i.e., the sensitivity of the portfolio to market movement.  On February 1st, that chart warned Walczak that the portfolio stood to lose 3.3% for every 1% rise in the S&P.  By February 8th, the chart showed that the portfolio stood to lose 4.7% for every 1% rise in the S&P.

106.    Walczak read these emails.

107.    Accordingly, from February 1 through February 8th, 2017, Walczak faced the precise scenario in which he had told investors he would take affirmative steps to limit risk.  Yet, he chose not to make a single trade during that period.

108.    From February 9 to February 15, 2017, the market rose approximately 2.5% and the Fund lost over 14% of its value.  Fund losses continued through at least the end of month, while the underlying market barely rose an additional half a percent.

**October/November 2014**

109.    Walczak's failure to manage risk in a manner consistent with his assurances to investors and investment advisors was not accidental—it dates back to at least 2014.

110.    For example, portfolio analysis of the days before and after the November 4, 2014 Open House call, belie the representations he made about risk management on that call.

111.    On October 31, 2014, a stress test of the Fund's portfolio using OptionVue or similar software would have predicted the Fund losing over 35% if the S&P Futures market were to rise 5%. The software still would have shown over a 30% loss, even if the 5% market move were to occur over the course of a week. And it would have shown that the Fund would be *completely wiped out* (i.e., 100% loss) if the S&P Futures market were to rise 10% within the following weeks.

112.    In the following days, however, Walczak did not meaningfully reduce this risk.

113.    A stress test as of the end of trading on November 3, 2014—the day before Walczak's Open House call with investment advisors (*see supra* ¶ 83)—would have shown that the portfolio's risk profile was still beyond the limits Walczak conveyed to investors. Specifically, on November 3, 2014, OptionVue or similar software would have shown that: a 3% market rise would cause an approximately 17% decline in the Fund's value; a 5% market rise would cause a loss of more than 35%; and a 10% rise still would have wiped out the Fund completely. Even if Walczak ran stress tests that assumed these market increases would occur over the course of a week, he would have seen similar results.

114.    On November 7, 2014—three days after the November 4th Open House call on which Walczak told investment advisors he would "hedge the portfolio to bring it back in line"—a stress test still would have displayed risks well outside the 8% limit. Specifically, a stress test on that day would have shown that a 5% rise in the S&P Futures market would cause over a 35% loss for the Fund, even if that 5% rise occurred over a week. And a stress test would have shown the Fund losing everything if the market advanced 10% over the following weeks. Luckily for Catalyst and the Fund, it did not.

**June – August 2016**

115.    From June 1, 2016, to August 31, 2016, Walczak continuously left the Fund exposed to steep losses.

116.    On at least sixty of sixty-five trading days during this period, a stress test would have shown that a 5% increase in the market would cause double-digit losses to the Fund.  On the majority of trading days during this period, such a stress test would have revealed a 5% increase in the market causing losses in excess of 25%.

117.    Portfolio analysis of the days surrounding the June 7, 2016, Open House call further highlights Walczak's failure to manage risk consistent with his representations to investment advisors.

118.    On each trading day from June 1, 2016, to June 6, 2016—the days leading up to Walczak's June 7 Open House call (*see supra* ¶ 86-87)—these stress tests would have shown a 5% market increase causing losses over 24%.  On these days, despite this significant exposure, Walczak continued to enter 1x3 call ratio spreads, *adding* to the Fund's net short position.

119.    Walczak represented on the June 7th call that he acted to eliminate risk of double digit losses in precisely these circumstances when, in fact, he had not.

120.    In the days after the June 7th call, Walczak did little—if anything—to reduce risk.  On June 8, 2016, the Fund was net short approximately 99,000 call option contracts.  This number increased through June, peaking at over 137,000 on June 30th.

121.    The Fund's loss exposure increased further in July.

122.    A stress test on the portfolio as of the close of trading on Friday, July 8th, would have shown a 5% market increase—occurring within the following week—causing over a 40%

loss to the Fund. This, like others before it, is exactly the type of scenario in which Walczak told investors he "jump[ed] in right away" to take that risk off the table.

123.    But on the following trading day, Monday, July 11, 2016, he did not do so. He did not buy back any of the Fund's approximately 47,000 short call contracts expiring at the end of the week, and only bought back 6,000 of the approximately 47,000 short call contracts expiring at the end of the month.

124.    Not surprisingly, a stress test using OptionVue or similar software as of the close of trading on July 11 would have shown that a 5% market increase would cause at least a 35% loss to the Fund if that increase occurred within the following week.

125.    On July 12, 2016, the risk increased: A stress test as of the close of trading on that date would have shown that a 5% market increase within the following week would cause the Fund to lose over 44% and that a mere 2% market increase the following day would result in over a 12% loss to the Fund.

126.    Risk remained at similar levels through the end of the week.

127.    On Friday, July 15, 2016, Walczak's assistant portfolio manager wrote to him and Catalyst's CEO expressing relief that the market had not risen. "We got lucky today with a down market," she said.

