UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| U.S. COMMODITY FUTURES TRADING COMMISSION, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| EDWARD S. WALCZAK, | ) ) |
| Defendant. | ) ) ) ) ) ) ) ) |

No. 20 Civ. 75

ECF Case

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S
## MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

MARKET AND FUND BACKGROUND .......................................................................... 3

    I.   The Fund Was Comprised Predominantly of Options on S&P 500 Futures Contracts ..................................................................................................................... 3

    II.  Walczak's Primary Strategy for the Fund—Call Ratio Spreads of Options on S&P Futures Contracts—Risked Unlimited Losses ....................................................... 4

    III. OptionVue Would Have Shown Walczak When an Increase in the S&P Would Cause a Greater-than-8% Loss to the Fund ............................................................ 5

LEGAL ARGUMENT ....................................................................................................... 7

    I.   Legal Standard for Summary Judgment ................................................................. 7

    II.  This Court Has Jurisdiction and Venue Over This Matter ..................................... 8

    III. Defendant Walczak Violated Section 4$o$(1)(B) of the Act by Making Materially Misleading Statements about His Management of the Fund .................................. 8

      A.   Legal Standard ................................................................................................. 8

      B.   Application to Undisputed Fact ........................................................................ 9

        1.   Walczak's Specific Representations Regarding Risk Management ............... 9

        2.   Walczak's Specific Representations Regarding Risk Management Were False or Misleading ................................................................................................................. 13

          a.   Walczak's Admissions About His Actual Risk Management Practices .... 13

          b.   Objective Data Corroborates Walczak's Admissions that He Did Not Manage Risk as He Represented ................................................................................. 15

        3.   Materiality ................................................................................................... 20

    IV. Defendant Walczak Violated Sections 4$o$(1)(A) and 6(c)(1) of the Act and Regulation 180.1(a) by Making Materially Misleading Statements about His Management of the Fund *with Scienter* .............................................................. 21

      A.   Legal Standard for Additional Element of Scienter ....................................... 21

      B.   Application to Undisputed Fact ...................................................................... 23

CONCLUSION ................................................................................................................. 25

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................................. 7

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ........................................................................... 7

*CFTC v. Aurifex Commodities Rsch. Co.*, No. 1:06-CV-166, 2008 WL 299002, at *6 (W.D. Mich. Feb. 1, 2008) ................................................................................................................. 20

*CFTC v. Driver*, 877 F. Supp. 2d 968 (C.D. Cal. 2012), *aff'd*, 585 F. App'x 366 (9th Cir. 2014) ...................................................................................................................................... 21, 22, 24

*CFTC v. Emini Experts, LLC*, No. 614CV1766, 2016 WL 7666148 (M.D. Fla. Mar. 29, 2016), *report and recommendation adopted*, No. 614CV1766, 2016 WL 3098199 (M.D. Fla. June 3, 2016) ......................................................................................................................................... 23

*CFTC v. Heffernan*, 245 F. Supp. 2d 1276 (S.D. Ga. 2003) ......................................... 8, 9, 20, 24

*CFTC v. Int'l Fin. Servs., Inc.*, 323 F. Supp. 2d 482 (S.D.N.Y. 2004) ...................................... 20

*CFTC v. Kraft Foods Grp., Inc.*, 153 F. Supp. 3d 996 (N.D. Ill. 2015) ...................................... 23

*CFTC v. Marquis Fin. Mgmt. Sys., Inc.*, No. Civ.A. 03–74206, 2005 WL 3752233 (E.D. Mich. June 8, 2005) ............................................................................................................................ 20

*CFTC v. Noble Wealth Data Info. Servs., Inc.*, 90 F. Supp. 2d 676 (D. Md. 2000), *aff'd in part, vacated in part on other grounds sub nom. CFTC v. Baragosh*, 278 F.3d 319 (4th Cir. 2002) .................................................................................................................................................. 20, 24

*CFTC v. R.J. O'Brien*, 310 F.3d 1321 (11th Cir. 2002) .............................................................. 24

*CFTC v. S. Tr. Metals, Inc.*, 894 F.3d 1313 (11th Cir. 2018) ..................................................... 22

*CFTC v. Savage*, 611 F.2d 270 (9th Cir. 1979) ........................................................................... 9

*CFTC v. Wilson*, 19 F. Supp. 3d 352 (D. Mass. 2014), *aff'd sub nom. CFTC v. JBW Cap.*, 812 F.3d 98 (1st Cir. 2016) ................................................................................................................. 9

*Fresno Cty. Employees' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526 (S.D.N.Y. 2017) .... 25

*Harrell v. U.S. Postal Serv.*, 445 F.3d 913 (7th Cir. 2006) ........................................................ 7

*Harris N.A. v. Hershey*, 711 F.3d 794 (7th Cir. 2013) ................................................................ 7

*Meadows v. SEC*, 119 F.3d 1219 (5th Cir. 1997) ....................................................................... 23

*Messer v. E.F. Hutton & Co.*, 847 F.2d 673 (11th Cir. 1988) ...................................................... 8

*Posey v. Skyline Corp.*, 702 F.2d 102 (7th Cir. 1983) ................................................................. 7

*Ptasznik v. St. Joseph Hospital*, 464 F.3d 691 (7th Cir. 2006) ................................................... 7

*SEC v. e-Smart Technologies*, 85 F. Supp. 3d 300 (D.D.C. 2015) .............................................. 7

*SEC v. Randy*, 38 F. Supp. 2d 657 (N.D. Ill. 1999) .................................................................... 23

*SEC v. Sentinel Mgmt. Grp. et al.*, No. 07-4684, 2012 WL 1079961 (N.D. Ill. Mar. 30, 2012) .. 20

*SEC v. Watkins*, 317 F. Supp. 3d 1244 (N.D. Ga. 2018) ............................................... 25

*SEC. v. Lyttle*, 538 F.3d 601 (7th Cir. 2008) ....................................................... 23, 24

*See Commodity Trend Serv., Inc. v. CFTC*, 233 F.3d 981 (7th Cir. 2000) ............................ 21, 22

*Sundstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033 (7th Cir. 1977) ............................... 23

*TFC Indus. v. Northway, Inc.*, 426 U.S. 438 (1976) ................................................... 20

### Statutes

28 U.S.C. § 1331 (2018) ................................................................................. 8

28 U.S.C. § 1345 (2018) ................................................................................. 8

7 U.S.C. § 13a-1(a) (2018) ............................................................................... 8

7 U.S.C. § 13a-1(e) (2018) ............................................................................... 8

7 U.S.C. § 6b (2018) ................................................................................. 20, 22

7 U.S.C. § 6*o*(1)(A) (2018) ...................................................................... passim

7 U.S.C. § 6*o*(1)(B) (2018) .................................................................. 8, 9, 21, 22

7 U.S.C. § 9(1) (2018) ......................................................................... 21, 22, 23, 25

### Rules

Fed. R. Civ. P. 56(a) ..................................................................................... 7

