UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| U.S. COMMODITY FUTURES TRADING COMMISSION, | ) ) ) |
| Plaintiff, | ) No. 20 Civ. 75 |
| v. | ) ECF Case |
| EDWARD S. WALCZAK, | ) ) ) |
| Walczak. | ) ) ) ) |

**DEFENDANT EDWARD S. WALCZAK'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

**PAGE**

I.    INTRODUCTION ........................................................................................................ 1

II.   RELEVANT EVIDENCE .......................................................................................... 1

    A.    Witnesses .......................................................................................................... 1

    B.    Catalyst Recruits Walczak ............................................................................... 2

    C.    The Fund's Strategy ......................................................................................... 3

    D.    Catalyst's Risk Committee and Risk Management ........................................ 4

    E.    The Fund's Risk Disclosures ........................................................................... 5

    F.    House Calls and Context .................................................................................. 6

    G.    Option Vue Graphs and Stress Tests .............................................................. 9

    H.    Fund Drawdowns, Risk Management and Trading ........................................ 10

III.  ARGUMENT .............................................................................................................. 11

    A.    Standard on Summary Judgment ..................................................................... 11

    B.    Genuine Issues of Fact as to Elements of Plaintiff's Claims ......................... 12

        i.    There remains an issue of fact as to whether Walczak made a
            misrepresentation (he did not) ................................................................. 12

        ii.   Their remain issues of fact as to materiality .......................................... 16

        iii.  Their remain issues of fact as to scienter ................................................ 18

    C.    Plaintiff Does Not and Cannot Establish Other Necessary Elements ........... 21

        i.    Plaintiff Cannot Meet the Standard for Non-Scienter Fraud in Count II ... 21

        ii.   Plaintiff Has Proved No Evidence to Establish the Required
            "in connection with" element necessary to succeed on Count
            III, Section 6(c)(1) of the CEA ............................................................... 22

    IV.   CONCLUSION ........................................................................................................... 23

## TABLE OF AUTHORITIES

**CASES**                                                                                          **PAGE**

*Anderson v. Liberty Lobby, Inc*.,
477 U.S. 242 (1986)…………………………………………………………..         11

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986) ……………………………………………………....……         11

*CFTC v. Heffernan,*
245 F.Supp.2d 1276 (S.D. Ga. 2003). ………………………………………         11-12, 21-22

*CFTC v. Garcia*, *et al.,*
2021 WL 4295250 (S.D. Tex. Sept. 21, 2021) ……………………………….         22

*CFTC v. Giddens,*
2013 WL 12244536 (N.D. Ga. 2013) ………………………………………..         13

*CFTC v. Kraft Foods Grp. Inc.*
153 F. Supp. 3d 996 (N.D. Ill. 2015) …………………………………………         21

*CFTC v. Reisinger,*
2014 WL 4922432 (N.D. Ill 2014) …………………………………………..         11, 19

*CFTC v. Savage,*
611 F.2d 270 (9th Cir. 1979) …………………………………………………         21

*CFTC v. Wilson*,
19 F. Supp. 3d 352 (D. Mass. 2014)………………..………………………..         22

*Clark v. Coats & Clark, Inc.,*
929 F.2d 604 (11th Cir. 1991) ……………………………………………….         12

*Fitzpatrick v. City of Atlanta,*
2 F.3d 1112 (11th Cir.1993) ………………………………………………….         12

*Four Parcels v. Pate et al.,*
941 F.2d 1428 (11th Cir. 1991) ……………………………………………….         12

*Gebhardt v. ConAgra Foods, Inc.,*
335 F.3d 824 (8th Cir.2003) ………………………………………………….         16

*Laird v. Integrated Resources, Inc.,*
897 F.2d 826, 832 (5th Cir. 1990)…………………………………………….         16

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
475 U.S. 574, 587(1986)……………………………………………………………… 11

*Meadows v. SEC*
119 F.3d 1219 (5th Cir. 1997) …………………………………………………….. 21

*Messer v. E.F. Hutton & Co.,*
847 F.2d 673 (11th Cir. 1988)……………………………………………………… 22

*Omnicare, Inc. v Laborers Dist. Council Const. Industry Pension Fund,*
575 U.S. 175 (2015),…………………………………………………………….. 13

*Parnes v. Gateway 2000, Inc.,*
122 F.3d 539 (8th Cir. 1997) 16

*P.H. Glatfelter Co. v. Voith, Inc.,*
784 F.2d 770 (7th Cir. 1986). …………………………………………………….. 18

*Provenz v. Miller,*
102 F.3d 1478 (9th Cir. 1996). ……………………………………………………… 18

*Searls v. Glasser,*
64 F.3d 1061 (7th Cir.1995) ……………………………………………………… 16

*SEC v. Bauer,*
723 F.3d 758 (7th Cir. 2013) ……………………………………………………… 16

*SEC v. Lytttle*
538 F.3d 601 (7th Cir. 2008) ……………………………………………………… 20

*SEC v. True North Finance Corp.*
909 F.Supp.2d 1073 (D. Minn 2012) ……………………………………………… 13

*SEC v. Randy*
38 F. Supp. 2d 657 (N.D. Ill. 1999)……………………………………………….. 20

*Silverman v. Motorola,*
798 F.Supp.2d 954 (N.D. Ill. 2011)……………………………………………….. 18

*Wehrenberg v. Fed. Signal Corp.,*
2008 WL 2787438 (N.D.Ill. Apr. 29, 2008). ………………………………… 16

**STATUES**

7 U.S.C. § 6o(1)(A) (2018) ……………………………………………………… 12

7 U.S.C. § 6o(1)(B) (2018)…………………………………………………… 12

7 U.S.C. 9(1) (2018)……………………………………………………….. 12, 22

**RULES**

F.R.C.P. 56………………………………………….………………………… 11

Defendant Edward S. Walczak respectfully submits this Memorandum in Opposition to the Plaintiff's Motion for Summary Judgment:

## I.   INTRODUCTION

Unfortunately, an agency of the United States government uses incomplete, out-of-context sound bites to tell a misleading story of an alleged fraud. It tries to prejudice this Court when it describes a portfolio manager's judgment as a "bet," as if the industry it regulates were a gambling industry. At the same time, it falsely portrays the markets and the role of a portfolio manager such that managing a fund is a mechanical, entirely predictable exercise. Worse, it changes or removes words in quotes to help paint its misleading picture. Plaintiff ignores entirely the inability of models to accurately predict an outcome, the undisputed testimony of many witnesses, the roles of those witnesses collectively, and the total mix of information available.