* * * * *

128.    In sum, Walczak gave investors and investment advisors the impression that risk management was paramount and that, with the help of sophisticated options software, he took affirmative steps to prevent the Fund from losing more than 8% of its value. Walczak's actual approach to risk management shows that he did not take this active, preventative approach. His passive attitude towards risk management is reflected in a statement he made to his floor trader

21

on January 25, 2017.  As they lamented that the market was moving higher, causing losses for the Fund, Walczak said that the "game plan" was to "hold your breath and listen to all the screaming from the crowd and eventually it passes."

129.    As alleged above, Walczak held to this game plan in the following weeks— choosing not to trade for the first eight days of February, despite substantial exposure to the Fund.  He did not even try to employ the risk management tools that he told investors he used. As a result, those investors suffered over a half a billion dollars in losses.

*Other Misleading Statements*

130.    Walczak made other statements to investment advisors that had the effect of making the Fund appear to be a safer investment than it actually was.

131.    For example, on October 24, 2014, Walczak emailed certain investment advisors graphs of "typical Fund call butterfly" spreads.  A butterfly spread is a risk-limited options strategy.  At the time, Walczak was not, in fact, entering butterfly spreads, but rather call ratio spreads, which were riskier.

132.    On March 9, 2015, Walczak again gave the impression that the Fund's strategy involved butterfly spreads rather than call ratio spreads.  On that date, in response to a question from a salesperson about how to explain the strategy to investment advisors, Walczak said, "I do use broken wing butterfly as the main strategy for upside capture."  This was not an accurate characterization of the Fund's positions at the time.

133.    At times, Walczak also referred to options generally as "risk limited" instruments. For example, on the October 25, 2016, phone conference referenced above, Walczak said "we have a serious advantage, as I said, by simply using options because *they're risk limited no*

*matter what we're doing with them.*"  This is false (selling call options poses unlimited risk) and exemplifies the recklessness with which Walczak tried to convince investors and investment advisors that the Fund was a safer investment than it actually was.

*Walczak Profited Immensely from the Fund*

134.    From October 2015 to November 2016, the Fund's assets under management grew from under $2 billion to over $4.2 billion.

135.    Catalyst charged investors a fee of 1.75% of AUM.  Per Walczak's portfolio management agreement with Catalyst, he was paid half of this fee.

136.    Under this agreement, Walczak was paid over $5.5 million in 2015 and over $24 million in 2016.

137.    In the first three months of 2017 alone, Walczak was paid over $7.75 million.

## VI.  VIOLATION OF THE COMMODITY EXCHANGE ACT

### COUNT I

**Violation of Section 4*o*(1)(A),
7 U.S.C. § 6*o*(1)(A) (2018)
(Fraud by Associated Person of Commodity Pool Operator)**

138.    The allegations set forth in paragraphs 1 to 137 are re-alleged and incorporated herein by reference.

139.    7 U.S.C. § 6*o*(1)(A) makes it illegal for an associated person of a commodity pool operator "to employ any device, scheme, or artifice to defraud any client or participant or prospective client or participant."

23

140. At all relevant times, Catalyst was registered with the Commission as a commodity pool operator.

141. At all relevant times, Walczak was registered with the Commission as an associated person of Catalyst.

142. During the Relevant Period, through statements to investors or investment advisors, Walczak intentionally gave them the impression that he took steps to prevent the Fund from losing more than 8% of its value.  These statements, made on Open House calls and in written materials and communications, were false or misleading because, throughout the Relevant Period, it was not actually Walczak's practice to employ such measures.

143. Walczak knew that he did not actually employ such measures, and therefore knew that his statements were false and misleading.

144. As alleged above, Walczak made other statements to investment advisors regarding the Fund's strategy and positions that would lead them to believe that the Fund was a safer investment than it actually was.

145. Walczak knew the Fund's actual positions, and therefore knew that these statements were false and misleading.

146. The misleading statements alleged above were material, as they related directly to investment risk.

147. Accordingly, Walczak's conduct violated 7 U.S.C. § 6*o*(1)(A).

**COUNT II**

**Violation of Section 4$o$(1)(B),**
**7 U.S.C. § 6$o$(1)(B) (2018)**
**(Non-Scienter Fraud by Associated Person of Commodity Pool Operator)**

148.    The allegations set forth in paragraphs 1 to 147 are re-alleged and incorporated herein by reference.

149.    7 U.S.C. § 6$o$(1)(B) makes it illegal for an associated person of a commodity pool operator "to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant."

150.    At all relevant times, Catalyst was registered with the Commission as a commodity pool operator.

151.    At all relevant times, Walczak was registered with the Commission as an associated person of Catalyst.

152.    During the Relevant Period, Walczak made statements that would give a reasonable investor or investment advisor the impression that he took steps to prevent the Fund from losing more than 8% of its value. These statements were false or misleading because, throughout the Relevant Period, it was not actually Walczak's practice to employ such measures.