### Regulations

17 C.F.R. § 180.1(a) (2020) .................................................................... 22, 23, 25

# INTRODUCTION

The undisputed facts of this case show that Edward Walczak repeatedly made materially false or misleading statements about how he managed risk in the Catalyst Hedged Futures Strategy Fund (the "Fund"). Walczak was the portfolio manager of the Fund. Walczak's main strategy was to be net short call options on S&P 500 Futures contracts—positions that stood to lose increasing, and potentially unlimited, amounts of money as the price of the S&P 500 Index rose above a certain level. Walczak assured investment advisors, however, that he took specific steps to limit this risk. He said he used sophisticated options pricing software to "stress test" the Fund portfolio. Specifically, Walczak repeatedly stated that he stress-tested how the Fund would perform if the price of the S&P Futures contract ("S&P") increased up to 10% (among other scenarios). He said that if his software predicted that any of those S&P price increases cause the Fund to lose more than 8%, he would take affirmative steps to remove that risk—"so that we can no longer find a stress point that will result in greater than an 8 percent draw down."

Walczak admits that he did not actually manage risk this way. Though his story has changed over the course of the Commission's investigation and this litigation, there is no dispute that Walczak did not actually do what he said he did. In October 2017, Walczak admitted in testimony to the Commission: "I don't manage specifically to an eight-percent drawdown threshold. So I am not considering whether we're going to cross that threshold or not because, again, it's not something I'm managing to specifically." In more recent deposition testimony, Walczak maintained that he kept an eye on that 8% threshold, but still admits that he did not necessarily reduce risk when his software predicted that a price increase in the S&P Futures contract would lead to a greater-than-8% loss to the Fund. He further admitted that he would first assess the *probability* of the particular S&P price increase that would cause the greater-than-8% loss. If, in his view, the probability of that S&P price increase was low, he would not reduce

1

risk. Therefore, by his own admission, Walczak was as best not managing risk as represented, but rather gambling—playing his own, subjective odds that the market would not rise high enough to cause the greater-than-8% loss to the Fund that he knew from his stress testing would occur.

When Walczak had described his risk management process to investment advisors, he did not disclose that he reduced risk *only* if he believed that an 8% loss was *likely*. He said he reduced risk *when* one of his stress tests showed that an increase in the S&P of up to 10% would cause a greater than 8% loss to the Fund. These misrepresentations cost investors dearly.

For extended periods from September 2013 through February 2017, Walczak stacked the Fund portfolio with short call positions and consistently failed to mitigate risk in the way he repeatedly told investment advisors he would. Instead, he bet, with investors' money, that the S&P would not move too much higher, too quickly. In late January and early February 2017, Walczak's stress tests would have consistently shown that an S&P increase of as little as 2.5% would have caused a greater-than-8% loss to the Fund. Yet, contrary to what he said he would do in such situations, Walczak chose not to reduce risk at all. Indeed, from February 1st through February 8th, Walczak did not execute a single trade—betting, hoping that the S&P would not go any higher. But it did. The S&P Index increased approximately 3% from February 9th to February 28th, causing the Fund to lose over 17% of its value and costing investors approximately $680 million.

None of the above facts is in dispute, and the Court should grant the Commission's motion for summary judgment as to Defendant's liability on its claims under Sections 4*o*(1)(A) and (B), Section 6(c)(1), and Regulation 180.1.

## I. The Fund Was Comprised Predominantly of Options on S&P 500 Futures Contracts

Walczak's primary strategy for investing the Fund's assets was to buy and sell call options on S&P 500 futures contracts ("S&P Futures contract"). (Plaintiff's Statement of Proposed Findings of Fact ("Stmt. of Fact") ¶¶ 27–28.) An S&P Futures contract is a financial derivative traded on the Chicago Mercantile Exchange ("CME") that allows the buyer to earn (or lose) the difference between the price of the S&P 500 Index on the date the contract settles and the price at which the buyer bought the contract. (*Id.* ¶¶ 11–13.) Per CME specifications, the buyer earns $250 multiplied by that difference if the S&P 500 Index goes up, or loses that amount if the S&P 500 Index goes down. (*Id.* ¶ 14.)

Rather than purchasing the Futures contracts themselves, however, Walczak invested the Fund primarily in call options on S&P Futures contracts. (*Id.* ¶¶ 27–28.) Call options are also traded on the CME, and they allow the buyer the ability—rather than the obligation—to purchase one underlying S&P Futures contract at a predetermined price, called the "strike price." (*Id.* ¶¶ 15–16.) The seller of the call option is conversely obligated, when the buyer exercises the option, to deliver to the purchaser one underlying S&P Futures contract at the strike price. (*Id.* ¶ 17.) The buyer pays the seller a premium for the right to buy the underlying S&P Futures contract. (*Id.* ¶ 18.)

For example, the buyer of an option on S&P Futures with a strike price of 2,200 might decide to exercise the option when S&P Futures contracts are trading on the exchange at 2,250,

---

[1]This section provides background on the mechanics and characteristics of the options contracts traded by Walczak and the S&P Futures contracts that they were tied to. The facts asserted in this section should not be controversial. Finding them to be undisputed, however, is not necessary for the Court to grant Plaintiff's motion. Plaintiff will set forth the factual assertions underpinning its motion in the Legal Argument section below.

requiring the seller to deliver the S&P Futures contract to the buyer for a price of 2,200. The buyer could turn around and sell the contract in the market at 2,250, making a 50-point profit (i.e., 50 times the same $250, per CME's contract specifications), less the cost of the initial premium. Buying an option is referred to as going "long." (*Id.* ¶ 19.)

Conversely, the seller of the option in this example would have to go out in the market and buy an S&P Futures contract at the market price of 2,250 and deliver it to the buyer for 2,200. Therefore, the seller would lose 50 times $250, mitigated by any premium the seller earned from selling the option in the first place. Selling an option is referred to as going "short." (*Id.* ¶ 20.)

Importantly, a seller of options on S&P Futures is subject to potentially unlimited losses. (*Id.* ¶ 21.) Specifically, as the S&P Futures market goes up, the option seller's cost of buying the underlying S&P Futures contract to deliver to the buyer of the option (called "covering the short") goes up correspondingly. (*Id.*) There is no limit to how high the market can go. Conversely, the buyer of a call option can lose, at most, the premium it paid for the option in the first place, but has the opportunity to make unlimited gains. (*Id.* ¶ 22.)