Ultimately, multiple questions of material fact remain as to: (1) whether a misrepresentation or omission occurred; (2) materiality; and (3) scienter, and Plaintiff made no attempt to present evidence on other elements necessary to support its claims. This Court should, therefore, deny Plaintiff's Motion for Summary Judgment.

## II.   RELEVANT EVIDENCE

### A.  Witnesses

The Mutual Fund Series Trust is an open-end investment management company formerly known as Catalyst Funds. It has a series of publicly traded mutual funds, which throughout the period relevant to this case included the Catalyst Hedged Futures Strategy Fund (the "Fund"). Catalyst Capital Advisors LLC ("Catalyst") acted as the advisor to the Fund. Jerry Szilagyi ("Szilagyi") is the President and CEO of Catalyst. (Facts, ¶ 1.) He founded Catalyst in 2006 and launched its first fund that same year. (Facts, ¶ 1.) David Miller ("Miller") is a co-founder of

Catalyst with Szilagyi, portfolio manager, and Chief Investment Officer of Catalyst. (Facts, ¶ 3.) Later George Amrhein ("Amrhein") joined Catalyst as Director of Business Development, and in January 2015 he became the Director of Risk Management and Chief Risk Officer. (Facts, ¶ 4.) Catalyst also employed a Chief Compliance Officer, Robert Glass, at all relevant times. (Facts, ¶ 6.) Finally, Michael Schoonover ("Schoonover") was a portfolio manager and Chief Operating Officer for Catalyst (Facts, ¶ 2), and Larry Milder ("Milder") was President and Chief Executive Officer of Catalyst's distributor and was in charge of all the wholesalers (Facts, ¶ 5).

Edward S. Walczak graduated from Middlebury College in 1977 with a degree in physics and economics. (Facts, ¶ 8.) He obtained a Master's in Business Administration from Harvard University's Graduate School of Business. (Facts, ¶ 8.) He then became a Captain in the United States Army Corps of Engineers and had a career in supply chain management before he began trading professionally. (Facts, ¶ 8.) In 2005, Walczak started Harbor Financial, LLC, a Commodity Trading Advisor and Commodity Pool Operator. (Facts, ¶ 8.) From 2005 to 2013, Walczak was the portfolio manager for the Harbor Assets, LLC (the "Harbor Asset Fund"). (Facts, ¶ 8.)

### B. Catalyst Recruits Walczak

In 2013, through research and screening, Amrhein found Walczak and began recruiting him to bring his Harbor Asset Fund to Catalyst.  (Facts, ¶¶ 9-10.) As part of its due diligence, Catalyst obtained from Walczak the private placement memorandum, marketing materials, and audited financials for Walczak's Harbor Asset Fund. (Facts, ¶ 11.) Catalyst knew and understood the strategy and the risk of the Harbor Asset Fund. (Facts, ¶ 13.) Ultimately, Catalyst offered, and Walczak accepted, an opportunity for Walczak to use his expertise as portfolio manager and focus entirely on investment management, while Catalyst would provide everything else. (Facts,

¶ 12.) In December 2014, Catalyst added Kimberly Rios ("Rios") to assist Walczak with running the Fund, eventually serving as Assistant Portfolio Manager. (Facts, ¶ 7.)

### C. The Strategy

Catalyst and Walczak consistently disclosed the strategy as investing primarily in long and short call and put options on the Standard & Poors 500 Index. (Facts, ¶ 23.) Both also consistently disclosed that the Fund traded options and spreads. (Facts, ¶ 23.) Walczak used several tools to help him make trading decisions on behalf of the Fund (Facts, ¶ 26), but his overall opinion was that, over time, the market would revert to a mean price and volatility (Facts, ¶ 21). Walczak's strategy was not designed to be directional. (Facts, ¶ 25.) He used several technical indicators to help him identify market direction, support and resistance areas, as well as market price momentum, including chart patterns, stochastic analysis, Bollinger bands and relative strength index. (Facts, ¶ 26.) Walczak traded the strategy consistently from when he was portfolio manager of the Harbor Asset Fund through the Fund. (Facts, ¶¶ 17, 18.)

The ongoing strategy of the Fund was to be active and to avoid a situation where a drawdown reached 8%, and when it got there, it became "all hands on deck": instead of one portfolio manager, a whole team of people tried to work out what to do. (Facts, ¶ 84.)

Moreover, the Fund was required to, and did, disclose its holdings in filings with the United States Securities and Exchange Commission ("SEC") when it filed Forms N-CSR and Form N-Q (the Quarterly Schedule of Portfolio Holdings of Registered Managed Investment Companies). (Facts, ¶ 24.)

3

**D.  Catalyst's Risk Committee and Risk Management**

The day-to-day risk management with respect to the Fund resided with the Fund's advisors and other service providers to the Fund. (Facts, ¶ 28.) After bringing on the Fund, Catalyst formalized the Fund's risk metrics and tracked them on a daily basis, with the risk metrics becoming formalized in late 2014. (Facts, ¶ 31.) Coming into 2015 when Amrhein transitioned to Chief Risk Officer, it was his job to be another set of eyes watching over the portfolio manager's adherence to the risk parameters that had been deployed from the early days. (Facts, ¶ 27.) In March 2016, Catalyst automated the production and calculation of the daily risk reports with a firm that specializes in risk management, Model Alpha or Manamu Solutions (Facts, ¶ 34.)