153.    Walczak made other statements to investment advisors regarding the Fund's strategy and positions that would lead them to believe that the Fund was a safer investment than it actually was.

154.    The misleading statements alleged above were material, as they related directly to investment risk.

155.    This conduct violated 7 U.S.C. § 6$o$(1)(B).

25

**COUNT III**

**Violation of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2018), and Regulation 180.1, 17 C.F.R. § 180.1(a) (2019) (Employment of Deceptive Devices)**

156.     The allegations set forth in paragraphs 1 to 155 are re-alleged and incorporated herein by reference.

157.     7 U.S.C. § 9(1) makes it unlawful "for any person, directly or indirectly, to use or employ, or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate . . . ."

158.     17 C.F.R. § 180.1(a) makes it "unlawful for any person, directly or indirectly, in connection with any swap . . . to intentionally or recklessly:  (1) use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud; (2) make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading; [or] (3) engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person."

159.     Under the Dodd-Frank Act revisions to the Commodity Exchange Act, options on futures contracts are classified as swaps, and therefore subject to the prohibitions of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a).

160.     As alleged above, Walczak traded options on S&P Futures contracts, which are swaps.

161.    During the Relevant Period, Walczak intentionally or recklessly gave investment advisors the impression that he took steps to prevent the Fund's total assets—which included swaps—from losing more than 8% of their value.  This statement was false or misleading because, throughout the Relevant Period, it was not actually Walczak's practice to employ such measures.

162.    Walczak made other statements to investment advisors regarding the Fund's strategy and positions that would lead them to believe that the Fund was a safer investment than it actually was.

163.    The misleading statements alleged above were material, as they related directly to investment risk.

164.    This conduct violated 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a).


## RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that the Court, as authorized by Section 6c of the Act, as amended, 7 U.S.C. §13a-1 (2018), and pursuant to its own equitable powers:

A.    Enter an order finding Defendant Walczak liable for violating 7 U.S.C. §§ 6*o*(1)(A), 6*o*(1)(B), and 9(1), and 17 C.F.R. § 180.1(a);

B.    Enter orders of a preliminary and permanent injunction restraining and enjoining Defendant, and any of their affiliates, agents, servants, employees, successors, assigns, attorneys, and persons in active concert with him who receive actual notice of such order by personal service or otherwise, from:

i.  Directly or indirectly violating 7 U.S.C. §§ 6*o*(1)(A), 6*o*(1)(B), and 9(1), and 17 C.F.R. § 180.1(a);

ii.  Applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9);

iii.  Trading on or subject to the rules of any registered entity (as that term is defined by Section 1a(40) of the Act, 7 U.S.C. § 1a(40) (2012));

iv.  Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3, 17 C.F.R. § 1.3 (2019)), for accounts held in the name of Defendant or for accounts in which Defendant has a direct or indirect interest;

v.  Having any commodity interests traded on Defendant's behalf;

vi.  Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

vii.  Soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling of any commodity interests; and

viii.  Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2019)), agent, or any other officer or employee of any person registered, exempted from registration, or required to be registered with the CFTC except as provided for in 17 C.F.R. § 4.14(a)(9).

28

C.      Enter orders requiring Defendant to pay civil monetary penalties of not more than the civil monetary penalty prescribed by Section 6c(d)(1) of the Act, 7 U.S.C. § 13a-1(d)(1) (2018), as adjusted for inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114–74, 129 Stat. 584, tit. VII, § 701, *see* Regulation 143.8, 17 C.F.R. § 143.8 (2019), for each violation of the Act or Regulations as described herein, plus post-judgment interest;

D.      Enter an order requiring Defendant to disgorge, pursuant to such procedure as the Court may order, all benefits received, including, but not limited to, salaries, bonuses, commissions, loans, fees, revenues, and profits derived, directly or indirectly, from acts or practices that constitute violations of the Act and Regulations as described herein, including pre- and post-judgment interest thereon from the date of such violations;

E.      Enter an order requiring Defendant to make full restitution, pursuant to such procedure as the Court may order, to every person or entity who sustained losses proximately caused by Defendant's violations  (in the amount of such losses), as described herein, plus pre-judgment interest thereon from the date of such violations, plus post-judgment interest.

F.      Enter an order requiring Defendant to pay costs and fees, as permitted by 28 U.S.C. §§ 1920 and 2412(a)(2) (2018); and

G.      Enter an order providing such other and further relief as this Court may deem necessary and appropriate under the circumstances.

## VII. JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: January 27, 2020

Respectfully submitted,

COMMODITY FUTURES
TRADING COMMISSION

Manal M. Sultan
Deputy Director

By: _/s/ Samuel Wasserman___
Samuel Wasserman
Candice Aloisi

Division of Enforcement
140 Broadway, 19th Floor
New York, New York 10005
Phone: (646) 746-9700
Fax: (646) 746-9939