A call option whose strike price is below the current price of the underlying S&P Futures contract is referred to as "in the money." (*Id.* ¶ 23.) A call option whose strike price is above the current price of the underlying S&P Futures contract is referred to as "out of the money." (*Id.* ¶ 24.) All else being equal, the more "in the money" an option is, the more valuable it is. (*Id.* ¶ 25.)

## II. Walczak's Primary Strategy for the Fund—Call Ratio Spreads of Options on S&P Futures Contracts—Risked Unlimited Losses

Walczak traded options on S&P Futures contracts for the Fund's portfolio using a "call ratio spread" strategy that he designed, controlled, and implemented. (*See id.* ¶¶ 26–27.) This

strategy entailed buying a certain number of call options and simultaneously selling two or three

(or more) times as many call options with the same expiry date, but with a higher strike price,

i.e., options that were further out of the money.  (*Id.* ¶ 28.)  As with selling a single call option,

Walczak's potential losses associated with these call ratio spreads were unlimited because he

sold more calls than he purchased.  (*See id.* ¶ 30.)

Walczak took on riskier positions over time.  In or around mid-2014, he increased the

number of options he would buy and sell in the call ratio spreads.  (*Id.* ¶ 33.)  And in or around

December 2014, Walczak increased the *ratio* of short to long calls as well.  (*Id.* ¶¶ 31–32.)

Instead of selling two call options for every one he purchased, Walczak sold three.  (*Id.* ¶ 32.)

The Commission's expert report lays out how this change resulted in more risk—greater

exposure to losses—as the market rose.  (*Id.* ¶ 34.)

By 2016, the Fund was persistently net short tens of thousands, if not hundreds of

thousands, of call options on S&P Futures.  (*Id.* ¶¶ 35–37.)  At the end of March 2016, the Fund

was net short over 50,000 call option contracts in the July expiry alone.  (*Id.* ¶ 35.)  By the end of

June 2016, the Fund was short over 140,000 call option contracts on S&P Futures across all

expiries.  (*Id.* ¶ 36.)  At the end of November 2016, the Fund was still net short 75,000 call

option contracts on S&P Futures.  (*Id.* ¶ 37.)  These unhedged positions exposed the Fund to the

risk of tremendous losses—unlimited losses—in the event that the price of the S&P 500 Futures

contract rapidly increased.  (*Id.* ¶ 34.)

## III.    OptionVue Would Have Shown Walczak When an Increase in the S&P Would Cause a Greater-than-8% Loss to the Fund

To manage this tremendous amount of risk inherent to his strategy, Walczak used,

according to his conversations with investment advisors, a software program called OptionVue.

(*Id.* ¶¶ 38, 55.)  OptionVue allows the user to input a portfolio of options so that the program can

chart how that portfolio would perform—i.e., change in value—given price movements in the underlying asset. (*Id.* ¶ 40.) In Walczak's case, OptionVue allowed him to input his portfolio of options on S&P Futures contracts and see how the value of that portfolio would change depending on movement in the price of the underlying S&P Futures contract. (*Id.* ¶ 41.) OptionVue displays this projection on a graph. (*Id.* ¶ 42.) The x-axis of the OptionVue graph displays the simulated price of the S&P; the y-axis of the OptionVue graph displays either the "value" of the portfolio or the "profit/loss" of the portfolio. (*Id.* ¶¶ 42–43.) Accordingly, Walczak could use OptionVue to see a graphical representation of the expected "value" (or expected "profit/loss") of the Fund's options portfolio at different simulated S&P Futures prices. (*Id.* ¶ 44.) Reading the graph from left to right, Walczak could see how OptionVue predicted the value of the portfolio to change as the S&P increased. (*Id.*)

OptionVue allows the user to incorporate other variables into these stress tests. Specifically, OptionVue allows the user to simulate changes in the S&P Futures price over different time frames. (*Id.* ¶ 45.) For example, one curve in the graph would show how the value of the portfolio would change if the simulated change in the S&P (as reflected on the x-axis) occurred immediately; another curve in the graph would show how the value of the portfolio would change if the simulated change in the S&P (as reflected on the x-axis) occurred over 21 days; and still others could show time frames in between. (*Id.* ¶¶ 46–51.)

OptionVue can also incorporate changes in volatility. For example, the user could simulate the scenarios above, but also assume that volatility would increase 5% or decrease 5%. (*Id.* ¶ 52.)

*All graphs, however, showed the expected "value" (or "profit/loss") of the portfolio on the y-axis given the simulated price level of the S&P Futures contract on the x-axis.* (*Id.* ¶ 44.)

As demonstrated below, Walczak touted the OptionVue software as a sophisticated tool that he used to predict how the portfolio would respond to price movements in the S&P Futures contract and adjust the portfolio accordingly to avoid losses of greater than 8% of the portfolio's value. (*See infra* Section III.B.1.) He told investment advisors on many occasions that he would "remove" excess risk should OptionVue indicate that an increase in S&P Futures contracts could cause the Fund to lose more than 8% of its value. (*See id.*) Unfortunately for investors in the Fund, Walczak did not actually do this to manage risk. (*See infra* Section III.B.2.)

## LEGAL ARGUMENT

### I. Legal Standard for Summary Judgment

Summary judgment should be granted if the depositions, documents, answers to interrogatories, declarations, and other materials show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c); *Harrell v. U.S. Postal Serv.*, 445 F.3d 913, 918 (7th Cir. 2006) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).[2] Upon such a showing, Defendant, in order to avoid summary judgment, must "set forth specific facts showing that there is a genuine issue for trial." *Posey v. Skyline Corp.*, 702 F.2d 102, 105 (7th Cir. 1983); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A "mere scintilla" of evidence in support of Defendants' position is not sufficient; rather, there must be "evidence on which the jury could reasonably find for the non-moving party." *Harris N.A. v. Hershey*, 711 F.3d 794, 798 (7th Cir. 2013) (citing *Ptasznik v. St. Joseph Hospital*, 464 F.3d 691, 694 (7th Cir. 2006)).

---

[2] The court may consider expert reports submitted in support of motions for summary judgment. *See SEC v. e-Smart Technologies*, 85 F. Supp. 3d 300, 312 (D.D.C. 2015) (declining to strike SEC's report from consideration on summary judgment).

## II.      This Court Has Jurisdiction and Venue Over This Matter

This Court has jurisdiction over this action under both federal question jurisdiction, 28 U.S.C. § 1331 (2018), and because federal district courts have original jurisdiction over civil actions commenced by any federal agency expressly authorized to sue by Act of Congress, *see* 28 U.S.C. § 1345 (2018).  The Commission is authorized to sue by Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a) (2018), which provides that the Commission may seek injunctive relief against any person whenever it shall appear to the Commission that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act, or any rule, regulation, or order thereunder.