Catalyst also had a risk committee composed of David Miller, Jerry Szilagyi, George Amrhein, Kimberly Rios, and Michael Schoonover. (Facts, ¶ 37.) Amrhein had access to the underlying positions in the Fund, and Amrhein and Jerry Szilagyi enforced compliance with the risk parameters (Facts, ¶ 38 and ¶ 35.) These risk parameters, or "risk metrics," were assigned trigger levels, so that if they reached the indicated level, that served as a signal for the management team to take some action, which could vary depending on the risk metric. (Facts, ¶ 32.) For example, two risk metrics watched for drawdowns of 5% in a week or 8% in a month, and if such drawdown level was hit, it would require the risk committee to get together with the portfolio managers and make a plan regarding adjustments, if any. (Facts, ¶ 33.)

Further, Catalyst had calls with the portfolio managers, meetings of the risk committee, and sometimes included individuals from the introducing broker to manage risk. (Facts, ¶ 36.) Of course, Catalyst disclosed to investors that "although the risk management policies of the advisor and the service provider are designed to be effective . . . there is no guarantee that they will be

effective." (Facts, ¶ 29.) You cannot develop risk parameters to prevent drawdowns; that is a fact of life.

### E.  Risk Disclosures

Catalyst was required to, and did, file annual registration statements, including a prospectus with the United States Securities and Exchange Commission. (Facts, ¶ 24.) Catalyst was also required to provide the prospectus to the investors before or with the delivery of shares. Walczak had no role in drafting the prospectus, other than reviewing the description of the strategy, and he provided to Catalyst his prior private placement memorandum; however, Catalyst opted not to include certain disclosures from the Harbor Asset Fund in the registration statement for the Fund. (Facts, ¶¶ 15-16 and ¶¶ 68-70.)

> The various SEC filings for the Fund over the years disclosed, among other things:
>
> "Futures Risk. . . This risk could cause the Fund to lose more than the principal amount invested."
>
> "Management Risk. The portfolio manager's judgments about the attractiveness, value and potential appreciation of particular securities in which the Fund invests may prove to be incorrect and there is no guarantee that the portfolio manager's judgment will produce the desired result."
>
> "The Funds losses are potentially large in a sold put transaction and potentially unlimited in a sold call transaction."

(Facts, ¶ 72.) The Statement of Additional Information filed with the registration statement further disclosed:

> Successful use by a Fund of options on stock indices will be subject to the ability of the Adviser [Catalyst] to correctly predict movements in the directions of the stock market.

(Facts, ¶ 73.)  Similarly, the November 2016 prospectus disclosed:

> Futures Risk. . . This risk could cause the Fund to lose more than the principal amount invested.

> Management Risk. The portfolio manager's judgments about the attractiveness, value and potential appreciation of particular securities in which the Fund invests may prove to be incorrect and there is no guarantee that the portfolio manager's judgment will produce the desired result; and

> Hedging Risk. There can be no assurance that the Fund's hedging strategy will reduce the risk.

(Facts, ¶ 74.)  And the corresponding Statement of Additional Information from 2016 disclosed:

> Risks of Options on Stock Indexes. . . .[S]uccessful use by a Fund of options on stock indexes is subject to the advisor's [Catalyst's] ability to correctly predict movements in the direction of the stock market generally or of a particular industry or market segment.

(Facts, ¶ 73.)

### F.  House Calls and Context

Catalyst hosted house calls for investment professionals, representatives of registered investment advisors. (Facts, ¶ 56.) These representatives have fiduciary obligations to the clients they represent to conduct due diligence on the investments they recommend. (Facts, ¶ 57.) Further, most if not all, are registered representatives of FINRA member firms and hold licenses in the securities industry. In other words, the people on these calls are not novice investors, but professional investment managers with legal obligations to understand the Fund. (Facts, ¶ 57.) Amrhein would also listen in on some of the house calls. (Facts, ¶ 58.)

On the calls over the years, Walczak would take questions and describe what was happening in the Fund *at that time*. (Facts, ¶¶ 62-63.) The advisors always had an opportunity to ask questions on the calls and could email questions after calls. (Facts, ¶¶ 66, 63-64, 81.) Catalyst shared audio recordings of the calls with investment advisors who wanted to listen as part of their due diligence. (Facts, ¶ 61.) That is the context in which Walczak spoke when he participated in these calls.

Catalyst knew and understood the risk of the strategy was to the upside, a rapid increase in the market, particularly in a low volatility environment. (Facts, ¶ 13.) During the calls, Walczak continually described the primary risk to the Fund as being to the upside, stating, for example:

- But where we take our risk is in extreme upside moves. (Facts, ¶ 86.)

- … we do have risk to the extreme upside movement. (Facts, ¶ 86.)

- If the market goes too high we'll lose money on the calls we sold and that's where the risk in the fund is." (Facts, ¶ 86.)

- "The risk -- the prime risk in the fund is a year like 2013 where the market just goes – not just relentlessly higher because we want to make money if the market goes higher, but if it goes relentlessly higher at an unusual rate -- 2013 was up 30 percent, that's an unusual rate . . . ." (Facts, ¶ 86.)

- "The risk is that it goes up too far.  The positions will make money if the market advances at a moderate rate.  They'll lose money if the market advances at a very rapid rate both in time and in price." (Facts, ¶ 86.)

- "But we also do have some risk that if the S&P ran up to 2250 or 2275 over the next month, we'd have to do some risk management, because we would blow through those profit ranges and be on that side of the equation that -- in which the fund struggles, too far, too fast." (Facts, ¶ 86.)