Venue properly lies with this Court, pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e) (2018), as Walczak is an inhabitant of the Western District of Wisconsin.  (Stmt. of Facts ¶ 10.)

## III.     Defendant Walczak Violated Section 4*o*(1)(B) of the Act by Making Materially Misleading Statements about His Management of the Fund

### A.      Legal Standard

Section 4*o*(1)(B) of the Act prohibits an "associated person of a commodity pool operator by use of . . . any means or instrumentality of interstate commerce, directly or indirectly . . . to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or . . . prospective client."  7 U.S.C. § 6*o*(1)(B) (2018).  To prevail on its claim against Defendant Walczak, the Commission must prove that he made a misrepresentation or omission that was material.  *CFTC v. Heffernan*, 245 F. Supp. 2d 1276, 1292 (S.D. Ga. 2003). The Commission need not prove that Defendant acted with *scienter* to prove a violation of Section 4*o*(1)(B).  *Messer v. E.F. Hutton & Co.*, 847 F.2d 673, 677 (11th Cir. 1988); *Heffernan*, 245 F. Supp. 2d at 1292; *see also CFTC v. Wilson*, 19 F. Supp. 3d 352, 363 (D. Mass. 2014),

*aff'd sub nom. CFTC v. JBW Cap.*, 812 F.3d 98 (1st Cir. 2016) ("[S]ection [4]*o*(1)(B) . . . has no scienter requirement."); *CFTC v. Savage*, 611 F.2d 270, 285 (9th Cir. 1979) ("If the [CPO] intended to do what was done and its consequence is to defraud the client or prospective client that is enough to constitute a violation of section 4*O*(1) [*sic*].").  Thus, Section 4*o*(1)(B) is concerned with whether Defendant's conduct "had the *effect* of a fraud upon a customer or potential customer."  *Heffernan*, 245 F. Supp. 2d at 1290.

    B.    <u>Application to Undisputed Fact</u>

        *1.    Walczak's Specific Representations Regarding Risk Management*

From at least late 2014 through early 2017, Walczak regularly spoke at length about the Fund on conference calls with investment advisors.  (Stmt. of Fact ¶ 53.)  These conference calls were referred to as "Open House" calls.  (*Id.* ¶ 54.)  On these Open House calls, Walczak discussed how he managed risk.  (*See infra.*)

From late 2014 through 2016, Walczak repeatedly told investment advisors on these calls that he used sophisticated options software—OptionVue—to manage the risk in the Fund.  (Stmt. of Fact ¶ 55.)  Walczak said that he used the software on a daily basis to "stress test" the Fund against a variety of market movements.  (*Id.* ¶ 55–57.)  Walczak said that these stress tests were "the one predictive thing we do."  (*Id.* ¶ 58.)  They were designed to predict "how the portfolio is going to behave as the market moves back and forth in price."  (*Id.* ¶ 59.)

As shown by the excerpts below, on the Open House calls, Walczak gave investment advisors the clear impression that, every day, he stress-tested the Fund to, among other things, understand how the Fund's value would change if the price of the S&P 500 Futures increased up

to 10%.[3]  Moreover, he stated that if any of his stress tests predicted that the Fund would lose

over 8% of its value, he would remove that risk before it materialized.  (*E.g.*, *id.* ¶ 61.)

For example, on November 4, 2014, when asked about his risk management process,

Walczak explained how he used OptionVue to predict the impact of various market movements

on the portfolio, and that if the impact of any of those market movements was a greater-than-8%

loss to the Fund, he would hedge "to bring it back in line":

> I use risk management to control losses to roughly 8 percent.
> That's the number I use in stress testing. . . .
>
> I have very sophisticated options pricing models.  I plug the
> portfolio into these models each day.  I stress the portfolio
> for a series of price movements up to 10 percent.  I stress the
> portfolio for volatility movements. . . .  I stress it for price
> movement, and then I look over five different time
> frames. . . .  I'll vary those time frames to match up to
> different times [that are] important [to] options, expiration
> for part of the portfolio, for example.
>
> *So I . . . identify what's the impact on the portfolio value at
> these stress points.  And if the impact is greater than my 8
> percent limit, then I'll go in and I'll hedge the portfolio to
> bring it back in line.*

(*Id.* ¶¶ 62–63 (emphasis added).)

On September 15, 2015, Walczak noted that he ran his stress tests every day and *when*

they showed that a rise in the S&P of up to 10% would cause a greater-than-8% loss to the Fund,

he brought it back in line within his 8% drawdown limit:

> What we do with the fund on a daily basis is . . . we stress,
> we aggregate all those [positions] in the models we use to
> predict what will happen to the portfolio value under
> different scenarios.  And the specific scenarios we stress the
> portfolio value against are +5%, +10% price movement in
> the S&P [among other scenarios] . . . looking for portfolio
> values that will exceed our 8% drawdown limit. And when
> we find that that happens, then we go in and make position

---

[3] Walczak also stated as much over email.  (Stmt. of Fact ¶ 77.)

adjustments to bring that potential drawdown back into line with our 8% guideline, which is what we try to hold a drawdown to.

(*Id.* ¶ 64.)

A few weeks later, on October 13, 2015, when asked what he was doing from a "risk management perspective," (*id.* ¶ 66), Walczak stated that it was his policy to "implement" adjustments to "remove" risk of a greater-than-8% loss:

> [O]n a daily basis . . . the portfolio in aggregate is plugged into our options modeling software and we'll stress price moves of plus 5 and plus 10 percent on the S&P and minus 5, minus 10 and minus 15% on the S&P.
>
> We'll . . . have snapshots of the portfolio value at those P&L . . . at those stress points. . . .
>
> We look at that across five different timeframes and what *we're looking for is a drawdown of greater than 8 percent in the portfolio value. If we find that at any one of those price and volatility stress points*, we'll identify whether . . . for example, it's price or volatility, which are the two major impacts[ o]n the portfolio[. *W]e'll identify what is causing that potential 8 percent drawdown*, or greater than 8, . . . that's our line in the sand, so to speak.
>
> . . . [*W]e'll model the most effective alternative to remove that risk excursion and then we'll implement that position on the portfolio.*
>
> So, that's what we do internally to manage the portfolio. We've done that basically since I've run the Fund. So, over its entire life.

(*Id.* ¶ 67 (emphasis added).)

Again, on March 1, 2016, Walczak assured investment advisors that when his stress tests showed a condition that might cause a greater-than-8% drawdown he would make an adjustment so that such a condition would "no longer" cause such a drawdown:

> We stress the portfolio across a number of different dimensions. We look for where, what conditions might cause a greater than 8 percent draw down. . . . [*W]e'll model*

11

> *adjustments; we'll choose the most economical and effective*
> *adjustment to bring us back in bounds so that we can no*
> *longer find a stress point that will result in greater than an*
> *8 percent draw down.*

(*Id.* ¶ 69 (emphasis added).)