In addition, and contrary to Plaintiff's argument, Walczak never guaranteed, limited, or placed a threshold at an 8% drawdown.  (Facts, ¶¶ 79, 80, 83, 85.) That was urban legend. (Facts, ¶ 83.)  If there was an 8% drawdown, the Fund became more conservative and strove to limit losses to 8%. (Facts, ¶ 80.) It became all hands on deck when it came close to that level. (Facts, ¶ 79.) In fact, it is clear that advisors understood this based on comments on house calls like "I know you shoot for not going over the 8% drawdown" and you "try to limit the strategy's risk to 8% downside. (Facts, ¶¶ 81-82.)

There are numerous examples of Walczak clearly stating that there is no guarantee (although he should not have needed to do so to professional, sophisticated investment advisors):

7

- "So ideally, you have a fund that if everything is working right -- and I have to stress there are no guarantees." (Facts, ¶ 85.)

- "But that's an important message, is that the fund is behaving exactly how it has behaved in the past.  And there's no guarantee that we'll be successful, obviously, but so far nothing new." (Facts, ¶ 85.)

- "Again, this does not mean there's a hard stop or a guarantee of an 8 percent loss containment."  (Facts, ¶ 85.)

- "There's no guarantees in the world, especially in markets, but that's our goal in everything we do is to keep our drawdown to 8 percent." (Facts, ¶  85.)

- "There's obviously no guarantees in the business." (Facts, ¶ 85.)

- And about the risk management he stated, "That is the thing that sets us apart from many investment vehicles, is that we are very aggressive about risk management.  But there are no guarantees." (Facts, ¶ 85.)

Walczak explained, for example on a November 10, 2015 house call, discussing the Fund

at that time:

> nothing is static in what we do. Both from an entry and adjusting standpoint we're doing that on a daily basis. So, should we see a continuation of the rise that's interrupted for the last couple days, we would at some point -- again, we stress the fund for risk every day. And so, I can't tell you at what point that might be. But as we do our risk stresses, at some point we would come into -- we would make adjustments to try and take some of that risk off the table.

> But if -- from just a static snapshot position today, if we sit and do nothing, then the fund will make good money, up until about 2180ish, and then we'll start to have some upside risk from there; it will start to lose some money.

(Facts, ¶ 91.)

Finally, given the role of a portfolio manager, it goes without saying that the portfolio

manager exercises his judgment and discretion. (Facts, ¶ 87.) That is his job. The prospectus for

the Fund continually disclosed that his judgment may not prove accurate. (Facts, ¶ 72.) Walczak

told advisors on house calls that: "We do some further analytics to determine some price levels.

And then ***discretion*** takes over and we start looking at individual options liquidity and pricing,

and that's kind of the *discretionary* thing in terms of the actual execution.  So that's where *discretion* comes in. The other important *discretionary* piece of what we do is what I described right at the beginning. And "there's a lot of different things we can do. We use some *discretion* about taking off positions, adjusting positions, trying to capture a little bit of that unrealized gain. Still leaving some opportunity on the table if we get another pullback and volatility spike. So other *discretion* comes in around profit-taking and adjusting opportunity." (Facts, ¶ 87.)

### G.  Option Vue Graphs and Stress Tests

There can be no question that Walczak and Rios stress tested the Fund daily. Rios testified unequivocally that she stress tested the portfolio nearly daily. (Facts, ¶ 53.) Walczak similarly testified that he stress tested the portfolio nearly daily. (Facts, ¶¶ 40, 45-47, 51-52.) Rios in fact observed Walczak stress test the Fund and make adjustments to bring the Fund back in bounds to avoid finding a stress point that would result in a greater than 8% loss. (Facts, ¶¶ 52, 54.) Rios observed that, when Walczak looked at an OptionVue graph that showed a 5% increase in the S&P over any timeframe would result in a greater than 8% loss, he would dissect the portfolio to figure out which options were causing the strain and then make a decision on what to do about the portfolio. (Facts, ¶ 54.)

Moreover, there is more to it than looking at an OptionVue graph. (Facts, ¶¶ 109-110, 54.) If an OptionVue graph suggested, all else being equal, that a 5% increase in the market could result in a greater than 8% loss that would require Walczak to immediately hedge and remove that risk. You need time, volatility level, decay, where the market came from, and external events. (Facts, ¶ 54.) The charts assume all else is equal and nothing else happens. (Facts, ¶ 109.) They do not accurately portray risk, but are meaningful to start the conversation and ask, "What does this mean?" (Facts, ¶ 109.) When you compare such OptionVue graphs to

actual realized returns, discrepancies of 25% have been known to occur in some cases. (Facts, ¶ 110.)

### H. Fund Drawdowns, Risk Management and Trading

Walczak successfully managed the Fund to limit drawdowns to 8%. The proof of that is in the fact that the Fund and the Harbor Asset Fund, combined, suffered drawdowns of more than 8% on only three occasions from their inception through February 2017. (Facts, ¶ 92.) That was always public information. (Facts, ¶ 92.) Over the course of 2016, Catalyst, including CEO Szilagyi, and Walczak had a number of discussions regarding risk, and Walczak continued to reduce the Fund's exposure. (Facts, ¶¶ 93, 102, 93.) In July 2016, the Fund suffered a drawdown. Walczak and Szilagyi collaborated on alternatives to reduce risk, and Walczak executed their plan. (Facts, ¶ 101.)

Between the July 2016 drawdown and December 2016, there were more discussions regarding risk that included Amrhein, Miller, Schoonover, Szilagyi and Walczak. (Facts, ¶ 102.) In December 2016, Schoonover began to look at historical S&P 500 up moves and to track the daily risk exposure. (Facts, ¶ 108.) However, there were no breaches of any risk parameters until December 2016. (Facts, ¶ 103.) On December 10, 2016, a team at Catalyst had a call to discuss managing risk, and Szilagyi invited the Fund's primary trader to the call. (Facts, ¶¶ 111, 112.) The decisions from December on were more than just Walczak's decisions. (Facts, ¶ 107.) Nonetheless, on December 10, 2016, the Fund suffered another drawdown.