A few months later, on June 7, 2016, Walczak emphasized the pre-emptive nature of his

process—that he acted to make the risk "go away" before it materialized:

> [W]hen we find an out-of-bounds situation, so to speak, we
> then jump right back in . . . until that risk goes away. . . .
>
> We try to be a couple of chess moves ahead of that part of
> the portfolio management because we modeled that
> scenario a week ago, and we already took steps so that if
> the market is down 5 percent tomorrow that was part of our
> model from a week ago, and either it didn't cause us a
> problem in the model, so we're fine, or it did cause us a
> problem, and it's already fixed before it happens.

(*Id.* ¶¶ 70–71.)

On September 13, 2016, Walczak touted the effectiveness of his process:

> [A]s we look ahead and stress the portfolio and we identify
> a condition that is out of bounds, we will hedge that right
> now.
>
> . . . [W]e're never in a situation where we have sort of a hard
> stop loss, and we're just sitting waiting for that[ 8] percent
> to get triggered and then we get out because we're constantly
> hedging.
>
> That's the first thing we do every day is to identify risks and
> tune up our hedges if they're not sufficient.
>
> And that allows us to avoid that hard stop and still maintain
> our drawdown discipline.

(*Id.* ¶¶ 72–74; *see also generally id.* ¶¶ 61–75.)

On all of these occasions, Walczak communicated an unequivocal "if-then" relationship

between what he saw in OptionVue and his risk-mitigating trades. He said "I'll"—*I will*—or

"*we will*" or "*we go in*" to hedge. He did not say "we might" or "I might" or indicate that any

other factors went into his decision to mitigate risk other than what the OptionVue stress test showed him. To the contrary, Walczak stated that "no discretion [was] allowed." (*Id.* ¶¶ 78.) Indeed, each of these statements represented to investment advisors that if and when any one of Walczak's stress tests showed an expected drawdown of greater than 8%, he would remove that risk before it materialized. (*See e.g.*, *id.* ¶ 71 (Exhibit ("Ex.") 18[4] (Transcript, June 7, 2016 Open House Call), at 19:10–23:24 ("[I]t's already fixed before it happened.")).)

        2.    *Walczak's Specific Representations Regarding Risk Management Were False or Misleading*

        a.  *Walczak's Admissions About His Actual Risk Management Practices*

Walczak's representations that he took the aforementioned steps to avoid losses greater than 8% of the Fund's value were not true. This is undisputed.

Indeed, to find that these representations were, at a minimum, misleading, the Court need look no further than Walczak's own admissions. During the Commission's investigation, Walczak testified that he did not, in fact, manage specifically to an 8% drawdown threshold. (*See, e.g.*, *id.* ¶ 80 (Ex. 1 (Investigative Testimony of Edward Walczak, October 27, 2017), at 174:8–9 ("I'm not managing the portfolio to say, you know, X gain or loss.")); *id.* ¶ 79 (Ex. 3 (Investigative Testimony of Edward Walczak, April 4, 2018), at 680:6–10 ("I don't manage specifically to an eight-percent drawdown threshold. So I am not considering whether we're going to cross that threshold or not because, again, it's not something I'm managing to specifically.")).)

---

[4] All numbered exhibits are attached to the Declaration of Samuel Wasserman Pursuant to 28 U.S.C. § 1746 in Support of Plaintiff's Motion for Summary Judgment, filed simultaneously with the Commission's Motion for Summary Judgment, this memorandum in support thereof, and the Commission's Proposed Findings of Fact.

In litigation, Walczak has changed his story slightly, but it is no less inculpatory. Walczak now maintains that if he ran a stress test in OptionVue, and that stress test predicted that a particular increase in the S&P would cause a greater-than-8% loss to the Fund, it was his practice to assess the *likelihood* of that particular increase in the S&P before deciding whether to reduce risk. (*See id.* ¶ 82 (Ex. 4 (Deposition of Edward Walczak in *SEC v. Walczak*, July 27, 2021 ("Walczak SEC Dep.")), at 88:12–13 ("I had to choose whether or not those scenarios were likely enough to take action.")); *id.* (Ex. 4 (Walczak SEC Dep.), at 130:2–3 ("And then I evaluate whether that's a likely enough scenario to take some action.")).) If he thought that the market scenario causing the greater-than-8% loss was unlikely, he would *not* hedge against it. (*Id.* ¶ 83 (Ex. 4 (Walczak SEC Dep.), at 155:22–25 ("[I]f I see a scenario that I believe to be likely enough to take action, that shows an 8-percent drop down, I'll go in and do any number of hedging procedures . . . ."); *id.* (Ex. 4 (Walczak SEC Dep.), at 157:19–20 ("[O]r I'll identify that the scenario is unlikely and I won't do anything.")).) Walczak maintains that he had the discretion not to remove the risk of the greater-than-8% loss if he did not deem it appropriate. (*See id.* ¶ 81 (Docket Entry ("Dkt.") 25 (Deposition of Edward Walczak, May 18, 2021), at 191:15–19 ("Q: [E]ven if one of your OptionVue stress tests showed a greater th[a]n 8% drawdown, you felt you had the discretion not to remove that risk, right? A: Correct.")).)

This was not what Walczak told investors from 2014 through 2016. When Walczak described his risk management process on Open House calls, the steps he articulated were clear and unequivocal; and he failed to disclose that he would not reduce risk at all if he decided that the stress-tested circumstance was, in his estimation, unlikely. (*See supra* Section III.B.1.)

> b. *Objective Data Corroborates Walczak's Admissions that He Did Not Manage Risk as He Represented*

Though Walczak's own admissions are enough to belie his representations to investment advisors, analysis of Walczak's trading records and the Fund's options positions corroborates the fact that he failed to manage risk in the way he said he would. Specifically, Plaintiff's expert analysis shows that Walczak positioned the portfolio such that 5% and 10% increases in the price of the S&P Futures would have frequently caused greater-than-8% losses to the Fund, and Walczak carried that risk for extended periods without mitigating it. Even more modest increases in the price of the S&P Futures—such as a rise of 2.5%—would have often (and eventually did) cause losses in excess of the 8% threshold. (Stmt. of Fact ¶ 90.) Yet, Walczak continually failed to reduce risk under such circumstances. (*Id.* ¶ 92.)