Of course, Szilagyi, Miller, Amrhein and Schoonover were all aware of the Fund's exposure going into February 2017. (Facts, ¶ 115.) Unfortunately, in February 2017 the Fund suffered a significant, 22% drawdown. (Facts, ¶ 127.) It was still a loss less than other markets suffered. It was a once in 100 years event, and at least one person believes Walczak was heroic in

limiting the losses. (Facts, ¶¶ 125-128.) Further, there is no question that Walczak actively traded the Fund. (Facts, ¶ 118.) However, sometimes doing nothing is the right answer. (Facts, ¶ 52.) That proved true, for example, on February 2, 2017 and February 6, 2017, when the Fund did not trade, but the return for those days was positive. (Facts, ¶ 119.) Walczak did trade in response to risk metric triggers 29 out of the 35 times they arose from July 2016 through February 2017, including 21 out of the 23 of those that did not merely call for Walczak to submit an explanation of the Fund's position to Catalyst. (Facts, ¶ 104.)

Walczak, with the collective decision-making team at Catalyst, did not bet – he did what he did in the past, he monitored his metrics and made his decisions. (Facts, ¶¶ 93-123.) As a reality disclosed in the Fund's prospectus, in February 2017 his decisions did not achieve the desired results. (Facts, ¶¶ 74, 121-128.) That does not make him a fraud.

## III.   ARGUMENT

### A. Standard on Summary Judgment

A genuine factual dispute where a reasonable jury could find for either party precludes summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986); *CFTC v. Reisinger,* 2014 WL 4922432 (N.D. Ill. 2014)*.* Which facts are material depends on the substantive law applicable to the case. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242 (1986)*.* This Court, in ruling on the Plaintiff's motion for summary judgment, must construe all facts and make all reasonable inferences in favor of Walczak. *See CFTC v. Reisinger*, 2014 WL 4922432 (N.D. Ill. 2014).

Plaintiff, as the moving party, has the initial burden of showing the Court, by reference to materials on file, the basis for the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *CFTC v. Heffernan*, 245 F. Supp. 2d 1276 (S.D. Ga. 2003). How to carry this burden depends on who

bears the burden of proof at trial. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). If the movant bears the burden of proof at trial, that party "must show that, on all the essential elements of its case, ... no reasonable jury could find for the nonmoving party." *Four Parcels v. Pate*, 941 F.2d 1428, 1438 (11th Cir. 1991). A mere conclusory statement that the non-movant cannot meet the burden at trial is insufficient. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). Further, because Walczak does not carry the burden of proof, he need only provide evidence that a reasonable jury could find in his favor to defeat summary judgment. *Heffernan*, 477 U.S. at 1289. Walczak easily meets that standard, and summary judgment should be denied.

**B. Genuine Issues of Fact as to Elements of Plaintiff's Claims**

Count I alleges a violation of Section 4o(1)(A) of Commodities Exchange Act ("CEA") (Fraud by an Associated Person of Commodity Pool Operator). Count II alleges a violation of Section 4o(1)(B) (Non-Scienter Fraud by an Associated Person of Commodity Pool Operator), and finally Count III alleges violation of Section 6(c)(1) of the CEA. For the Plaintiff to prevail under any of the alleged sections, Plaintiff must prove that Walczak made a materially false or misleading statement. To prevail upon Count I (Section 4o(1)(A)) and Count III (Section 6(c)(1)), Plaintiff must additionally prove scienter.  To prevail upon Count III, Plaintiff must also prove that Walczak made a false or misleading statement in connection with any contract for the sale of any commodity. The elements of scienter and materiality makes these claims particularly inappropriate for resolution on summary judgment.

Here, Plaintiff cannot prevail because there is at least a question of fact as to each element of each count and this Court, therefore, should deny Plaintiff's Motion for Summary Judgment.

**i.    There remains an issue of fact as to whether Walczak made a misrepresentation (he did not)**

Whether a statement is misleading is based on the perspective of a reasonable investor. The inquiry (like the one into materiality) is objective, *Omnicare, Inc. v Laborers Dist. Council Const. Industry Pension Fund*, 575 U.S. 175, 186-87 (2015), and depends on the "'overall message' and the 'common understanding of the information conveyed.'" *CFTC v. Giddens*, 2013 WL 12244536 (N.D. Georgia 2013). In addition, the statements must be viewed from the perspective of when they were made, not using "fraud by hindsight." *See SEC v. True North Finance Corp.*, 909 F. Supp. 2d 1073, 1101 (D. Minn. 2012).

As an initial matter, Plaintiff fails to clearly identify the representations it alleges are false, making it difficult to ascertain which misrepresentations are the subject to their motion. While Section III.B.2 is titled "Walczak's specific representations . . .," Plaintiff does not actually cite to specific representations. Plaintiff instead takes sound bites from different testimonies and house calls and strings them together to conclude that the Walczak did not manage risk. Indeed, it is difficult to determine if the CFTC is arguing that Walczak did not actually conduct stress testing or that he ignored stress test results.

On one hand, Plaintiff appears to argue that Walczak did not stress test the Fund at all (*see* Plaintiff Statement of Fact asserting that there are no contemporaneous records), while on the other hand, Plaintiff appears to argue that Walczak ignored the findings of the stress tests (*see* Plaintiff's Expert Report). Both arguments ignore the undisputed testimony of Kimberly Rios and of Walczak regarding their near daily stress test (Facts ¶¶ 40, 45-47, 51-53) and Walczak's responses to the tests (Facts ¶¶ 104, 52, 54). Both arguments ignore the risk management responsibility, involvement, and oversight of Catalyst. (Facts ¶¶ 27-29, 31, 33, 34, 36-38.) Both arguments also ignore the undisputed active trading in the Fund. (Facts ¶ 118.) Walczak traded 29 out of 35 times in response to risk metric triggers between July 2016 and February 2017.