The Commission's expert, Stuart McCrary, re-created the model that OptionVue used to project the impact on an options portfolio of a change in the price of the S&P Futures. (Stmt. of Fact ¶ 87.)[5] Mr. McCrary then used the model to stress test the Fund's precise holdings on each day throughout the period September 2013 to February 2017. (*Id.* ¶ 88.) He simulated increases in the price of the S&P Futures contract of 2.5%, 5%, and 10% for each day during that period. (*Id.*)[6] He ran these simulations assuming the rises in the S&P Futures contract took place over zero days (immediately), seven days, and fourteen days. (*Id.* ¶ 89.)

---

[5] There are no contemporaneous records of any of Walczak's OptionVue stress tests prior to March 2017. (Stmt. of Fact ¶ 86.)

[6] To corroborate the results of his model, Mr. McCrary ran simulations in OptionVue on a sampling of dates. These simulations showed that OptionVue's results were substantially similar to the results produced by Mr. McCrary's own analysis—if anything, his analysis was more conservative. (*Id.* ¶ 91.) His analysis is therefore an appropriate and close approximation of the stress test results that Walczak would have seen in OptionVue, if he were using it as he told investment advisors he was.

Mr. McCrary's undisputed conclusion is that stressing the portfolio against a 10% increase in the S&P Futures would have predicted a greater-than-8% loss on 85% of trading days from September 2013 through February 2017. (*Id.* ¶ 93.) Such a stress test would have shown a greater-than 8% loss on *every* trading day from March 1, 2016, to February 1, 2017, and would have showed a *greater than 60% loss* on *all but three* trading days from June 1, 2016 to August 1, 2016. (*Id.* ¶¶ 94–95.) The stress test would have shown this same result—a greater than 60% loss on all but three trading days from June 1, 2016, to August 1, 2016—*even if* the stress test were to assume that the 10% market rise occurred over the course of two weeks. (*Id.* ¶ 96.)

In light of this analysis, and consistent with his own sworn testimony, Walczak simply could not have been doing what he told investment advisors he was doing: reducing the risk in the Fund when a 10% stress test showed the risk of a greater than 8% drawdown in Fund value.

Mr. McCrary's analysis also shows that Walczak's statements about his risk management procedures were false or misleading, even as they related to more modest stress tests, such as 2.5% or 5% increases in the S&P Futures contract. For example, at the end of the day on October 31, 2014, if Walczak had run a stress test simulating a 5% increase in the price of the S&P Futures contracts, his OptionVue software would have predicted a roughly 33% drop in the value of the portfolio. (*Id.* ¶ 97.) Even a stress test simulating a 2.5% increase in the S&P Futures contract would have resulted in approximately an 11% loss in value. (*Id.* ¶ 98.) Yet, the following trading day, November 3, 2014, Walczak did not trade at all, let alone in a manner that would have decreased the risk in his portfolio. (*Id.* ¶ 99.)

Although Walczak executed some trades over the following weeks, those trades did not come close to reducing risk below the 8% threshold he touted to investment advisors. According to Mr. McCrary's analysis, on each day from November 5, 2014, through November 20, 2014,

the Fund was poised to lose at least 30% of its value if the market were to rise 5%, and at least 10% of its value if the market were to rise a more modest 2.5%. (*Id.* ¶ 100.) Furthermore, even if Walczak's stress tests assumed the 5% increase in the S&P Futures occurred over either seven or fourteen days, the stress tests still would have shown a breach of the 8% loss threshold on each day from October 31, 2014, to November 28, 2014. (*Id.* ¶ 101.)

In short, although Walczak said on November 4, 2014, among many other times, that if the impact of his stress tests on the portfolio value was "greater than his 8 percent limit, he would go in and hedge the portfolio to bring it back in line" (*id.* ¶ 63), Walczak's actual trading record in November 2014 shows that he did nothing of the sort (*id.* ¶¶ 99–101).

June through August of 2016 is another example of an extended period where the evidence is undisputed that Walczak did not manage the Fund's risk as he told investment advisors he would. On each day from June 1 to June 23, 2016, a stress test would have shown that a 5% increase in the S&P Futures contract would have caused the Fund to lose well over 10% of its value. (*Id.* ¶ 102.) Stress tests assuming that such a 5% increase occurred over the course of a week would also have shown Fund losses in excess of 10% on each of those days. (*Id.*)

Yet, during this period, Walczak's trading often *increased* the risk of loss to the Fund. (*Id.* ¶ 103.) Indeed, on each day from June 1 to June 8, 2016, Walczak's trades increased the Fund's exposure to a rising market. (*Id.*) From June 14 through June 30, 2016, Walczak either did not trade, or entered trades that, again, increased the losses the Fund would suffer from an increase in the S&P Futures. (*Id.* ¶ 104.)

This pattern of high-risk, but little or no action continued through the summer of 2016. On most days in July, a 10% increase in the S&P Futures contract would have wiped out the

Fund completely. (*Id.* ¶ 105.) Even much more modest increases would have caused significant

drawdowns. For example, from July 12 through July 29, 2016, stress tests simulating a mere

2.5% increase in the S&P would have predicted losses ranging from approximately 16% to 22%.

(*Id.* ¶ 106.)

On some days in this period, Walczak's trades increased risk; on other days, his trades

reduced risk, but not meaningfully. (*Id.* ¶ 107.) On July 15—after a day on which a 2.5% rise in

the S&P would have yielded losses to the Fund of *over 20%* (*id.* ¶ 109)—Walczak did not trade

at all (*id.* ¶ 110), and was particularly fortunate that the S&P did not rise and that such large

losses did not materialize. Indeed, Walczak's assistant portfolio manager conceded that "[w]e

got lucky today with a down market." (*Id.* ¶ 108.)

The following week, Walczak's trading on July 18 through 20, 2016, added risk to the

Fund. (*Id.* ¶ 107.) That Friday, July 22, 2016, one of the Fund's Futures Commission Merchants

asked Walczak how the Fund's value would be affected by an increase in the S&P Futures

contract of 10%. (*Id.* ¶ 111.) Walczak responded the following Monday that a stress test he ran

on the Fund's options expiring that past Friday (only a portion of the portfolio) had shown an

expected loss of $1.22 billion. (*Id.*) At the time, a loss of $1.22 billion would have been

approximately 35% of the Fund's assets under management. (*Id.* ¶ 112.) Walczak knew from

OptionVue that the Fund faced the risk of massive loss from an increase in the S&P Futures

contract and he did not come close to engaging in the risk management steps that he told

investment advisors on Open House calls he would take.

Through January and February 2017, Walczak continued to carry such high levels of

exposure. (*Id.* ¶¶ 113–15.) Although Walczak told investment advisors on Open House Calls

that he ran stress tests of increases in the S&P Futures price of up to 10%, running such a 10%

stress test in January 2017 would have showed on *every single day* the Fund losing far greater than 8% of its value, even assuming that 10% S&P increase occurred over seven or fourteen days.  (*Id.* ¶ 113.)  On each day of January 2017, a stress test simulating a mere 2.5% rise in the S&P over seven days would have predicted a greater-than-8% loss to the Fund.  (*Id.* ¶ 114.)  Yet, there was not a single day from January 3 through January 25th on which Walczak's trades reduced risk.  (*Id.* ¶ 115.)