(Facts ¶ 104.)  Both arguments also ignore that sometimes making no trades is the right thing to do. (Facts ¶ 52.) Finally, the arguments ignore Rios's testimony that she ran stress tests and that she observed Walczak running OptionVue. (Facts ¶¶ 53, 54.)

Plaintiff hyper-focuses on theoretical OptionVue graphs, and its baseless position that those graphs actually mechanically predict what will happen if price movements occur is also misplaced. OptionVue is a golf club, not the golfer. (Response to Statement of Facts, ¶ 44). Other external factors, and other metrics such as volatility, went into the consideration of what to do and what adjustments to make in response to those graphs. (Facts ¶¶ 41, 51, 54, 87, 98.)  In addition, Plaintiff's argument that stress tests would have shown that the Fund "persistently faced the risk that it would lose 8% or more of its value" and a "stress test of a 10% increase in the S&P 500 Futures contract would have predicted a loss of more than 8% on 85% of trading days in the testing period" supports Walczak's position and undermines Plaintiff's case. It makes the point:  wed to a theoretical test, as Plaintiff insists, the Fund should have lost more than 8% on 85% of the trading days, but in reality, Walczak's trading, and on some days his intentional *lack* of trading, prevented that from occurring. His risk management worked as represented.

Even if this Court accepts as specific Plaintiff's undifferentiated contention that Walczak misrepresented "risk management practices," Plaintiff presents no evidence of a *misrepresentation* of those practices. Plaintiff did not, because it cannot, present evidence that Walczak and Catalyst did not manage the risk as represented. Rather, Plaintiff boldly concludes that because the Fund suffered a drawdown of greater than 8%, Walczak misrepresented his risk management practices. This, of course, falsely assumes that Walczak represented a guarantee of a limit of a drawdown of no greater than 8%.  He did not. Further, it amounts to an impermissible claim of fraud by hindsight.

To even get close to such a representation, Plaintiff ignores the context in which statements in house calls were made and the audience to whom they made, as well as the questions and statements of advisors on those calls. Instead, Plaintiff argues as though Walczak were speaking to clueless retail investors. He was speaking to investment professionals with a fiduciary obligation to read the prospectus and know and understand the Fund before recommending it to clients. Furthermore, during the calls, Walczak discussed and acknowledged drawdowns of greater than 8%, making anyone listening aware of the possibility.  Plaintiff also ignores the myriad disclosures by Catalyst in its prospectus and other documents that the Fund could suffer unlimited losses, more than principal. Plaintiff ignores the public disclosure of the Fund's holdings and ignores the public fact that the Fund had suffered drawdowns of greater than 8% on multiple occasions between its inception and February 2017.

In addition, Plaintiff appears to argue that Walczak omitted that he exercised discretion. That is not only false but also illogical. Portfolio managers use their judgment and exercise discretion. It is their job, and the jury, using its common sense, will no doubt understand that just as the professional advisors on the house calls did.

Finally, Plaintiff presents an expert who will testify that Walczak's trades increased risk. This is again based on mere hindsight and not evidence that Walczak misrepresented his risk management procedures.

Approaching it from the direction Plaintiff did, the fact that the Fund suffered drawdowns of 8% or more only three times in its existence leads to the conclusion that Walczak managed risk as he represented – to try to avoid such a drawdown. Viewing the overall message Walczak sent through his dozens of house calls with professional advisors, and the public, written disclosures, a reasonable jury could conclude that Walczak made no misrepresentation

whatsoever. Consequently, this Court should deny summary judgment on all counts.

Because an issue of fact remains as to whether Walczak made a misstatement, this Court should deny summary judgment as to all counts.

### ii.    There remain issues of fact as to materiality

Information is considered material if there is a substantial likelihood that the fact would have been viewed by a reasonable investor as significantly altering the total mix of information. *See SEC v. Bauer*, 723 F.3d 758, 772 (7th Cir. 2013); *Parnes v. Gateway 2000, Inc*., 122 F.3d 539, 546 (8th Cir. 1997) (describing immaterial misrepresentations to include matters of common knowledge that a reasonable investor can be presumed to understand, that present or conceal such insignificant data that simply would not matter to a reasonable investor, or that were so vague and hyperbolic that no reasonable investor would rely upon them). The scope of this standard is determined by the relative status and sophistication of the parties. *Laird v. Integrated Resources, Inc*., 897 F.2d 826, 832 (5th Cir. 1990). The determination requires delicate assessments of inferences a reasonable investor would draw and the significance of those inferences to him, and those assessments are peculiarly for the jury. *Id*. Summary judgment is appropriate on the issue of materiality only if the information in question is "'so obviously important or so obviously unimportant to an investor [ ] that reasonable minds cannot differ on the questions.'" *See Wehrenberg v. Fed. Signal Corp.*, No. 06–CV–487, 2008 WL 2787438, at \*6 (N.D. Ill. Apr. 29, 2008)*.* It is a highly fact dependent analysis, and it is ordinarily, as is the case here, a question for the jury. *See Searls v. Glasser*, 64 F.3d 1061, 1065–66 (7th Cir.1995); *see also Gebhardt v. ConAgra Foods, Inc*., 335 F.3d 824, 829 (8th Cir. 2003).

Plaintiff's entire argument regarding materiality is that because Walczak's misrepresentations related to the degree of risk investors were taking by investing money in the

Fund, they were material. (CFTC Brief p. 21.) Plaintiff cites no direct or opinion evidence of the alleged misrepresentation's significance to a reasonable investor. Plaintiff ignores the fact that the alleged misrepresentations revolve around general descriptions of risk management guidelines made to investment professionals, not investors. Plaintiff also ignores numerous other statements made in Open House Calls and in written documents (including the Fund's registration statements and prospectuses), and the publicly available market information, that constitute the total mix of information.  Plaintiff has not presented to this Court any evidence of representations made to any actual investors, let alone evidence from which it could conclude what inferences an investor might draw from the hundreds of statements made in dozens of house calls as compared to the representations made in the written prospectus.