*      *      *      *

The evidence is plain that Walczak was not managing risk as he represented, but rather betting that the price of the S&P would not rise too high, too quickly.  On each day from February 1 through February 8, 2017, stress tests would have shown the portfolio losing over 11% as a result of any S&P price increase over 2.5%.  (*Id.* ¶ 116.)  Even Catalyst's internal analysis of the Fund's "delta"—a measurement of an options portfolio that represents the expected change in the portfolio's value given a one percent move in the underlying asset, i.e., the S&P Futures contract—was showing similar levels of risk.  (*See id.* ¶ 118.)  Yet, *Walczak did not execute a single trade from February 1st to February 8th.*  (*Id.* ¶ 119.)  He did not execute a single trade during this period, despite, for example, stress tests that would have shown a mere 2.5% rise in the S&P on February 6th causing a 14% loss to the Fund, even assuming that 2.5% increase occurred over 7 days.  (*Id.* ¶ 117.)  According to Walczak's testimony, he must have determined that such an increase in the S&P was unlikely and decided not to reduce risk.  (*Id.* ¶¶ 82–83.)  He had not disclosed to his investors, however, that it was his practice to manage risk by instinct.  To the contrary, this was the precise situation in which he had assured investment advisors he would act to reduce risk—that he would "hedge that right now."  (*Id.* ¶ 73.)

The S&P rose approximately 3% over the rest of the month, and the Fund plunged over 17% from February 9th to February 28th, amounting to approximately $680 million in losses to investors. (*Id.* ¶¶ 120–21.) Walczak gambled with others' money and he lost.

### 3. *Materiality*

Walczak's misrepresentations about how he managed risk were material as a matter of law. "Misrepresentations and omissions are material as a matter of law if they are 'so obviously important to an investor, that reasonable minds cannot differ on the question of materiality.'" *SEC v. Sentinel Mgmt. Grp. et al.*, No. 07-4684, 2012 WL 1079961, at *5 (N.D. Ill. Mar. 30, 2012) (quoting *TFC Indus. v. Northway, Inc.*, 426 U.S. 438, 450 (1976)). Moreover, "misrepresentations concerning profit and risk go to the heart of a customer's investment decision and are therefore material as a matter of law." *CFTC v. Int'l Fin. Servs., Inc.*, 323 F. Supp. 2d 482, 501 (S.D.N.Y. 2004) (quoting *CFTC v. Noble Wealth Data Info. Servs., Inc.*, 90 F. Supp. 2d 676, 686 (D. Md. 2000), *aff'd in part, vacated in part on other grounds sub nom. CFTC v. Baragosh*, 278 F.3d 319 (4th Cir. 2002)); *CFTC v. Marquis Fin. Mgmt. Sys., Inc.*, No. Civ.A. 03–74206, 2005 WL 3752233, at *7 (E.D. Mich. June 8, 2005). *See also Sentinel*, 2012 WL 1079961, at *6 (holding misrepresentation regarding risk associated with investment to be material as a matter of law).

Courts have found misrepresentations similar to Walczak's to be material on summary judgment. *See, e.g.*, *CFTC v. Aurifex Commodities Rsch. Co.*, No. 1:06-CV-166, 2008 WL 299002 (W.D. Mich. Feb. 1, 2008) (finding material defendant's misrepresentations concerning, among other things, profit potential and the lack of risk to prospective participants, and granting summary judgment on a Section 4b, 7 U.S.C. § 6b (2018), charge, which has the same elements as a Section 4*o*(1)(A) charge); *Heffernan*, 245 F. Supp. 2d 1276, 1294–96 (finding material

defendant's misrepresentations concerning the profitability and success rate of a trading strategy, and granting summary judgment on a Section *4o*(1)(A) charge as to those statements); *CFTC v. Driver*, 877 F. Supp. 2d 968, 978–79 (C.D. Cal. 2012), *aff'd*, 585 F. App'x 366 (9th Cir. 2014) (finding material defendant's misrepresentations about the success of his trading strategy, and granting summary judgment on a Section 4*o*(1)(A) charge).

Because there can be no dispute that Walczak's misrepresentations related to the degree of risk investors were taking by investing money in the Fund were material, the CFTC has met this element of the offense.

In sum, the undisputed facts satisfy both elements of a Section 4*o*(1)(B) claim— misrepresentations and materiality of those misrepresentations. Accordingly, summary judgment on this claim is warranted.

## IV. Defendant Walczak Violated Sections 4*o*(1)(A) and 6(c)(1) of the Act and Regulation 180.1(a) by Making Materially Misleading Statements about His Management of the Fund *with Scienter*

### A. Legal Standard for Additional Element of Scienter

Section 4*o*(1)(A) of the Act makes it unlawful for an "associated person of a commodity pool operator, by use of . . . any means or instrumentality of interstate commerce, directly or indirectly—(A) to employ any device, scheme, or artifice to defraud any client or . . . prospective client." 7 U.S.C. § 6*o*(1)(A) (2018). The elements of Section 4*o*(1)(A) are the same as the elements of Section 4*o*(1)(B), but 4*o*(1)(A) also requires proof of *scienter*. *See Commodity Trend Serv., Inc. v. CFTC*, 233 F.3d 981, 993 (7th Cir. 2000) (explaining that Section 4*o*(1)(A) "requires that a CTA act with scienter," as opposed to 4*o*(1)(B), which "focuses upon the effect a CTA's conduct has on its investing customers rather the CTA's culpability, and so does not require a showing of scienter").

Section 6(c)(1) of the Act, makes it unlawful "for any person, directly or indirectly, to use or employ, or attempt to use or employ, in connection with any . . . contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate . . . ."  7 U.S.C. § 9(1) (2018).

Regulation 180.1(a), promulgated pursuant to Section 6(c)(1), makes it "unlawful for any person, directly or indirectly, in connection with any . . . contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly: (1) use or employ or attempt to use or employ, any manipulative device, scheme, or artifice to defraud; (2) make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading; (3) engage, or attempt to engage, in any act practice or course of business, which operates or would operate as a fraud or deceit upon any person."  17 C.F.R. § 180.1(a) (2020).