Here, the total mix of information is vast and consistent with information disclosing the risks of investing in the Fund. Moreover, it is not typical investors to whom Walczak made statements in the Open House Calls. Consequently, this Court should view those statements from the perspective of a reasonable investment advisor. Doing so, and considering the reasonable inferences a trained investment advisor might draw, will lead the Court to conclude, at best, that there is a question of fact as to whether any purported misrepresentation of Walczak's 8% drawdown guideline is material. Catalyst prepared the prospectus and other filings definitively disclosing the potential unlimited loss that has to be considered. Catalyst directed advisors on the Open House Calls to the prospectus. Moreover, while a disclosure in a prospectus would not excuse a clear misrepresentation, here, given that Walczak repeatedly told advisors that there was no guarantee and the fact that advisors were privy to the Fund's holdings and past record of drawdowns beyond 8%, it is unlikely a reasonable investor would have considered the statements materially misleading.

17

Moreover, Walczak did not unilaterally control the risk management of the Fund or unilaterally control which trades the Fund made and when, as the CFTC argues. That is simply not true. Advisors knew that. A simple read of Catalyst's public filings disclosed that. Plaintiff pokes fun at Walczak (CFTC brief p. 12) in arguing that he did not say "might" act, but said "will" act when he identifies out of bounds situations reasonable advisors and reasonable investors understood that he would evaluate the situation and determine the best course of action. It was not a promise to make a trade, nor would it be reasonable to interpret the statement as such – particularly when trading might be the exact wrong thing to do.

Furthermore, the fact that investment advisors stayed invested in the fund even after the February 2017 drawdown cuts against the materiality of any purported misrepresentation relating to the Fund's risk management procedures. The fact that one of the investment advisors Plaintiff alleged was upset with Walczak (for purportedly ignoring the risk parameters and making "inaccurate" statements with respect to the risk management protocols) stayed in the Fund at least through July 2019—well after "Walczak's [purported] risk management failures were exposed," further supports immateriality seeing that neither investment advisor invested differently. (Plaintiff's Complaint, ¶ 11)

### iii.   There remain issues of fact as to scienter

First, scienter generally cannot be determined on summary judgment. *See Silverman v. Motorola*, 798 F. Supp. 2d 954, 968 (N.D. Ill. 2011); *citing P.H. Glatfelter Co. v. Voith, Inc*., 784 F.2d 770, 774 (7th Cir. 1986). Indeed, resolving the issues raised by allegations of fraud is often difficult or impossible to resolve on summary judgment. *See Provenz v. Miller*, 102 F.3d 1478, 1489 (9th Cir. 1996). Second, establishing scienter requires proof that the defendant knew the statement was false or was reckless in disregarding a substantial risk that it was false. *See CFTC*

*v. Reisinger*, 2014 WL 4922432, at *10*.* On summary judgment, the Court cannot weigh evidence. *Id*. If a reasonable jury could conclude that Walczak did not know he misled his audience with descriptions of the risk management procedures, the Court must deny Plaintiff's motion.

Here, Catalyst recruited Walczak with the promise that he could focus on investment strategy, while it provided the rest. Catalyst conducted due diligence, and Walczak provided Catalyst with his previous fund's documents. The day-to-day risk management of the Fund resided with Catalyst. Catalyst had a risk committee, complete access to the Fund's trading and the authority and ability to enter orders for the Fund. Catalyst also created and monitored risk metrics for the Fund that CEO Szilagyi and Chief Risk Officer Amrhein enforced. Catalyst prepared and filed prospectuses with the United States Securities and Exchange Commission. Walczak did not write the prospectus. Of course, Plaintiff ignores the prospectus and ignores the participation and responsibility of Catalyst for risk management. Plaintiff also ignores the involvement and impact of Catalyst on Walczak's state of mind.

Instead, Plaintiff focuses on out-of-context sound bites. It does not, and cannot, point to any specific misrepresentation but relies on a general "misrepresentation of his risk management." If that general description is sufficient (it should not be), Plaintiff's evidence of Walczak's scienter is its argument that Walczak knew his representations to be false because he admitted that he "did not specifically manage to an eight percent draw down threshold;" admitted that he was not "managing to say, X, gain or loss;" and that Walczak ultimately made decisions regarding whether a risk was likely and acted accordingly, rather than mechanically. CFTC brief pp. 13-14. None of these purported "admissions" establish that Walczak knew, or recklessly disregarded a risk that, his statements were false. Walczak's job was discretion. Walczak also

stated on house calls that he used discretion, and he repeatedly warned that there were no guarantees. Through all of this, the prospectus was incorporated into each house call.  The prospectus disclosed a potential unlimited loss. In addition, Walczak testified to how he ran daily stress tests. Amrhein and Miller listed to house calls, and co-portfolio manager Rios participated in the house calls. None ever stopped Walczak or told him that his descriptions were misleading.  In fact, from at least early December 2016, the entire Catalyst team was involved in the decision making at the Fund, yet the Plaintiff asks this Court to determine that it was Walczak, and only Walczak, who knew that the Fund misrepresented its risk procedures. The collective decision making process is further evidence that Walczak did not act with scienter.