The elements of a charge under Section 6(c)(1) and Regulation 180.1(a) are coextensive with the elements of a charge under Section 4*o*(1)(A).  All require the same three elements of proof: (1) a misrepresentation that is (2) material, and (3) made with scienter.  *See CFTC v. S. Tr. Metals, Inc.*, 894 F.3d 1313, 1325 (11th Cir. 2018) (discussing the elements of Regulation 180.1); *Commodity Trend Serv., Inc.*, 233 F.3d at 993 (noting the one additional element of scienter for 4*o*(1)(A)); *Driver*, 877 F. Supp. 2d at 978 ("The same intentional or reckless misappropriations, misrepresentations, and omissions of material fact. . . violate section 4*o*(1)(A)–(B) of the Act."); *CFTC v. Emini Experts, LLC*, No. 614CV1766, 2016 WL 7666148, at *4 (M.D. Fla. Mar. 29, 2016), *report and recommendation adopted*, No. 614CV1766, 2016

WL 3098199 (M.D. Fla. June 3, 2016) (evaluating the same elements for Sections 4b, 4o(1)(A), and 6(c)(1) and Regulation 180.1)).

Plaintiff has already shown above that summary judgment against defendant is appropriate with respect to the first two elements. (*See supra* Section III.B.) The only remaining element necessary to establish violations of Section 4o(1)(A) and Section 6(c)(1) and Regulation 180.1 is *scienter.*

Regulation 180.1(a) explicitly provides that "intentional[] or reckless[]" conduct is sufficient for finding a violation. 17 C.F.R. § 180.1(a). Moreover, the Seventh Circuit has held that scienter is satisfied where defendant "either knew that the representations [he] made to investors were false or [was] reckless in disregarding a substantial risk that they were false." *See SEC. v. Lyttle*, 538 F.3d 601, 603 (7th Cir. 2008); *see also CFTC v. Kraft Foods Grp., Inc.*, 153 F. Supp. 3d 996, 1014 (N.D. Ill. 2015) (adopting recklessness as the "scienter requirement supported by long-standing precedent under the commodities and securities laws"). The recklessness standard can be met by conduct showing "an extreme departure from the standards of ordinary care, and that present[s] a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the defendant must have been aware of it." *SEC v. Randy*, 38 F. Supp. 2d 657, 670 (N.D. Ill. 1999) (quoting *Meadows v. SEC*, 119 F.3d 1219, 1226 (5th Cir. 1997)); *see also Kraft*, 153 F. Supp. 3d at 1015 (citing *Sundstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033, 1045 (7th Cir. 1977)).

B.    Application to Undisputed Fact

Walczak had to have known that the representations he made to investment advisors about risk management were false. Indeed, as the Portfolio Manager, Walczak knew everything about the Fund's strategy and risk management. He unilaterally controlled the risk management of the Fund. (Stmt. of Fact ¶ 26.) At all relevant times, he unilaterally controlled which trades

the Fund would make and when. (*Id.*) Under the circumstances, he must have known that what he was *doing* to manage the Fund's risk differed from what he was *telling* clients he was doing to manage the Fund's risk. *See Lyttle*, 538 F.3d at 603 ("When the facts known to a person place him on notice of a risk [of misleading investors], he cannot ignore the facts and plead ignorance of the risk."). Walczak's knowledge is sufficient to establish scienter under *Lyttle. See id.*; *see also Noble Wealth*, 90 F. Supp. 2d at 686 (finding scienter on summary judgment where the defendants knew the falsity of their statements regarding, among other things, profit and risk); *Driver*, 877 F. Supp. 2d at 978 (finding scienter on summary judgment because defendant sent false account statements despite "at most kn[owing] those statements were false, or at the very least recklessly distribut[ing] those statements without regard for the truth of the statements").

Moreover, Walczak acted with reckless disregard for the fact that his statements would mislead investment advisors. Indeed, Walczak knew that the investment advisors on the Open House calls cared about his risk management process—they repeatedly asked him questions about it. (*See, e.g.*, *Stmt*. of Facts ¶¶ 66, 70.) He must have known that by omitting the fact that he played the odds and left risk management to chance, he was downplaying to investment advisors their risk of loss. Under such circumstances, a finding of scienter at the summary judgment stage is appropriate. *See CFTC v. R.J. O'Brien*, 310 F.3d 1321, 1330 (11th Cir. 2002) (finding scienter as a matter of law where Defendant, "a federally registered professional," like Walczak, "downplay[ed] risk of loss"); *Heffernan*, 245 F. Supp. 2d at 1293–96 (finding scienter on summary judgment when the defendant "severe[ly] depart[ed] from the ordinary standard of care" by making multiple misrepresentations, including by "represent[ing] that he risks his own capital using his trading system when he knows otherwise," and by omitting "obvious" information that defendant "must have known" regarding the accuracy of his trading strategy);

24

*cf. Fresno Cty. Employees' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 552–53 (S.D.N.Y. 2017) (finding a strong inference of scienter on a PSLRA motion to dismiss where the defendant spoke "extensively" on a topic that he knew was "a subject about which investors and analysts often inquired").

Significantly, Walczak does not claim that his misrepresentations were made by mistake. To the contrary, he testified that he was *not obligated* to inform investment advisors that he exercised discretion and that he assessed probabilities rather than take the objective, concrete steps he told them he would take in response to his OptionVue stress tests.  (Stmt. of Fact ¶ 85.) Where a defendant acted with broader discretion than that which he communicated to investors, a finding of scienter on summary judgment is appropriate.  *See SEC v. Watkins*, 317 F. Supp. 3d 1244, 1256–57 (N.D. Ga. 2018) (finding scienter on summary judgment and rejecting defendant's argument that he had "leeway" to use investors' money for purposes beyond the purposes conveyed to investors, and further noting that "[a]n investor is entitled to accurate information to consider in making his investment decision").

In sum, no reasonable fact finder could conclude that Walczak did not knowingly or recklessly misrepresent his risk management processes to investors.  Walczak either intended to lie, or did not care that he was lying.  Accordingly, the Court should find that Walczak undisputedly acted with scienter, and grant summary judgment for the Commission on Sections 4*o*(1)(A) and 6(c)(1) and Regulation 180.1.

## **CONCLUSION**

For the foregoing reasons, the Commission respectfully requests that the Court grant summary judgment as to Defendant's liability all counts, and allow post-liability briefing to determine the scope of relief to be imposed, including but not limited to entry of a permanent

injunction, imposition of civil monetary penalties, disgorgement, restitution, and such other and further relief as the Court deems appropriate.

Dated:  August 30, 2021            Respectfully submitted,

                                   COMMODITY FUTURES TRADING
                                   COMMISSION

                                   By:   /s/ Samuel Wasserman
                                         Samuel Wasserman
                                         Candice Aloisi
                                         Peter Janowski (admission pending)

                                         Division of Enforcement
                                         140 Broadway, 19th Floor
                                         New York, New York, 10005
                                         (646) 746-9700

                                         *Attorneys for Plaintiff*