No objective data proves Walczak's scienter either. Again, Plaintiff remains stuck on the concept that a stress test actually establishes or proves something will or will not happen. This is just wrong. As Walczak, Schoonover, Rios, Miller and DeLaval establish, OptionVue screens are theoretical guides only. In addition, the OptionVue graphs were not the only information Walczak considered when deciding which trades to make. The same is true for hind-sight arguments that orders increased risk instead of decreasing it. Walczak was talking to professional advisors who he rightly presumed understood that. Further, from December 2016 through February 2017, the decision making was a collective process involving the Catalyst team.  Given the involvement of Catalyst in every aspect, the prospectus and the public disclosure of holdings, along with the context and extent of Walczak's responses to questions on house calls, a reasonable juror could easily conclude that Walczak did not intend his statements to be misleading.

Finally, the cases Plaintiff cites are inapposite. The cases each involve outright theft and wrongdoing: *See, e.g.*, *SEC v. Lyttle* (defendant sold products that did not exist); *SEC v. Randy*

38 F. Supp. 2d 657 (N.D. Ill. 1999) (unregistered broker selling bogus certificates); *CFTC v. Kraft Foods Grp. Inc*., 153 F. Supp. 3d 996 (N.D. Ill. 2015) (market manipulation); *Meadows v. SEC*, 119 F.3d 1219 (5th Cir. 1997) (misappropriation of funds).

Ultimately, a question of fact remains as to scienter, and summary judgment should be denied.

### C.  Plaintiff Does Not and Cannot Establish Other Necessary Elements

#### i.     Plaintiff Cannot Meet the Standard for Non-Scienter Fraud in Count II

First, Plaintiff does not even attempt to establish the necessary element that Walczak's alleged misrepresentation "had the effect of a fraud upon a customer or potential customer." *CFTC v. Heffernan*, 245 F. Supp. 2d 1276, 1290 (S.D. Ga. 2003). Instead it just argues that it need not prove scienter and then apparently concludes, without evidence, that Walczak's action had the effect of fraud on a customer or potential customer. It does not cite to testimony or evidence from a customer or potential customer. For that reason alone, this Court should deny summary judgment as to Count II.  Walczak, on the other hand, presented an email from an advisor that attended an allegedly misleading house call, demonstrating that he understood that Walczak was only "shooting" for keeping drawdowns below 8%. Walczak's statements did not have a fraudulent effect on that advisor, and there is, in fact, no evidence that it had such an effect on anyone.

Moreover, in one of the cases cited by Plaintiff, *CFTC v. Savage*, 611 F.2d 270 (9th Cir. 1979), a court concluded that no reasonable juror could conclude that the placement of undeniably unauthorized trades operated as a fraud or deceit, but rather merely as a breach of contract. *Savage*, 611 F.2d at 679. Here, even assuming Walczak misrepresented the risk management process, there is simply no evidence that doing so operated as fraud or deceit.

The other cases the CFTC cites are egregious, obvious frauds. *See, e.g.*, *Heffernan*, 245 F. Supp. 2d 1276 (advisor lied about using his own trading system and taking positions); *Messer v. E.F. Hutton & Co.*, 847 F.2d 673 (11th Cir. 1988) (unauthorized trading); *CFTC v. Wilson*, 19 F. Supp. 3d (D. Mass. 2014) (lied to investors about the balance of a fund). Outright lies and theft may establish the fraud on a customer or prospective customer with nothing more. Here, however, at best, this Court has been presented with ambiguous and extensive statements regarding risk management procedures. There are no allegations, and no evidence, of outright lies. Moreover, when the Court, and later a jury, considers the audience to whom, and the context in which, Walczak made statements in house calls, it even less likely the statements had a fraudulent effect on a customer or potential customer.

A reasonable jury may conclude that Walczak's statements had no fraudulent effect. Accordingly, Plaintiff is not entitled to judgment as a matter of law as to Count II, and this Court should deny Plaintiff's Motion for Summary Judgment.

### ii. Plaintiff Has Proved No Evidence to Establish the Required "in connection with" element necessary to succeed on Count III, Section 6(c)(1) of the CEA

Representations regarding risk management are in connection with "investors" deciding to invest in the Fund, as the Plaintiff alleges, not in connection with a swap contract. While the "in connection with" requirement is construed broadly (*see, e.g.*, *CFTC v. Garcia*, 2021 WL 4295250 (S.D. Tex. Sept. 21, 2021), Plaintiff completely ignores it. It has provided no evidence, or even argument, as to this element. The shares of the Fund are not such contracts, and Plaintiff has made no attempt, and has presented no evidence, to support the contention that they are. Plaintiff's case is premised on its position that there can be no dispute that Walczak's misrepresentations related to the degree of risk investors were taking ***by investing in the Fund*** . . ." Accordingly, the alleged fraud is in connection with investments in the Fund, not in connection

with a commodity or swap contract. Plaintiff ignores this required element, and, consequently, summary judgment should be denied.

## CONCLUSION

Based on the evidence available to the Court here and construing all facts and inferences in favor of Walczak, there is a genuine dispute. A reasonable jury could, and likely will, find in Walczak's favor. Plaintiff is not entitled to judgment as a matter of law. Accordingly, this Court should deny Plaintiff's motion for summary judgment.

Dated: October 5, 2021                    Respectfully submitted,

By: /s/ James L. Kopecky                  By: /s/ Zachary J. Ziliak
James L. Kopecky (ILBar#6225359)          Zachary J. Ziliak
KOPECKY SCHUMACHER ROSENBURG LLC          ZILIAK LAW LLC
120 N. LaSalle, Street, Suite 2000        141 W. Jackson Blvd., Suite 4048
Chicago, IL 60602                         Chicago, IL 60604
Tel. 312-380-6552                         Tel. 312-462-3350
jkopecky@ksrlaw.com                       zachary@ziliak.com
*Counsel for Defendant*                   docket@ziliak.com
                                          *Counsel for Defendant*

**CERTIFICATE OF SERVICE**

The undersigned, an attorney, hereby certifies that he caused true and correct copies of the foregoing document to be served upon all counsel of record via ECF on October 5, 2021.

/s/ Zachary J. Ziliak