UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| | ) |
| U.S. COMMODITY FUTURES TRADING COMMISSION, | ) ) ) |
| | ) |
| Plaintiff, v. | ) No. 20 Civ. 75 |
| EDWARD S. WALCZAK, | ) |
| | ) ECF Case |
| Defendant. | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |

## DEFENDANT'S RESPONSE TO
## PLAINTIFF'S STATEMENT OF PROPOSED FINDINGS OF FACT

Defendant, Edward S. Walczak, in response to Plaintiff Commodity Futures Trading Commission's ("CFTC" or "Commission") Statement of Proposed Findings of Fact in support of Plaintiff's Motion for Summary Judgment, states as follows.

### RESPONSES

1.      The CFTC is an independent federal regulatory agency that is charged by Congress with the administration and enforcement of the Commodity Exchange Act (the "Act") and the Regulation promulgated thereunder.  (7 U.S.C. §§ 1 et seq., 17 C.F.R. §§ 1–190.)

**RESPONSE:** Undisputed.

2.      Edward Walczak is, and has been throughout the relevant period, a resident of Wisconsin. (*See* Docket Entry ("Dkt.") 14, Defendant's Answer and Affirmative Defenses to Plaintiff's Amended Complaint ("D's Answer") ¶ 15.)

**RESPONSE:** Undisputed.

3.      Edward Walczak served as the Portfolio Manager of the Catalyst Hedged FuturesStrategy Fund (the "Fund") from that mutual fund's inception in September 2013 until approximately January 2020. (*Id.* ¶ 17.)

**RESPONSE:** Disputed. Admit that Edward Walczak served as a portfolio manager. Dispute that he was "the" portfolio manager, as Kimberly Rios also served as portfolio manager from 2015 until January 2020.  CFTC Ex. 2 at 27:18 to 28:11.

4.      Walczak was registered with the CFTC as an Associated Person of Catalyst Capital Advisors LLC ("Catalyst") from August 28, 2013 until January 27, 2020.  (*Id.*)

**RESPONSE:** Undisputed.

5.      Catalyst has been registered with the CFTC as a Commodity Pool Operator sinceAugust 28, 2013.  (*Id.* ¶ 18.)

**RESPONSE:** Undisputed.

6.      From September 2006 to August 2015, Walczak was registered with the CFTC as an Associated Person, and listed as the Principal, of Harbor Financial LLC.  (*Id.* ¶ 17.)

**RESPONSE:** Undisputed.

7.      Harbor Financial was registered as a Commodity Pool Operator from September 2006 to February 2014 and as a Commodity Trading Advisor from September 2006 to August 2015. (*See id.* ¶ 17.)

**RESPONSE:** Undisputed.

8.       The violations alleged in the Complaint are violations of the Commodity Exchange Act and Regulations.

**RESPONSE:** Objection. This is not a fact and not supported in violation of Rule 56.

9.      The CFTC is authorized by Congress to seek relief against any person who

2

appears to have committed a violation of any provision of the Act or any rule, regulation or order thereunder.  (7 U.S.C. § 13a-1(a) (2018).)

**RESPONSE:**  Objection. This is not a fact and not supported in violation of Rule 56.

10.       Defendant Walczak resides in this District.  (D's Answer at ¶ 15.)

**RESPONSE:**  Undisputed.

11.       An S&P 500 Futures contract ("S&P Futures contract") is a financial derivative traded on the Chicago Mercantile Exchange ("CME").  (*See* Ex. 32 (CME Group, S&P 500 Futures—Contract Specs), at 1–2.)

**RESPONSE:**  Undisputed.

12.       The buyer of an S&P Futures contract earns a profit if, on the date of the contract's settlement, the price of the S&P 500 index, as calculated by the CME, is greater than the contract price.  (*See* Dkt. 24, Expert Report of Stuart A. McCrary ("McCrary Report"), at ¶¶ 15–16.)

**RESPONSE:**  Undisputed.

13.       The buyer of an S&P Futures contract loses money if, on the date of the contract'ssettlement, the price of the S&P 500 index, as calculated by the CME, is less than the contract price.  (*Id.*)

**RESPONSE:**  Undisputed.

14.       The buyer of the contract earns (or loses) $250 multiplied by the difference between the settlement price and the contract price.  (*Id.*)

**RESPONSE:**  Undisputed.

15.       Call options on S&P Futures contracts are another financial product, also traded on the CME and tied to the value of the S&P 500 Index. (*See, e.g.*, Ex. 33, (CME Group, S&P

500 Options—Contract Specs), at 1–2.).)

**RESPONSE:** Disputed.  While the value of the S&P 500 Index has a strong impact on the price of S&P Futures contracts, which is in turn one variable that affects the price of call options on S&P Futures contracts, those call options are not directly tied to the S&P 500 Index, and other variables aside from the prices of the S&P 500 Index and S&P Futures contracts can affect the prices of call options on S&P Futures contracts.  *See, e.g.*, CFTC Ex. 32 (describing contract specifications of S&P Futures contracts, with no direct linkage to the current S&P Index level during most of the life of the futures contracts); Ex. 35 (De Laval Report) ¶ 15 (noting dependence of option prices on implied volatility, time to expiration, and risk-free interest rates).

16.     The buyer of a call option on an S&P Futures contract is entitled—but not obligated—to purchase one underlying S&P Futures contract at a predetermined price, called the "strike price."  (*See* Dkt. 24 (McCrary Report), at ¶¶ 17–23.)

**RESPONSE:**  Undisputed.

17.     The seller of a call option on an S&P Futures contract is obligated, upon the buyer's election to exercise the option, to deliver to the purchaser one underlying S&P Futures contract at a predetermined strike price. (*Id.*)

**RESPONSE:** Disputed.  As shown in CFTC Ex. 33, S&P options are listed on the CME and cleared, so that no linkage is retained between an option's initial purchaser and seller.  A seller of a call option on an S&P Futures contract may (if such seller has not yet purchased an offsetting option) come to be obligated, upon the election by the holder of an equivalent option to exercise such option, to deliver one underlying S&P Futures contract at the predetermined strike price, but there is no guarantee that exercise by the initial purchaser will trigger such an obligation in the original seller or that exercise by another holder of an equivalent option will not

4

trigger such an obligation in the original seller.  Nothing in the source material cited by Plaintiff speaks to the contrary.

18.     The buyer pays the seller a premium for the option.  (*Id.*)

**RESPONSE:** Disputed.  As shown in CFTC Ex. 33, S&P options are listed on the CME and cleared, so that while the buyer *pays* the premium and the seller *receives* a premium, the buyer does not actually send the premium directly to the seller.  Nothing in the source material cited by Plaintiff speaks to the contrary, and indeed Paragraphs 22 and 23 of the McCrary Report explicitly discuss what the buyer pays and what the seller received, without ever suggesting that the buyer sends payment to the seller.

19.     Buying an option is referred to as going "long."  (*Id.*)

**RESPONSE:** Disputed.  Buying an instrument can lead to a positive position in the instrument ("long" that one instrument) or reduce a negative position in the instrument (less "short" the instrument).  Furthermore, some options, such as put options, have values that decrease when the price of the underlying product increases, so that being long such an option implies being effectively short the underlying product, and vice versa.  *See, e.g.*, Fischer Black & Myron Scholes, "The Pricing of Options and Corporate Liabilities," 81 Journal of Political Economy 637 (1973) ("Black & Scholes") at 646-67 (defining put options and proposing a formula for their valuation).

20.     Selling an option is referred to as going "short."  (*Id.*)

**RESPONSE:** Disputed.  Selling an instrument can lead to a negative position in the instrument ("short" that one instrument) or reduce a positive position in the instrument (less "long" the instrument).  Furthermore, some options, such as put options, have values that decrease when the price of the underlying product increases, so that being short such an option

implies being effectively long the underlying product, and vice versa. *See, e.g.*, Black & Scholes at 646-67 (defining put options and proposing a formula for their valuation).

21.     A seller of options on S&P Futures is subject to potentially unlimited losses. (*Id.* ¶¶ 22–23; *id.* at 7 ex. 2 (demonstrating that as the price of the S&P Futures moves higher, the losses to the call seller accumulate without limit).

**RESPONSE:** Disputed.  A seller of *call* options on S&P Futures is subject to potentially unlimited losses, but a seller of *put* options on S&P Futures is subject to only limited losses.  The paragraphs and exhibit cited by Plaintiff address only S&P Futures call options, which increase in value as the price of S&P Futures increases.  By contrast, S&P Futures put options increase in value as the price of S&P Futures decreases, and as the price of such futures cannot fall below zero, there is a limit to the potential losses that can result from the sale of put options on S&P Futures.  Nothing in the evidence cited by Plaintiff speaks to the contrary.  *See* Ex. 35 (De Laval Report) ¶ 27 (quoting the Fund's registration statement, which notes that "[t]he Fund's losses are potentially large in a sold put transaction and potentially unlimited in a sold call transaction").

22.     The buyer of a call option can lose, at most the premium it paid for the option in the first place, but can make unlimited gains as the market rises. (*Id.* ¶ 22–23; *id.* at 6 ex 1.)

**RESPONSE:** Undisputed.

23.     A call option whose strike price is below the current price of the underlying S&P Futures contract is referred to as "in the money." (*Id.* ¶ 18.)

**RESPONSE:** Undisputed.

24.     A call option whose strike price is above the current price of the underlying S&P Futures contract is referred to as "out of the money." (*Id.* at 5 n.10.)

**RESPONSE:** Undisputed.

25.     All else being equal, the more "in the money" an option is, the more valuable it is to own.  (*Id.*)

**RESPONSE:** Disputed.  The evidence cited by Plaintiff (Dkt. 24 (McCrary Report) at 5 n.10) does not support this statement but rather merely defines "at-the-money" and "out-of-the-money."  Furthermore, this statement is ill defined, as it is not clear what all else is being held equal.

26.     At all relevant times, Walczak controlled the strategy and made the trading decisions for the Fund. (*See* Ex. 2 (Investigative Testimony of Edward Walczak, April 3, 2018 ("Walczak Apr. 3, 2018 Testimony"), at 264:9–12.)

**RESPONSE:** Disputed. In the testimony cited he does not state that he "controlled" the strategy and trading decisions.  Rather, he states that he was *responsible* for making investment decisions, but not necessarily solely responsible, and there is no discussion of the Fund's "strategy" in the material cited by Plaintiff.  *See* Walczak Apr. 3, 2018 Testimony at 263:23 to 264:15.  Moreover, Jerry Szilagyi was also authorized to trade on behalf of the Fund throughout Walczak's time with Catalyst. Ex. 36 (June 7, 2021 Transcript from *Walczak v. Catalyst Capital Advisors, LLC*, AAA Case No. 01-20-0003-8157) at 149:19 to 150:4 (testimony of Mr. Szilagyi).

27.     Walczak's investment strategy involved entering into call ratio spreads on S&P Futures contracts. (*See* Ex. 1, (Investigative Testimony of Edward Walczak, October 27, 2017 ("Walczak Oct. 2017 Testimony")), at 61:7–20.)

**RESPONSE:** Disputed.  Walczak's investment strategy shifted between different option strategies depending on market conditions and did not always involve call ratio spreads.  *E.g.*, CFTC Ex. 2 at 39:22 to 40:18.

28.     The call ratio spread strategy entailed buying a certain number of call options on

S&P Futures and simultaneously selling two or three times as many call options on S&P Futures with the same expiration as the calls he purchased but at a higher strike price. (*Id.*)

**RESPONSE:** Undisputed.

29.     Walczak tended to enter these call ratio spreads on a cash neutral basis. (*Id.* at 61:20–22.)

**RESPONSE:** Undisputed.

30.     The call ratio spreads Walczak entered had unlimited loss potential. (*See id.* at 254:17–20; *see also* Dkt. 24 (McCrary Report), at ¶ 26–29.)

**RESPONSE:** Undisputed.

31.     Until approximately December 2014, Walczak tended to enter call ratio spreads in which he sold twice as many calls as he purchased (i.e., "1x2" call ratio spreads). (*See* Dkt. 24 (McCrary Report), at 8 ex.3 & app'x 3.)

**RESPONSE:** Disputed. First, as noted above, Defendant sometimes traded puts rather than calls. CFTC Ex. 2 at 39:22 to 40:18. Second, when trading puts, Defendant did not engage in ratio spreads. *Id.* Third, the evidence cited by Plaintiff is limited to the period from September 2013 forward and does not analyze any earlier trades by Defendant. Dkt. 24 (McCrary Report) at 8 ex.3 & app'x 3.

32.     Beginning in approximately December 2014 and continuing through November 2016, Walczak tended to enter call ratio spreads in which he sold *three* times as many calls as he purchased (i.e., "1x3" call ratio spreads). (*Id.*; *see also* Ex. 1 (Walczak Oct. 2017 Testimony), at 61:19.)

**RESPONSE:** Disputed. First, as noted above, Defendant sometimes traded puts rather than calls. CFTC Ex. 2 at 39:22 to 40:18. Second, when trading puts, Defendant did not engage

8

in ratio spreads.  *Id.*

33.     Over time, Walczak not only increased the ratio of the short to long calls, but also the size of the trade. (*See* Dkt. 24 (McCrary Report), at app'x 3 (showing, for example, trade sizes increase from 100 x 200 in the first half of 2014 to 1,000 x 3,000, or more, in later years).)

**RESPONSE:** Disputed.  As shown at Dkt. 24 (McCrary Report) at 8 ex.3, the number of options transactions concluded by the Fund swung repeatedly up and down from September 2013 through February 2017, with three of the lowest trade counts occurring in the final three months. All else equal, fewer trades mean a smaller total position, and thus it cannot be said that the Fund's effective option position consistently increased in size over time.  Second, the final three months in that exhibit show a transition from 1x3 to 1x2 call ratio spreads, which result in smaller option sales, assuming equal option purchase sizes.  Third, McCrary Report app'x 3 shows that the size of the trades was far from monotonically increasing as a function of time.  For instance, page 2 of that appendix shows the size of the long call moving from 100, up to 317, down to 83, up to 200, down to 100, up to 400, down to 100, up to 200, down to 100, and up to 200.  Page 3 of the exhibit shows the size of the long call moving from 200, down to 100, up to 400, down to 100, up to 400, down to 100, up to 300, down to 100, up to 200, down to 100, up to 400, down to 100, and so on.  Similar short-term oscillations can be found on most of the pages of the exhibit.  And the same is true over a longer time horizon, as can be seen by the size of the first long call on each page of that exhibit:  in order, 75, 100, 200, 1500, 1000, 375, 1000, 500, 500, 1000, 1000, and 1000 — again, hardly a consistent rise in size.  Fourth, even to the extent some moderate growth in trade size could be ascertained in the data, Plaintiff overlooks the growth in the Fund's overall size during the period studied.  *See* Ex. 37 (Catalyst_005_87727) (showing growth from $34.1 million in January 2014, to $4.3 **billion** in November 2016, or over

120 times the size of the fund in early 2014). To maintain the same proportional exposure, the Fund would have had to increase the size of its trades by the same percentage that its AUM increased, and the Fund's trade sizes came nowhere close to matching the growth rate of the AUM.

34. All else being equal, as the market rises above the strike price of the short call position, 1x3 call ratio spreads accumulate losses faster than 1x2 call ratio spreads. (*See id.* ¶¶ 27–29; *id.* exs. 4A & 4B.)

**RESPONSE:** Disputed. First, as evidenced by Paragraphs 28 and 29 in the McCrary Report, both 1x2 and 1x3 call ratio spreads can yield profits at expiration even when the market is above the strike price. Dkt. 24 (McCrary Report) ¶ 28 (1x2 call spread with long strike at 2500 and short strike at 2525 yields profits through a market value of 2550, or 25 points above the short strike); *id.* ¶ 29 (1x3 call spread with long strike at 2500 and short strike at 2550 yields profits through a market value of 2575, or 25 points above the short strike). Second, as Defendant typically entered call ratio spreads on a cash-neutral basis (Plaintiff's Proposed Finding of Fact No. 29, above) and the call premium measured at any given time for options that share all parameters aside from strike decreases as strike increases (as the right to buy for $X implies the right to buy for $X+1, so that the lower-strike call has to be at least as valuable as the higher-strike call, plus some value reflecting the chance that the underlying price could end up between the two strike prices at expiration), Defendant would typically use different strikes for a 1x2 call ratio spread than for a 1x3 call ratio spread, so that Plaintiff's comparison is ill defined without specification of how the strikes are changed between the 1x2 and 1x3 spreads. Third, the discussion and exhibits cited by Plaintiff to support this allegation point to valuations *at expiration*, whereas the Fund's call ratio spreads were by definition nearly always *before*

10

expiration.  Fourth, any movement in the underlying market takes some amount of time to transpire, so that it is nonsensical to hold time to expiration constant while contemplating the effect of large moves in the underlying price, such as the graphs cited by Plaintiff do.  Fifth, prior to expiration, the value of a call, and in turn of a call ratio spread, varies not only as a function of the price of the underlying market but also as a function of time to expiration, volatility, and other factors.  *See* Ex. 35 (De Leval Report) ¶ 15 (discussing effect of these variables on option value).  For certain levels of those parameters, the value of a 1x3 call ratio spread tends to increase as time passes if both the underlying market value and forecasts for volatility remain constant, even for values of the underlying market well above the short strike, which implies that if the market rises sufficiently slowly, the value of a 1x3 call ratio spread will tend to *increase* even as the underlying market rises above the short strike with volatility held constant.[1] Moreover, volatility typically does *not* remain constant as the underlying market rises; rather, the market's forecast for volatility tends to *fall* in such circumstances.  *See, e.g.*, CFTC Ex. 18 at 20:23 to 21:6 (description of how increases in price typically coincide with decreases in volatility and decreases in price typically coincide with increases in volatility).  And in some market conditions, the value of a 1x3 call ratio spread can increase as the market's forecast for the volatility of the S&P decreases, even when the S&P is above the short strike, so that once again, if an upward movement in spot is accompanied by a sufficiently large downward movement in volatility, the 1x3 call ratio spread will actually *increase* in value, even with the underlying

---

[1] As McCrary Report Exhibit 4A illustrates, a short call ratio spread has limited upside but unlimited downside.  As time to expiration decreases, the range of likely values for the underlying market at expiration narrows, so that the value of the short call spread averages in less and less of the extreme loss region and thus increases.  This occurred in practice in the Fund, as can be seen by the positive Theta values from January 1 through February 13, 2017, in Ex. 38 (Catalyst_005_0194342) at 30.  There must then exist some sufficiently low speed for increases in price for the increase in value from the passage of time to outweigh the decrease in value coming from that rise in the underlying market.

market above the short strike.[2]

35.     At the end of March 2016, the Fund was net short over 50,000 call option contracts in the July expiry alone, and net short over 80,000 calls over all expiries.  (*See* Ex. 27.)

**RESPONSE:** Undisputed

36.     At the end of June 2016, the Fund was net short over 140,000 call option contractson S&P Futures across all expiries.  (*Id.*)

**RESPONSE:** Undisputed

37.     At the end of November 2016, the Fund was still net short 75,000 call option contracts on S&P Futures.  (*Id.*)

**RESPONSE:** Undisputed

38.     Walczak said he used a software program called OptionVue. (Dkt. 25, Deposition of Edward Walczak, May 18, 2021 ("Walczak Dep."), at 136:8–11.)

**RESPONSE:** Undisputed.

39.     The OptionVue software models options price behavior.  (*Id.* at 136:5–7.)

**RESPONSE:** Undisputed.

40.     OptionVue allows the user to input a portfolio of options and the program can chart how that portfolio would perform given price movements in the underlying asset.  (*Id.* at 163:9–164:1; *see also id.* at 186:20–187:7; Dkt. 24 (McCrary Report), at ¶ 33.)

**RESPONSE:** Disputed.  First, OptionVue has multiple settings that assume different responses by volatility forecasts to posited movements in the price of the underlying asset ("spot").  *See, e.g.*, Ex. 18 at 20:23 to 21:6 (describing one such regime); Dkt. 25 at 165:17-20

---

[2] Decreasing volatility decreases the range of likely outcomes for the underlying market at expiration in the same way that decreasing time to expiration does, so that this result follows by the same logic as described in the previous footnote.

([T]he software contains at least three, I think now maybe four or five different volatility models, some of which are more appropriate to calls, some of which are more appropriate to puts."); CFTC Ex. 4 at 34:21 to 35:5 (discussing OptionVue's ability to model changes in the skew of the distribution of returns). Those different settings yield different forecasts for the value of a portfolio as a whole at proposed spot levels. *See* Dkt. 25 at 163:9-14 (note from Defendant that in order for OptionVue graphs to be meaningful, "you have to select a whole lot of things to make that realistic"); Ex. 39 (OptionVue Help) at 5 (listing four available volatility modes). Second, the graphs cited in the McCrary Report indicate what the value of the portfolio would be according to one model of option valuation, *at the same time*, and with *all parameters other than spot held constant*, if the spot value were presently different than what was actually observed. This is manifestly different from predicting how the portfolio's value will look after some potential movement in spot, when that movement would take time and thus decrease time to expiration, in addition to affecting volatility forecasts in a way that may or may not be accurately predicted by OptionVue. All such graphs are thus limited in value, and while they can provide inputs to further analysis, they cannot be said to forecast the portfolio's actual valuation following various proposed spot moves. *See generally* Ex. 35 (De Leval Report) ¶¶ 16-25 (discussing shortcomings with "spot slides" such as are used in the McCrary Report and OptionVue). Third, at best, OptionVue attempts to forecast prices *given a certain model of option behavior*, and there can be no guarantee that market dynamics will adhere to that model, a point Plaintiff has made no effort to rebut. *See* Ex. 39 at 5 (listing four available volatility modes); Dkt. 24 at 12 n.18 ("I don't have specific knowledge of what formulas OptionVue used."); Black & Scholes at 640 (deriving the classic option valuation model on the assumption of "ideal conditions," including constant and known volatility, no transaction costs to trades in

13

the underlying market, and an unlimited ability to borrow at the risk-free rate, none of which are present in actual markets).

41.     Specifically, Walczak could input the Fund's portfolio of options on S&P Futures contracts and see how the value of the portfolio would change depending on movement in the price of the underlying S&P Futures contract. (Dkt. 25 (Walczak Dep.), at 163:9–164:1; *see also id.* at 186:20–187:7; Dkt. 24 (McCrary Report), at ¶ 33; Ex. 29 (sample image of OptionVue screen)*.*)

**RESPONSE:**  Disputed.  For all the reasons cited in response to Plaintiff's Proposed Finding of Fact No. 40 above, the output of OptionVue would *not* reveal "how the value of the portfolio would change depending on movement in the price of the underlying S&P Futures contract."  OptionVue relies on a model for option behavior that need not be reflected in reality. OptionVue can be set to assume one of several regimes of volatility dynamics in response to spot movements, at most one (and usually zero) of which could be truly reflected in the market at any given time, and Plaintiff and the McCrary Report have made no effort to specify which such regime is the right one to use.  Ex. 39 at 5 (listing four available volatility modes).  OptionVue's spot slide graphs assume no passage of time, when all such moves require some amount of time to transpire.  Dkt. 25 at 163:9-14; Ex. 35 (De Leval Report) ¶¶ 16-25; Dkt. 24 at 12 n.18; Black & Scholes at 640.

42.     OptionVue displays this projection on a graph, with the x-axis showing the simulated price of the S&P 500 Futures contract. (Ex. 29; *see also* Dkt. 26, (Deposition of Kimberly Rios, April 20, 2021 ("Rios Dep.")), at 61:9–12; *see also* Dkt. 24 (McCrary Report), at ¶ 33.)

**RESPONSE:** Disputed.  First, for the reasons cited above, the values presented by

14

OptionVue cannot accurately be termed "projections," as they assume market dynamics that are not present in reality, instantaneous shifts in spot that somehow do not inform the market's view of volatility, and a fixed volatility regime that applies uniformly across all strikes and expirations, among other things.  Second, even looking aside from all of those shortcomings of OptionVue, Plaintiff has not specified which volatility regime a user should choose, and for most settings OptionVue would yield different numbers than whatever Plaintiff is suggesting were the right ones.  Ex. 39 at 5 (listing four available volatility modes); Dkt. 25 at 163:9-14; Ex. 35 (De Leval Report) ¶¶ 16-25; Dkt. 24 at 12 n.18; Black & Scholes at 640.

43.    The y-axis of the OptionVue graph would display either the "value" of the portfolio or the "profit/loss" of the portfolio. (Ex. 29; *see also* Dkt. 26 (Rios Dep.), at 61:1–8; *see also* Dkt. 24 (McCrary Report), at ¶ 33.)

**RESPONSE:** Disputed.  For all the reasons cited in response to Plaintiff's Proposed Findings of Fact Nos. 41 and 42 above, OptionVue's outputs cannot accurately be said to indicate the "value" of a portfolio or the "profit/loss" of a trade.  Dkt. 25 at 163:9-14; Ex. 35 (De Leval Report) ¶¶ 16-25; Dkt. 24 at 12 n.18; Black & Scholes at 640.  Furthermore, as Defendant ordinarily did not record trade entry prices in OptionVue, the tool lacked sufficient information to generate a valid "profit/loss" forecast.  Dkt. 25 at 156:9-11.

44.    Reading the graph from left to right, Walczak could see how OptionVue predicted the portfolio would change in value as the S&P Futures contract price increased.  (Ex. 29; *see also id.* at 163:9–164:1; *see also id.* at 186:20–187:7.)

**RESPONSE:** Disputed.  Option Vue does not predict.  CFTC Ex. 4 at 36:3 to 37:15 ("It's a golf club, not a golfer.").  At most, OptionVue applies a model known to be imperfect to observed market data that is shifted in fashions that cannot occur in actual trading and indicates

what its model suggests for a value of a given portfolio assuming a particular volatility regime that Plaintiff has not specified.  For all the reasons set forth above, the graphs from OptionVue cannot accurately be said to "predict[ how] the portfolio would change in value as the S&P Futures contract price increased."  Dkt. 25 at 163:9-14; Ex. 35 (De Leval Report) ¶¶ 16-25; Dkt. 24 at 12 n.18; Black & Scholes at 640.  Furthermore, Plaintiff's citations to "*id.* at 163:9-164:1" and "*id.* at 186:20-187:7" appear to be references to docket entry 25, and the language at Dkt. 25 at 186:20 to 187:7 does not in any way support Plaintiff's Proposed Finding of Fact No. 44.  Finally, *none* of the three sources cited by Plaintiff here assert that OptionVue did or could "predict[ how] the portfolio would change in value as the S&P Futures contract price increased."

45.     OptionVue can graph multiple lines (or, curves) representing the portfolio's expected value given movement in the S&P Futures contract over various time frames.  (Ex. 29 (showing curves representing simulated S&P price changes over zero days (immediately), 5 days, 9 days, and 14 days, respectively). *See id.* at 144:8–17; *see also* Dkt. 26 (Rios Dep.), at 70:3–15; Ex. 4 (Deposition of Edward Walczak in *SEC v. Walczak*, July 27, 2021 ("Walczak SEC Dep.")), at 105:18–106:10; Dkt. 24 (McCrary Report), ¶ 33.)

**RESPONSE:**  Disputed.  OptionVue can indeed graph multiple lines (or curves) representing different calendar dates, but for all the reasons set forth above, it is inaccurate to suggest that these curves represent "the portfolio's expected value" given various proposed movements in the price of the S&P Futures contract.  Dkt. 25 at 163:9-14; Ex. 35 (De Leval Report) ¶¶ 16-25; Dkt. 24 at 12 n.18; Black & Scholes at 640.

46.     OptionVue has a field called "Max Projection Date," which allows a user to set the maximum time frame over which they wish to project the movement of the S&P Futures contract price.  (Ex. 29; Dkt. 25 (Walczak Dep.), at 145:6–146:7.)

16

**RESPONSE:** Disputed.  First, Exhibit 29 indicates no field called "Max Projection Date," although there is a "Max Proj Date."  Second, nothing in the sources cited by Plaintiff in any way suggest the OptionVue aims to "project the movement of the S&P Futures contract price."  *See* CFTC Ex. 29; Dkt. 25 at 145:6–146:7.

47.      By default, this date is set at the expiry date of the earliest dated option in the portfolio, but could be adjusted by the user.  (Dkt. 26 (Rios Dep.), at 58:20–59:2.)

**RESPONSE:** Defendant acknowledges that the default in the software is as stated in Plaintiff's Proposed Finding of Fact 47 but notes that he typically sets OptionVue instead to display dates running through the *latest* dated option in the Fund's portfolio.  Dkt. 25 at 164:2-6, 176:3-7; CFTC Ex. 4 at 44:18-25.

48.      OptionVue also allows the user to set the "number of lines,"—five, by default— which divides the maximum time frame into equal increments.  (Ex. 29; Dkt. 25 (Walczak Dep.), at 178:17–179:7.)

**RESPONSE:**  Undisputed.

49.      At least one line (or curve) on the graph would be labeled "T+0," representing the expected value of the portfolio if the S&P Futures price were to rise or fall *that day* to any of the levels shown on the x-axis.  (Ex. 29; Dkt. 25 (Walczak Dep.) at 179:8–12.)

**RESPONSE:** Disputed.  While at least one line (or curve) on the graph would be labeled "T+0," it is not accurate to say that this curve "represent[s] the expected value of the portfolio if the S&P Futures price were to rise or fall *that day* to any of the levels shown on the x-axis." First, as Plaintiff has noted in Plaintiff's Proposed Finding of Fact No. 43 above, OptionVue can be set to display a measure of profit or loss instead of a measure of portfolio value.  Second, the value of a portfolio can change dramatically in the course of a day even if spot and volatility

remain constant, especially close to expiration, so that there can be no single "expected value of the portfolio" conditioned on movement in futures prices absent specification of the *time* (not just day) as of which valuations are to be estimated.  Ex. 40 (Transcript of Aug. 9, 2016 Open House Call) at 10:1 to 11:1.  Third, for all the reasons set forth above, it cannot be said that OptionVue's graphs would indicate the expected value of the portfolio given proposed moves in the S&P Futures price.  Dkt. 25 at 163:9-14; Ex. 35 (De Leval Report) ¶¶ 16-25; Dkt. 24 at 12 n.18; Black & Scholes at 640.

50.      Another line would show the projected value of the portfolio at the "Max Projection Date," for example "T+21" if the Max Projection Date were 21 days away.  (*Id.* at 145:6–19.)

**RESPONSE:**  Disputed.  First, as noted above, none of the materials cited by Plaintiff on this point indicate a variable called "Max Projection Date" in OptionVue.  Second, while OptionVue would display a line (or curve) on the graph corresponding to the chosen maximum number of days in the future, it is not accurate to say that this curve represents "the projected value of the portfolio," for all the reasons set forth above.  Dkt. 25 at 163:9-14; Ex. 35 (De Leval Report) ¶¶ 16-25; Dkt. 24 at 12 n.18; Black & Scholes at 640.  Third, OptionVue in no way attempts to calculate "the projected value of the portfolio" at some future date, as any such projection would necessarily include a forecast for the S&P Futures price on that future date, and Plaintiff has pointed to no evidence that OptionVue attempted to predict the price of the S&P Futures contract on any particular future date.  CFTC Ex. 4 at 36:3 to 37:15 (OptionVue does not make predictions).

51.      To graph any other lines, OptionVue would split the period evenly.  (*Id.* at 179:4–7; *see also* Ex. 4 (Walczak SEC Dep.), at 113:21–114:4.)

**RESPONSE:** Undisputed.

52.       The user could also incorporate changes in volatility. For example, the user could simulate the scenarios above, but also assume that volatility would increase 5% or decrease 5%. (Dkt. 25 (Walczak Dep.), at 146:13–149:9.)

**RESPONSE:** Disputed.  The user could indeed incorporate changes in volatility, but it is generally not true that the user could coerce OptionVue to run all the scenarios above while simultaneously increasing volatility by 5% or decreasing volatility by 5%.  First, an increase or decrease of 5% is ambiguous, as volatility is commonly expressed in terms of percentages:  If volatility starts at 40%, does a drop of 5% take it to 35% (five "vol points" down), or 38% (95% of 40%)?  Second, if the current volatility is below 5%, OptionVue could not decrease that by a further five vol points, as volatility cannot be negative.  Third, OptionVue typically has separate volatility numbers for each expiration and strike, and Plaintiff's Proposed Finding of Fact No. 52 does not specify how the proposed 5% increase or decrease is to be applied across those various strikes and expirations.  Fourth, the simplest model for such a movement in volatility (a "parallel shift" up or down in implied volatility for all strikes and expirations) can lead to impossible volatility term structure when the incoming volatility term structure includes sufficiently low forward volatilities, namely when $(\sigma_1 - 0.05)^2 t_1 > (\sigma_2 - 0.05)^2 t_2$ for $t_1 < t_2$.

53.       From at least late 2014 through early 2017, Walczak spoke on multiple occasions about the Fund on conference calls with investment advisors.  (*See* Ex. 3 (Investigative Testimony of Edward Walczak, April 4, 2018 ("Walczak Apr. 4, 2018 Testimony")), at 509:12–21 ("Q: You participated in open house calls that were attended by both financial advisors and internal and/or external wholesalers from time to time, correct? A: Correct."); *id.* at 516–20 (Walczak confirming the June 7, 2016 Open House call is his voice); Ex. 1, (Walczak Oct. 2017

Testimony), at 306:4–12 ("Q: Who is at the receiving end of these calls by you? A: These would be financial advisers. Q: And is it your understanding that at least some of these financial advisors have discretion over their clients' portfolios? A: Sure, I think so.").)

**RESPONSE:** Undisputed.

54.     These conference calls were referred to as "Open House" calls. (*See* Ex. 3 (Walczak Apr. 4, 2018 Testimony), at 508–09.)

**RESPONSE:** Undisputed.

55.     On multiple Open House conference calls with investment advisors, Walczak stated that he used a software program—OptionVue—to predict how the value of the Fund portfolio would change under a variety of market scenarios and to manage the Fund's risk.  (*See infra* ¶¶ 60–68; *see also* Ex. 18 (Transcript, June 7, 2016 Open House Call) at 19:10–25 ("[I]n that software, we have our portfolio built, and we can then take stresses and say . . . what if the S&P goes to 2150 next week, and we figure that out, and then what if goes to 1900 at the end of the month, we do it graphically so we can see an overview .......... "); Ex. 11 (Audio Recording, June 7, 2016 Open House Call), at 25min, 00sec; Ex. 20 (Transcript, Oct. 25, 2016 Open House Call) at 32:1–15 ("So we aggregate all these options positions into a portfolio . . . , I guarantee you if you look at this portfolio, you have no chance of getting your head around it without some pretty decent options modeling software. So good news, we've got it, and . . . we actually graph the change in value of the portfolio over . . . a downside look of 15 percent and an upside look of 10 percent."); Ex. 13 (Audio Recording, Oct. 25, 2016 Open House Call), at 37min, 40sec; Ex. 4 (Walczak SEC Dep.), at 136:17–24 ("Q: In responding to such questions, did you describe how you used a software program to project portfolio value over several time horizons for range of assumptions about changes in the level of S&P 500 Index futures' prices and option volatility?

A: Yeah. I did . . . offer . . . sort of a generic explanation to give people a feel for . . . the way I used the tool, yes, that's correct.").)

**RESPONSE:** Objection: foundation and misquote.  Disputed.  Walczak admits using the words referenced in this paragraph 55 but denies the accuracy and completeness of the quotes. Furthermore, this recitation of a partial quote ignores the context and the audience.  Walczak therefore denies that paragraph 55 accurately reflects what he stated.  For instance, CFTC Ex. 18 at 19:16 to 20:1 shows Defendant telling financial advisors that "*instead of*, sort of, throwing darts at the wall and saying what if the S&P goes to 2150 next week, and we figure that out, and then what if it goes to 1900 at the end of the month, we [rather] do it graphically."  (Emphasis added.)  This is the exact opposite of the implication of the partial quote in Plaintiff's Proposed Finding of Fact No. 55, which suggests that Defendant did calculate portfolio values at S&P prices of 2150 and 1900.  Similarly, Defendant's statement at CFTC Ex. 20 at 32:8-13 includes more completely the explanation that "what we do is we look at the portfolio and we actually graph the change in value of the portfolio over *whichever price range we want to choose*, and we *generally* choose a downside look of 15 percent and an upside look of 10 percent."  (Emphases added.)  Far from a fixed range of -15% to +10% such as Plaintiff's Proposed Finding of Fact No. 55 suggests, Defendant was telling listeners that he had *discretion* over which range to consider.  And indeed, he continued (*id.* at 13-15), "And we will actually, when markets get volatile, … we'll typically extend that downside look to 20 percent," providing an example of how he varied the range in OptionVue based on current volatility levels.  *See generally* CFTC Ex. 18 at 17:16 – 23:24; CFTC Ex. 20 at 30:6 – 36:1.

56.     Walczak referred to this as "stress testing" the portfolio. (Ex. 18 (Transcript, June 7, 2016 Open House Call) at 18:8–25 ("[W]hen the fund was in its private form, we had a

large drawdown that I felt was unacceptable and so did a lot of work on risk management at that point and what factors contributed to the drawdown as a risk and came up with the structure and stress testing that we use today, the goal being to limit a drawdown to 8 percent."); Ex. 11 (Audio Recording, June 7, 2016 Open House Call), at 23min, 45sec.)

**RESPONSE:** Objection:  foundation and misquote.  Disputed.  Walczak admits using the words referenced in this paragraph 56 but denies the accuracy and completeness of the quotes. Furthermore, this recitation of a partial quote ignores the context and the audience.  Walczak therefore denies that paragraph 56 accurately reflects what he stated.  Contrary to Plaintiff's suggestion that "Walczak referred to this as 'stress testing,'" Plaintiff has in no way established that the stress testing described by Defendant consisted solely of, or even included, the kinds of exercises set forth in various Proposed Findings of Fact from Plaintiff and generically referred to as "this" in Proposed Finding of Fact No. 56.

57.     Walczak said that he performed the stress tests every day.  (*See infra* ¶¶ 62, 63, 66.)

**RESPONSE:** Disputed.  As support for this assertion, Plaintiff cites only the evidence from Plaintiff's Proposed Findings of Fact Nos. 62, 63, and 66, and none of the evidence cited in those paragraphs provides any indication that Defendant stated that he performed stress tests every day.

58.     Walczak said that these stress tests were "the one predictive thing we do." Ex. 19 (Transcript, Sept. 13, 2016 Open House Call), at 41:13; *see also* Ex. 12 (Audio Recording, Sept. 13, 2016 Open House Call), at 51min, 45sec.)

**RESPONSE:** Objection:  foundation and misquote.  Disputed.  In the answer quoted by Plaintiff here, Defendant never said that "stress tests" were "the one predictive thing we do."

Rather, he said, "And we do that by identifying where – you know, that's the one predictive thing we do it's on the risk side." CFTC Ex. 19 at 41:12-14. This Proposed Finding of Fact also ignores the context and the audience. *See generally id.* at 40:22 – 43:24.

59. The stress tests were designed to manage the Fund's risk by predicting "how the portfolio is going to behave as the market moves back and forth in price." (Ex. 18 (Transcript, June 7, 2016 Open House Call), at 20:2–4; *see also* Ex. 11 (Audio Recording, June 7, 2016 Open House Call), at 25min, 55sec).)

**RESPONSE:** Objection: foundation and misquote. Disputed. First, in the Open House Call that Plaintiff quotes in part here, Defendant said *not* that the OptionVue graphs in fact indicated how the portfolio would behave, but rather that in OptionVue he could see "a curve that *says* here's how the portfolio is going to behave"; Defendant did not adopt that same position. CFTC Ex. 18 at 20:2-3 (emphasis added). Second, Defendant did not indicate that this contemplation of the effects of movements in market prices constituted his "stress tests." *See id.* at 19:16 to 21:21. On the contrary, he emphasized that movements in volatility were more important than movement in the price of the S&P Futures, for purposes of his risk management. *Id.* at 20:18-22 ("And then, of course, enters the most important variable in options pricing, and that is volatility. So it's actually less important about where the price of the S&P is than where volatility [is,] or the simplest form is the VIX."). Third, this Proposed Finding of Fact ignores the context and the audience. *See generally id.* at 18:1 – 23:24.

60. Walczak said on multiple occasions that he stress-tested the portfolio to predict how the fund would perform if the value of the S&P were to increase by up to 10%. (*See infra* ¶¶ 60–61.)

**RESPONSE:** Disputed. Admit that Defendant indicated on multiple occasions that "we"

considered increases in the value of the S&P of up to 10% as part of stress tests of the Fund's portfolio.  But first, none of the evidence cited in Plaintiff's Proposed Findings of Fact Nos. 60 and 61, including the evidence in additional Proposed Findings of Fact cross-referenced in Proposed Finding of Fact No. 61, indicates that *Defendant individually* conducted such calculations.  Second, none of that evidence indicates that Defendant or anyone else stress-tested the portfolio in order "to predict how the fund would perform if the value of the S&P were to increase by up to 10%."  Third, without specification of the time it takes the S&P to rise the indicated amount, there is no well-defined meaning of how the Fund would perform under such a move.

61.     Walczak stated that if any one of the stress tests revealed that the impact on the portfolio was greater than an 8% loss, Walczak would act to remove that risk.  (*See infra* ¶¶ 60–61, 64, 66, 68–72.)

**RESPONSE:**  Disputed.  First, none of the evidence cited in Plaintiff's Proposed Finding of Fact No. 61 indicates that *Defendant individually* would act to remove risk.  Second, while some of the quotes provided by Plaintiff indicate a plan to *reduce* risk, they do not suggest that the risk would be utterly "remove[d]."  Even the evidence referenced in Plaintiff's Proposed Finding of Fact No. 67, which is not referenced here, speaks only of removing a risk *excursion*, meaning the growth of risk exposure beyond the level deemed typical or acceptable, *not* the removal of risk entirely.  CFTC Ex. 16 at 16:5-7.

62.     On a November 4, 2014 Open House Call, when asked to "go over . . . how you do your stress testing," Walczak responded, "I use risk management to control losses to roughly 8 percent. That's the number I use in stress testing." (Ex. 15 (Transcript, Nov. 4, 2014 Open House Call), at 15:13–15; *see also* Ex. 5 (Audio Recording, Nov. 4, 2014, Open House Call), at

20min, 10sec.)

**RESPONSE:** Objection:  foundation and misquote.  Disputed.  Walczak used the words referenced in paragraph 62 but disputes the accuracy and completeness of the quote.  This response ignores the context and the audience. Walczak, therefore, disputes paragraph 62 accurately reflects what he stated.  *See* CFTC Ex. 15 at 15:9 – 19:10.

63.     On the same Open House call, Walczak further explained:

I have very sophisticated options pricing models.  I plug the portfolio into these models each day.  I stress the portfolio for a series of price movements up to 10 percent. I stress the portfolio for volatility movements. . . .  I stress it for price movement, and then I look over five different time frames. . . .  I'll vary those time frames to match up to different times [that are] important [to] options, expiration for part of the portfolio, for example. *So I . . . identify what's the impact on the portfolio value at these stress points, and if the impact is greater than my 8 percent limit, then I'll go in and I'll hedge the portfolio to bring it back in line.*

(Ex. 15 (Transcript, Nov. 4, 2014 Open House Call), at 17:20–18:14 (emphasis added); *see also* Ex. 5 (Audio Recording, Nov. 4, 2014, Open House Call), at 23min, 15sec.).

**RESPONSE:** Objection:  foundation and misquote.  Disputed.  Walczak admits using the words referenced in Plaintiff's Proposed Finding of Fact No. 63 but denies the accuracy and completeness of the quotes.  For instance, Plaintiff's first ellipsis in the partial quote here hides the following statements from Defendant, which emphasize the primacy of volatility over S&P Futures price level in calculating risk to the portfolio:  "I stress the portfolio for volatility movements.  Remember that volatility is the most important component of options pricing.  So I have to understand what will happen to the portfolio if one day you see the VIX go from 14 to 25 or 20 to 40 or something like that.  So I stress the portfolio for volatility, I stress it for price movement, and then I look over five different time frames."  CFTC Ex. 15 at 17:23 to 18:5.  Furthermore, this response ignores the context and the audience.  Walczak, therefore, disputes that paragraph 63 accurately reflects what he stated.  *See generally id.* at 15:9 – 19:10.

64.      On a September 15, 2015, Open House Call, Walczak stated:

What we do with the fund on a daily basis is . . . we stress, we aggregate all those
[positions] in the models we use to predict what will happen to the portfolio value
under different scenarios.  And the specific scenarios we stress the portfolio
value against are +5%, +10% price movement in the S&P [among other
scenarios] . . . looking for portfolio values that will exceed our 8% drawdown limit.
And when we find that that happens, then we go in and make position adjustments
to bring that potential drawdown back into line with our 8% guideline, which is
what we try to hold a drawdown to.

 (Ex. 6 (Audio Recording, Sept. 15, 2015 Open House Call), at 17min, 55sec.)

**RESPONSE:**  Objection:  foundation and misquote.  Walczak admits using the words
referenced in Plaintiff's Proposed Finding of Fact No. 64 but denies the accuracy and
completeness of the quotes.  In addition, this paragraph ignores the context and the audience.
Walczak therefore denies that Proposed Finding of Fact No. 64 accurately reflects what he stated.
*See* Ex. 41 (Transcript, Sept. 15, 2015 Open House Call) at 14:3 – 15:9.  For instance, Plaintiff's
bracketed reference to "[… other scenarios]" and ensuing ellipsis hides the fact that Defendant
emphasized variation in volatility, as well, as part of the stress test.

65.      On an October 6, 2015, Open House Call, Walczak stated: "[W]hen we do our
risk stresses on the portfolio we . . . say what happens if price is up 5, 10, 15%, what happens if
price is down 5, 10, 15%, what happens if volatility spikes?" (Ex. 7 (Audio Recording, Oct. 6,
2015 Open House Call), at 17min, 56sec.)

**RESPONSE:**  Objection foundation and misquote.  Disputed.  Walczak used the words
referenced in paragraph 65 but disputes the accuracy and completeness of the quote. This
response ignores the context and the audience.  Walczak, therefore, disputes paragraph 65
accurately reflects what he stated.  *See* Ex. 42 (Transcript, Oct. 6, 2015 Open House Call) at
13:23 – 15:25.

66.      On an October 13, 2015, Open House Call, an investment advisor asked

Walczak,"From a risk management perspective, what are you doing at the portfolio level?" (Ex.

16 (Transcript, Oct. 13, 2015 Open House Call), at 13:14–18.)

    **RESPONSE:** Undisputed.

    67.     Walczak responded:

[O]n a daily basis . . . the portfolio in aggregate is plugged into our options modeling software and we'll stress price moves of plus 5 and plus 10 percent on the S&P and minus 5, minus 10 and minus 15 percent on the S&P. We'll . . . have snapshots of the portfolio value at those P&L . . . stress points. . . .We look at that across five different time frames and what *we're looking for is a drawdown of greater than 8 percent in the portfoliovalue. If we find that at any one of those price and volatility stress points*, we'll identify whether  for example, it's price or volatility, which are the two major impacts[ o]n the portfolio[. *W]e'll identifywhat is it that's causing that potential 8 percent drawdown*, or greater than 8,  that's our line in the sand, so to speak. . . . [*W]e'll model the most effective alternative to remove that risk excursion and then we'll implement that position on the portfolio.* So, that's what we do internally to manage the portfolio. We've done that basically since I've run the Fund.  So, over its entire life.

(Ex. 16 (Transcript, Oct. 13, 2015 Open House Call), at 15:3–16:10 (emphasis added); *see also*

Ex. 8 (Audio Recording, Oct. 13, 2015 Open House call), at 19min, 37sec.)

    **RESPONSE:** Objection:  foundation and misquote.  Disputed.  Walczak admits using the

words referenced in Plaintiff's Proposed Finding of Fact No. 67 but denies the accuracy and

completeness of the quotes.  Furthermore, this paragraph ignores the context and the audience.

Walczak therefore denies that Proposed Finding of Fact No. 67 accurately reflects what he stated.

*See generally* CFTC Ex. 16 at 13:14 – 18:16.

    68.     On a February 2, 2016 Open House Call, Walczak stated:

For the S&P fund, a reminder that, we do stress market moves of +5, +10, -5, -10, and -15% on a price standpoint and we also stress volatility . . . . [I]n a market environment like this . . . we have very little exposure on the upside and as a result we also have very little risk to the upside so we have not encountered any material impact toeven a 15% upside move although our routine stress is only +10, wehave not seen anything even as high as 15 when we occasionally willgo that high to look at the market as well. . . .

(Ex. 9 (Audio Recording, Feb. 2, 2016 Open House Call), at 27min, 31sec.)

**RESPONSE:** Objection: foundation and misquote. Disputed. Walczak admits using the words referenced in Plaintiff's Proposed Finding of Fact No. 68 but denies the accuracy and completeness of the quotes. Furthermore, this paragraph ignores the context and the audience. Walczak therefore denies that Proposed Finding of Fact No. 68 accurately reflects what he stated. For instance, Plaintiff's first ellipsis hides the Defendant's emphasis on volatility as more important than price for stress testing, when he commented, "And then we also stress volatility because that, as I have repeated many times, volatility is the most important factor in options pricing. So we are very careful also to stress volatility movement in the fund as well." CFTC Ex. 9 at 27:30 to 29:00. *See generally* Ex. 43 (Transcript, Feb. 2, 2016 Open House Call) at 20:9 – 23:16.

69.     On a March 1, 2016, Open House Call, Walczak stated:

> We stress the portfolio across a number of different dimensions. We look for where, what conditions might cause a greater than 8 percent draw down. We then model hedging techniques, meaning the purchase and sale of additional options contracts, either ones we already hold—taking positions off is one thing we model, adding additional positions as hedges is another thing that we model and that's our most common adjustment. We'll model adjustments; we'll choose the most economical and effective adjustment to bring us back in bounds *so that we can no longer find a stress point that will result in greater than an 8 percent draw down*.

(Ex. 17 (Transcript, Mar. 1, 2016 Open House Call), at 29:19–30:6; *see also* Ex. 10 (Audio Recording, Mar. 1, 2016 Open House Call), at 40 min, 15 sec.) (emphasis added).)

**RESPONSE:** Objection: foundation and misquote. Disputed. Walczak used the words referenced in paragraph 69 but disputes the accuracy and completeness of the quote. This response ignores the context and the audience. Walczak, therefore, disputes paragraph 69 accurately reflects what he stated. *See* Ex. CFTC17 at 26:3 – 30:11.

70.     On a June 7, 2016 Open House Call, Walczak was asked:

What is the max drawdown you are shooting for given your stress test, the risk parameters? And if you could speak a little bit more to if you see a significant drawdown when you're doing the stress test. If, like, for example, there was a 10 percent drawdown or move up in the market which caused the fund to fall out of your 4 to 6 percent drawdown parameters, how do you—how do you change the portfolio to mitigate that potential risk in the fund?

(Ex. 18 (Transcript, June 7, 2016 Open House Call), at 17:18–18:1; *see also* Ex. 11 (Audio

Recording, June 7, 2016 Open House call), at 22 min, 00sec.)

**RESPONSE:** Objection: foundation and misquote. Disputed. Walczak admits the

words referenced in paragraph 70 but disputes the accuracy and completeness of the question.

This response ignores the context and the audience. Walczak, therefore, disputes paragraph 70

accurately reflects what he was asked. *See* CFTC Ex. 18 at 17:16 -18:1.

71.      In the course of his response, Walczak stated:

So the first thing pure and simple is our metrics are dialed in to limit our drawdown to 8 percent. There's no guarantees in the world, especially in markets, but that's our goal in everything we do is to keep our drawdown to 8 percent. . . . So even if you're an options guy, if you look at a portfolio statement, you have no chance whatsoever of understanding how that portfolio will behave under different market conditions, unless you have fairly sophisticated options modeling software, which, of course, we do. So in that software . . . we do it graphically so we can see an overview, meaning we look at a graph and along the bottom of that graph is the price of the S&P, and along the vertical axis of the graph is the value of the portfolios. *So we can see a curve that says here's how the portfolio is going to behave as the market moves back and forth in price*. . . . So as we look at that graphic we actually see . . . five different lines on that graph of what the portfolio value would look like, and those five lines are five different points in time. So we can now see what happens if the S&P goes up 25 points tomorrow, if it's up 25 points at the end of the month, if it's up 60 points three weeks from now. . . . [N]ot only does the software anticipate based on past behavior . . . , the software knows that if the market's down 10% volatility is going to be higher, and it uses historical data to project how much higher it will be, and that's reflected in the portfolio value of these options that we look at. . . . [W]e do pick stress points, and what we look at is a plus or minus [five] and ten percent price excursion and also a minus 15 percent excursion because we all know that downside moves can be larger and more rapid, generally speaking, than upside moves. So we look at all these stress points on those curves across time for places in which the portfolio values would cause us an unacceptable drawdown. And so when we identified that there's an unacceptable risk against our 8 percent parameter, we now use that same modeling software to figure out what to do about

it. . . . [W]hen we find an out-of-bounds situation, so to speak, we thenjump right back in . . . until that risk goes away. . . . There is never a scenario where we wake up one day, and there's a panic in the market, and we scratch our heads and say, oh, my gosh,we've got to get out of that position.  We've got to do something.  We try to be a couple of chess moves ahead of that part of the portfolio management because we modeled that scenario a week ago, and we already took steps so that if the market is down 5 percenttomorrow that was part of our model from a week ago, and either itdidn't cause us a problem in the model, so we're fine, or it did causeus a problem, and it's already fixed before it happens.

(Ex. 18 (Transcript, June 7, 2016 Open House Call), at 19:10–23:24 (emphasis added); *see also*

Ex. 11 (Audio Recording, June 7, 2016 Open House call), at 25 min, 00sec.)

**RESPONSE:** Objection: foundation and misquote.  Disputed.  Walczak admits using the words referenced in Plaintiff's Proposed Finding of Fact No. 71 but denies the accuracy and completeness of the quotes.  This response also ignores the context and the audience.  *See* CFTC Ex. 18 at 18:2 – 23:24.  For instance, through its ellipses, Plaintiff elides most of Defendant's discussion of volatility, which he describes as "the most important variable in option pricing," so that "it's actually less important about where the price of the S&P is."  *Id.* at 20:19-22.

72.     On the September 13, 2016 Open House Call, Walczak stated: "We do have a hard stop at 8%.  We would flatten the portfolio roughly at 8%." (Ex. 19 (Transcript, Sep. 13, 2016 Open House Call), at 41:19–20; *see also* Ex. 12 (Audio Recording, September 13, 2016 Open House Call), at 51min, 55sec.)

**RESPONSE:** Objection: foundation and misquote.  Disputed.  Walczak used the words referenced in paragraph 72 but disputes the accuracy and completeness of the quote.  This response ignores the context and the audience.  Walczak, therefore, disputes paragraph 72 accurately reflects what he stated.  *See* CFTC Ex. 19 at 40:22 – 43:24.

73.     On that same September 13, 2016, Open House Call, Walczak continued:

But the bottom line is as we look ahead and stress the portfolio andwe identify a condition that is out of bounds, we will hedge that rightnow. . . .   [W]hat happens if

the market moves 10 percent—whatever market it is— and if that gives us an uncomfortably large loss, we'llgo in and hedge that thing. Now that 10% move might never occur,but if we get even 3 percent in that direction, then automatically wehave that additional cushioning. And in that circumstance, then we'd look again at the model and we'd say, oops, we still have a problem.  We'll hedge some more.

(Ex. 19 (Transcript, Sept. 13, 2016 Open House Call), at 42:22–43:9; *see also* Ex. 12 (Audio

Recording, Sept. 13, 2016 Open House Call), at 53min, 15sec.)

**RESPONSE:** Objection: foundation and misquote.  Disputed.  Walczak used the words

referenced in paragraph 73 but disputes the accuracy and completeness of the quote.  This

response ignores the context and the audience.  Walczak, therefore, disputes paragraph 73

accurately reflects what he stated.  *See* CFTC Ex. 19 at 40:22 – 43:24.

74.      He further clarified on the same Open House Call:

[W]e're never in a situation where we have sort of a hard stop loss, and we're just sitting waiting for that[ 8][3] percent to get triggered and then we get out, because we're constantly hedging. That's the first thing we do every day is to identify risks and tune up our hedgesif they're not sufficient. And that allows us to avoid that hard stop and still maintain our drawdown discipline.

(Ex. 19 (Transcript, Sep. 13, 2016 Open House Call), at 43:16–24; *see also* Ex. 12 (Audio

Recording, Sept. 13, 2016 Open House Call), at 53min, 15sec.)

**RESPONSE:** Objection: foundation and misquote.  Disputed.  Walczak used the words

referenced in paragraph 74 but disputes the accuracy and completeness of the quote.  This

response ignores the context and the audience.  Walczak, therefore, disputes paragraph 74

accurately reflects what he stated.  *See* CFTC Ex. 19 at 40:22 – 43:24.

75.      On an October 25, 2016 Open House Call with investment advisors, Walczak

stated: "[W]e can use all sorts of combinations to give us just the right hedging exposure to bring

that portfolio back in line where we take that 8 percent risk off the table." (Ex. 20 (Transcript,

Oct. 25, 2016 Open House Call), at 35:16–19; *see also* Ex. 13 (Audio Recording, Oct. 25, 2016

Open House Call), at 42min, 00sec.)

**RESPONSE:** Objection: foundation and misquote. Disputed. Walczak used the words referenced in paragraph 75 but disputes the accuracy and completeness of the quote. This response ignores the context and the audience. Walczak, therefore, disputes paragraph 75 accurately reflects what he stated. *See* CFTC Ex. 20 at 30:6 – 36:1.

76.     On a November 15, 2016, Open House Call, Walczak stated: "In the S&P, we can model a single market and identify exactly what we need to do to control the daily volatility of the fund." (Ex. 14 (Audio Recording, Nov. 15, 2016 Open House Call), at 26min, 10sec.)

**RESPONSE:** Objection: foundation and misquote. Disputed. Walczak used the words referenced in paragraph 76 but disputes the accuracy and completeness of the quote. This response ignores the context and the audience. Walczak, therefore, disputes paragraph 76 accurately reflects what he stated. *See* Ex. 44 (Transcript, Nov. 15, 2016 Open House Call) at 19:24 – 43:24.

77.     In an email dated June 12, 2015, with the subject "Risk Evaluation for BNP", Walczak told an investment advisor at BNP Parisbas, "Each day I graphically view the stress points [of -15%/-10%/-5%/+5%/+10%] in combination with volatility stresses of VIX = 20, 30 and 45. I do that across 5 time frames. This represents 75 combinations of market parameters." (Ex. 22 (6/12/2015 email), at 1.)

**RESPONSE:** Admit that those words are contained in Exhibit 22 and deny that it is an accurate and complete quote. *See* CFTC Ex. 22.

78.     In an email dated August 26, 2014, with the subject line "Re: Catalyst Hedged Futures Fund," Walczak replied to a question from an investment advisor at Raymond James: "Individual positions are aggregated to an options pricing tool that models portfolio value

stressed by +5%, +10%, -5%, -10%, -20% price excursion, VIX +10, +20, across 5 time horizons extending to the Portfolio's longest dated options expiration. Absolute drawdown of 8% from high water requires flattening of risk, *no discretion allowed*. Performance in various market environments is illustrated by the Fund's monthly return history." (Ex. 21 (8/26/2014 email), at 1–2 (emphasis added).)

**RESPONSE:** Admit that those words are contained in Exhibit 21 and deny that it is an accurate and complete quote. *See* CFTC Ex. 21.

79.     Walczak did not, in fact, manage the Fund to an 8% drawdown threshold. (Ex. 3 (Walczak Apr. 4, 2018 Testimony), at 680:6–10 ("I don't manage specifically to an eight-percent drawdown threshold. So I am not considering whether we're going to cross that threshold or not because, again, it's not something I'm managing to specifically.").)

**RESPONSE:** Disputed.  Defendant admits that the quote recounted here was accurately transcribed, but he denies the allegation that he did not manage the Fund to an 8% drawdown threshold.  Defendant has rather explained on numerous occasions that his risk metrics were designed specifically to limit drawdowns to 8%, and that he in practice manages to those risk metrics, thereby indirectly working to limit drawdowns to 8%.  Indeed, immediately after the words Plaintiff recites here, Defendant went on to explain, "What I'm managing to is the process control parameters that over a very long period of time have demonstrated their ability to control drawdowns to roughly eight percent."  CFTC Ex. 3 at 680:11-14.

80.     Walczak admits that he did not manage the portfolio to a particular gain or loss number.  (Ex. 1 (Walczak Oct. 2017 Testimony), at 174:7–9 ("A clarifying answer to that is I'm not managing the portfolio to say, you know, X gain or loss.").)

**RESPONSE:** Undisputed.

81.      Walczak admits that his policy was *not* necessarily to react to a stress test that predicted a greater-than-8% loss, but rather to exercise his discretion. (*See* Dkt. 25 (Walczak Dep.), at 191:15–19 ("Q: . . . [E]ven if one of your OptionVue stress tests showed a greater th[a]n 8 percent drawdown, you felt you had the discretion not to remove that risk, right? A: Correct.").)

**RESPONSE:** Disputed as stated. Defendant admits that his policy included exercise of his discretion.  But the quote provided by Plaintiff here never indicates that a greater-than-8% loss was *predicted*, such as Plaintiff alleges here.  *See* Dkt. 25 at 191:15-19.  For all the reasons recounted above, it is inaccurate to suggest that a loss that appeared somewhere on some OptionVue graph as part of Defendant's stress tests or other analyses was necessarily a prediction or in any way reflected Defendant's belief as to the actual impact on the Fund's value that would occur as a result of any seriously contemplated market conditions. *See* Dkt. 25 at 163:9-14; Ex. 35 (De Leval Report) ¶¶ 16-25; Dkt. 24 at 12 n.18; Black & Scholes at 640. Furthermore, in the quote provided by Plaintiff here, Defendant acknowledges only that he had no obligation to "remove that risk," *not* that he would sometimes not "react" to numbers in a stress test.  Defendant could and did react to events in many fashions that did not necessarily result in immediate trading.

82.      Walczak admits that rather than act whenever one of his OptionVue stress tests predicted a greater-than-8% loss, he first considered the likelihood of that scenario occurring before deciding whether to make any adjustment.  (*See* Dkt. 24 (Walczak Dep.), at 203:6–9; Ex. 4 (Walczak SEC Dep.), at 88:12–13 ("I had to choose whether or not those scenarios were likely enough to—to take action."); *id*. at 130:2–3 ("And then I evaluate whether that's a likely enough scenario to take some action.").)

**RESPONSE:** Object to "rather than" as not a fact. Disputed as stated. Admit the accuracy of the quote.

83. If he thought that the market scenario causing the greater-than-8% loss was unlikely, he would *not* hedge against it. (*See* Ex. 4 (Walczak SEC Dep.), at 155:22–25 ("[I]f I see a scenario that I believe to be likely enough to take action, that shows an 8-percent drop down, I'll go in and do any number of hedging procedures . . . ."); *id.* at 157:19–20 ("[O]r I'll identify that the scenario is unlikely and I won't do anything").)

**RESPONSE:** Disputed.  First, during the same discussion Plaintiff is quoting here, Walczak explained that he sometimes "hedged" a portfolio by monitoring it and letting options move toward expiration, not solely be making active trades in the market.  CFTC Ex. 4 at 156:8-19 ("Q:  So -- so hedge the portfolio would mean execute trades, right?  A:  Not necessarily.  Q: Okay.  How would you hedge the portfolio without -- without executing any trades?  A:  Well, if -- if options are wasting assets.  So the risk of an option [declines][3] as time passes, generally speaking, all else equal.  So in some scenarios, particularly short dated options, you look, you identify a potential risk point, and you know that that risk is deteriorating rapidly over time and no action's necessary.");  *accord* Ex. 45 (June 9, 2021 Transcript from *Walczak v. Catalyst Capital Advisors, LLC*, AAA Case No. 01-20-0003-8157) at 295:5-8 (testimony by Walczak that "Sometimes I elected to hedge by taking positions of[f], sometimes I elected to do nothing because time decay would take my exposure down in a low volatility environment.");  Ex. 46 (June 10, 2021 Transcript from *Walczak v. Catalyst Capital Advisors, LLC*, AAA Case No. 01-20-0003-8157) at 121:10 to 122:16 (explanation by Walczak of how to hedge without trading);  Ex. 35 (De Laval Report) ¶ 41 (finding by expert witness that it is "broadly understood in risk

---

[3] The transcript says "detains" here.  It seems likely that the actual word was either "declines" or "decays."

management and trading that *not* placing orders in the market is a form of risk management"). Second, in the quote from page 157 of CFTC Exhibit 4, Defendant was *not* speaking of market scenarios that evidenced potential losses of greater than 8%, but rather portfolio holdings in which his "open option premium" exceeded 8%. CFTC Ex. 4 at 157:9-23 ("Q:  So when you reference, My 8 percent limit, what are -- what are you referencing?  A:  … That's a number I'm looking for in terms of open option premium.  And if I see a scenario where I'm uncomfortable with how likely it is that that happens, then I'll go in, and I'll take whatever action necessary.  Or I'll identify the scenario is unlikely and I won't do anything.  Or I'll identify the fact that doing nothing is also a lot of risk to come off, because of the nature of the options.").  Third, to be clear, Defendant said he would "do any number of hedging procedures" if he determined that a scenario of losing more than 8% was "likely enough to take action," *id.* at 155:22-25, but that does *not* mean he had to determine that a scenario was "likely" before he would take action. Defendant discussed whether a scenario was *likely enough*, without ever suggesting that the scenario would have to be deemed "likely" in other contexts, and nothing Plaintiff has cited here speaks to the contrary.

84.     Walczak admits that no matter what the OptionVue stress tests showed, he was not required to take action until other risk parameters were breached. (*See* Dkt. 25 (Walczak Dep.), at 196:2–5 ("Q...........So no matter what the graphs in OptionVue showed, you weren't required to take action until one of the risk metrics in the risk guidelines matrix that we looked at earlier was breached.  A: That's how we operated the Fund.  Yes.").)

        **RESPONSE:**  Undisputed.

85.     Walczak admits that he was not obligated to inform investors that he *exercised discretion* over whether or not to react to an OptionVue stress test that predicted losses to the

Fund of greater than 8%. (*See* Dkt. 25 (Walczak Dep.), at 193:2–14 ("I don't believe I had the obligation to inform investors of my day-to-day fund management decisions, including my judgment about what my stress tests revealed.").)

**RESPONSE:** Disputed.  The passage quoted by Plaintiff here begins with the question, "If one of your OptionVue stress tests showed a greater than 8 percent drawdown, and in your discretion you chose not to act to remove that risk, did you have the obligation to tell investors and investment advisors that you did not do so?"  Dkt. 25 at 193:2-7.  First, Defendant objects to this question to the extent that it seeks a legal conclusion. *See id.* at 193:8-9 (preserving the objection).  But second, neither this question nor Defendant's response — "Yeah.  So I -- I don't believe I had the obligation to inform investors of my day-to-day fund management decisions, including my judgment about what my stress tests revealed," *id.* at 193:11-14 — discusses whether Defendant had an obligation "to inform investors that he exercised discretion over whether or not to react to an OptionVue stress test that predicted losses to the Fund of greater than 8%."  Rather, both the question and the answer discussed whether Defendant had an obligation to disclose the *outcome* of his exercise of discretion *in a particular circumstance*.  Furthermore, the question posited a scenario in which an OptionVue stress test "showed" a potential loss of over 8%, not one in which the stress test "predicted" such an 8% loss, as appears in Plaintiff's premise here.  *Id.* at 193:3; *see* Defendant's Response to Plaintiff's Proposed Finding of Fact 81 (discussing how a point on an OptionVue graph does not constitute a "prediction").

86.      There are no contemporaneous records of any of Walczak's OptionVue stress testsprior to March 2017. (*See* Dkt. 24 (Walczak Dep.), at 217:8–218:9.)

**RESPONSE:** Disputed.  First, it has not been established that Defendant worked

exclusively in OptionVue to create stress tests; on the contrary, Defendant routinely calculated exposures in his head, worked them out on paper, worked on them in Microsoft Excel, or relied on colleagues or outside parties to perform parts of the stress tests. *E.g.*, Dkt. 25 at 24:17 to 25:5 (mental calculations, pencil and paper); Ex. 46 at 35:15 to 36:18 (testimony by Walczak regarding manual calculations); *id.* at 173:15 to 174:19 (Excel, pencil and paper, mental calculations, calculations by Kimberly Rios and interns, and calculations by outside parties). Second, in the colloquy quoted by Plaintiff, counsel for Plaintiff only asked Defendant if he had "any records of OptionVue stress tests that [he] ran in 2014," without any parallel questions for later years, so that there is no evidence that no such records exist for later years. *See* Dkt. 25 at 217:8 to 218:9. Third, in that same discussion, Defendant stated only that he was "not aware that OptionVue saves any modeling that I might have done" in 2014 (focusing on "modeling I do as a part of the stress testing process"), *id.* at 217:14-21, and that he did not "recall saving any specific graphs," *id.* at 217:22 to 218:1. The section cited by Plaintiff contains no assertion that no records exist, whether of OptionVue graphs or of other components of Defendant's stress tests. *See id.* at 217:8 to 218:9.

87.     Plaintiff's expert, Stuart McCrary, recreated OptionVue's functionality to see how OptionVue would have predicted the Fund's value to change as a result of changes in the S&P futures contract. (Dkt. 23 (McCrary Report), at ¶ 35.)

**RESPONSE:** Disputed. First, Mr. McCrary never claims that his model (the "McCrary Model") "recreated OptionVue's functionality" (and it did not in fact do so), and indeed he confesses to ignorance as to the specific models for option price and volatility dynamics used by OptionVue. Dkt. 24 (McCrary Report) ¶ 31 (McCrary Model "closely mimics" certain OptionVue functionality, generating "substantially similar results" in certain contexts, with no

claims as to perfect matching or complete coverage of OptionVue functionality); *id.* at 12 n.18 ("I don't have specific knowledge of what formulas OptionVue used."); *id.* at 14 ex. 5A, 15 ex. 5B (showing that a 1.25% increase in the S&P Futures contract price implies a *loss* in OptionVue for most time frames but a *profit* in the McCrary Model for all time frames on the same date, Oct. 31, 2014); *id.* at 17 ex. 5C, 18 ex. 5D (showing that a 1.25% increase in the S&P Futures contract price implies a *loss* in OptionVue for all time frames but a *profit* in the McCrary Model for all time frames on the same date, July 11, 2016); *id.* at 19 ex. 5D, 20 ex. 5E (showing that a 1.25% increase in the S&P Futures contract price implies a *loss* in OptionVue for all time frames but a *profit* in the McCrary Model for all time frames on the same date, Jan. 23, 2017).  Second, OptionVue has multiple modes that posit different ways that volatility can respond to suggested movements in the underlying market price, or spot, and Mr. McCrary never discusses which settings Defendant used or which the McCrary Model attempted to replicate.  *Compare* Dkt. 25 at 163:9-14 (noting that in order for OptionVue graphs to be meaningful, "you have to select a whole lot of things to make that realistic"); *id.* at 165:17-20 ("[T]he software contains at least three, I think now maybe four or five different volatility models, some of which are more appropriate to calls, some of which are more appropriate to puts."); CFTC Ex. 18 at 20:23 to 21:6 ("So fortunately, within our options software not only does the software automatically anticipate based on past behavior what will happen to volatility -- in other words, the software knows that if the market's down 10 percent volatility is going to be higher, and it uses historical data to project how much higher it will be, and that's reflected in the portfolio value of these options that we look at.  And similarly to the upside we know that volatility is likely to decline."); Ex. 39 (OptionVue Help) at 5 (listing four available volatility modes); *id.* at 1-2 (discussing OptionVue's default volatility term structure model and the many ways in which users can

override it or manually change its parameters); *and id.* at 3-4 (discussing OptionVue's default volatility smile model and the many ways in which users can override it or manually change its parameters) *with* Dkt. 24 (McCrary Report) (no discussion of volatility dynamics in the entire report). Third, it has not been established that "OptionVue would have predicted [how] the Fund's value [would] change as a result of changes in the S&P futures contract," as discussed above. Dkt. 25 at 163:9-14; Ex. 35 (De Leval Report) ¶¶ 16-25; Dkt. 24 (McCrary Report) at 12 n.18; Black & Scholes at 640. Accordingly, even to the extent that the McCrary Model is "similar" to the OptionVue model, that does not imply that the McCrary Model in any way matches how the Fund's value would actually have responded to various changes in the S&P Futures contract price. Fourth, neither the McCrary Model nor OptionVue attempts to model changes in the Fund's value "as a result of changes in the S&P futures contract" itself, such as adjustments to the contract's multiplier or expiration.

88. In his report, for each day from September 2013 through February 2017, Mr. McCrary calculated how the Fund's value was predicted to change as a result of rises of the S&P futures contract of 2.5 percent, 5 percent, and 10 percent. (*Id.*)

**RESPONSE:** Disputed. Mr. McCrary at most calculated what *his model* indicated the Fund's value would have been on various dates with the price of the S&P Futures contract at various levels. Mr. McCrary provides no validation of his model against actual market dynamics. His model does not match the one within OptionVue. His report provides no evidence that his model reflects what Defendant would actually have seen in his stress tests or his use of OptionVue at the time. His report does not specify which OptionVue volatility mode he was trying to emulate. His calculations indicate the difference in estimated Fund value as measured at two different spot values, but the McCrary Report provides no evidence that the

McCrary Model in any way tried to model how the Fund's value would act in response to a *rise* in the S&P Futures contract price — a rise that would necessarily take a macroscopic amount of time and inform the market's view as to volatility, thereby changing the Fund's expected value in a way that depends on both the speed and the path of that rise in the futures price. And Mr. McCrary did not in fact calculate values for "each day from September 2013 through February 2017," as evidenced by the many days (including but not limited to weekends) missing from Appendix 4 to the McCrary Report. *See generally* Dkt. 24 (McCrary Report). *See also* Dkt. 25 at 163:9-14; Ex. 35 (De Leval Report) ¶¶ 16-25; Dkt. 24 (McCrary Report) at 12 n.18; Black & Scholes at 640; Ex. 39 (OptionVue Help).

89.     For each date and each increase in the S&P futures contract, Mr. McCrary modeled how the Fund's value was predicted to change if the increase occurred (i) immediately, (ii) over the course of seven days, and (iii) over the course of fourteen days. (*Id.* at ¶ 36.)

**RESPONSE:** Disputed. For all the reasons discussed above, there is no basis for asserting that Mc. McCrary's calculations actually match (a) what Defendant would have seen in OptionVue or his stress tests more generally at the time, or (b) what OptionVue would calculate for the same spot, rate, volatility, and time inputs, or (c) what an accurate forecast would have been at the time for Fund value given various proposed movements in spot. Beyond this, the McCrary Model does not in fact attempt to predict the change in Fund value in the event of an immediate move in S&P Futures price, as large moves in vanishingly small times, such as Plaintiff describes in Proposed Finding of Fact No. 89(i), would provide evidence of a volatility spike and thus change other inputs to the option pricing model that Mr. McCrary appears to hold constant. Similarly, Mr. McCrary provides no evidence that he considered the effect of large spot moves over longer periods on volatility forecasts, so that he cannot be said to have modeled

predictions for Fund value as a result of large spot moves over seven or fourteen days, either. *See generally* Dkt. 24 (McCrary Report) (addressing the effect of neither immediate nor gradual spot movements on volatility forecasts). *See also* Dkt. 25 at 163:9-14; Ex. 35 (De Leval Report) ¶¶ 16-25; Dkt. 24 (McCrary Report) at 12 n.18; Black & Scholes at 640; Ex. 39 (OptionVue Help).

90.     Mr. McCrary found that, throughout the period in question, Walczak would have seen in OptionVue that the Fund frequently was exposed to the risk of an 8% or greater drawdown in response to rises in the S&P 500 Futures contract price of as little as 2.5%. (*Id.* at ¶¶ 48–56.)

**RESPONSE:** Disputed. As noted above, Mr. McCrary has not established that his model matches that used within OptionVue for any OptionVue mode; nor has he discussed which mode Defendant used during his time at Catalyst. Furthermore, the OptionVue graphs exemplified by CFTC Exhibit 29 indicate, at least for immediate moves, only what the Fund's value *would be at a given time if spot were different*, not what the Fund's value *would be if spot moved from the current value to a different one*, as the latter would imply a market price move that would in turn affect the market's view of volatility and hence another input to OptionVue's pricing model. *See generally* Dkt. 24 (McCrary Report). *See also* Dkt. 25 at 163:9-14; Ex. 35 (De Leval Report) ¶¶ 16-25; Dkt. 24 (McCrary Report) at 12 n.18; Black & Scholes at 640; Ex. 39 (OptionVue Help). Defendant also objects to the term "frequently" as not sufficiently precise as to be testable as a supposed fact. Defendant further objects to the phrase "the period in question" as not clearly defined, so as to render the entirety of Plaintiff's Proposed Finding of Fact No. 90 insusceptible to testing for truth or falsity.

91.     To corroborate the results of his model, Mr. McCrary ran simulations in the

OptionVue software itself for a sampling of dates in the range. These simulations showed that OptionVue's results were substantially similar to the results produced by Mr. McCrary's own analysis—if anything, his analysis was more conservative. (*Id.* at ¶¶ 37–47.)

**RESPONSE:** Disputed. Mr. McCrary provides only one set of values for OptionVue for each of three dates (McCrary Report at 14 ex. 5A, 17 ex. 5C, 19 ex. 5E), indicating that each was generated using only one of OptionVue's volatility modes (*cf.* Ex. 39 (OptionVue Help) at 5; Dkt. 25 at 165:17-20), a mode that Mr. McCrary never specifies. Mr. McCrary thus compared the McCrary Model to only one fashion in which OptionVue could function, without checking that that mode accurately matches true market dynamics or what Defendant would have seen while using OptionVue when he was with Catalyst. Furthermore, Mr. McCrary announces that OptionVue's results were "substantially similar" to those of his own model (McCrary Report ¶¶ 37, 42, 47) without describing any objective test for that finding. Defendant also objects to the term "conservative" as ambiguous: does a conservative model indicate smaller changes in price, or greater losses, or less extreme movements in volatility in response to spot moves, or what, exactly?

92. Despite that OptionVue would have shown Walczak that the Fund persistently faced the risk that it would lose 8% or more of its value, Walczak's trading did not meaningfully reduce the Fund's exposure to an increase in the S&P 500 futures contract price, and certainly not enough to limit the Fund's exposure to less than 8%. (*Id.* at ¶¶ 57–74.)

**RESPONSE:** Disputed. It has not been established that "OptionVue would have shown Walczak that the Fund persistently faced the risk that it would lose 8% or more of its value," for multiple reasons. First, Plaintiff has provided no evidence as to which volatility mode of OptionVue Defendant used while at Catalyst. *See* Ex. 39 (OptionVue Help) at 5. Second, Mr.

McCrary has not calculated what OptionVue would have shown under *any* volatility mode on more than three sample dates but has rather merely calculated what *his model* might have shown, without demonstrating that the two models match. *See* Dkt. 24 (McCrary Report) at 12 n.18 ("I don't have specific knowledge of what formulas OptionVue used."). Third, even Mr. McCrary's own numbers do not suggest that any given size move in the S&P Futures price threatened the Fund with a risk of 8% loss "persistently." *See id.* at 22 ex. 6A (indicating widespread, but not continuous, exposure to losses in excess of 8% in the event of a 10% increase in S&P Futures price, under whatever volatility dynamic is used in the McCrary Model). Fourth, Defendant varied the range of spot moves he displayed in OptionVue for reasons including changes in volatility. *E.g.*, CFTC Ex. 20 at 32:8-13 (range up to Defendant's discretion); *id.* at 13-15 (increasing size of decreases considered to 20% in high-volatility period). Thus, neither Mr. McCrary nor Plaintiff has established what Defendant would have seen in OptionVue on any given day, as the size move he displayed in the OptionVue graph was not constant during his time at Catalyst.

93.     A stress test of a 10% increase in the S&P 500 Futures contract would have predicted a loss to the Fund of more than 8% on 85% of trading days in the testing period. (*Id.* at 22 ex.6A; *id.* app'x 4.)

**RESPONSE:** Disputed. First, Plaintiff has not specified which of myriad possible "stress test" methodologies is presumed in Plaintiff's Proposed Finding of Fact No. 93, and Defendant accordingly objects to that term as ill-defined and not admitting determination of the Proposed Finding's truth or falsity. Second, to the extent that this Proposed Finding of Fact implicitly posits Defendant's own method of conducting stress tests, Plaintiff has not established how Defendant ran stress tests, having addressed only the component of such tests that

Defendant conducted in OptionVue, and hence Plaintiff has not established what Defendant's stress tests would have shown on any given date. Third, even looking only at OptionVue, Plaintiff has not established which OptionVue volatility mode Defendant used in his stress tests (*see* Ex. 39 (OptionVue Help) at 5), so that Plaintiff cannot establish even what Defendant would have seen in that portion of his stress tests. Fourth, the evidence cited by Plaintiff in its Proposed Finding of Fact No. 93 points only to the size of potential losses under the McCrary Model, not in OptionVue, and as discussed above, the two do not yield identical numbers. Dkt. 24 (McCrary Report) at 22 ex. 6A (graph of exposures calculated using McCrary Model, not OptionVue); *id.* app'x 4 (calculations based on McCrary Model, not OptionVue); *see also* Defendant's Response to Plaintiff's Proposed Findings of Fact Nos. 87-89 (noting various differences between the McCrary Model and OptionVue). Fifth, this Proposed Finding of Fact does not indicate the period over which the 10% rise would be permitted to occur, and Mr. McCrary's Appendix 4 points to a different frequency of potential losses in excess of 8% for different holding periods. Defendant also objects to the term "the testing period" as not defined.

94.     A stress test of a 10% increase in the S&P would have shown a loss to the Fund of more than 8% on every trading day from March 1, 2016, through February 1, 2017. (*Id.* at 22 ex.6A; *id.* app'x 4, at 13–18.)

**RESPONSE:** Disputed. First, Plaintiff has not specified which of myriad possible "stress test" methodologies is presumed in Plaintiff's Proposed Finding of Fact No. 94, and Defendant accordingly objects to that term as ill-defined and not admitting determination of the Proposed Finding's truth or falsity. Second, to the extent that this Proposed Finding of Fact implicitly posits Defendant's own method of conducting stress tests, Plaintiff has not established how Defendant ran stress tests, having addressed only the component of such tests that

Defendant conducted in OptionVue, and hence Plaintiff has not established what Defendant's stress tests would have shown on any given date.  Third, even looking only at OptionVue, Plaintiff has not established which OptionVue volatility mode Defendant used in his stress tests (*see* Ex. 39 (OptionVue Help) at 5), so that Plaintiff cannot establish even what Defendant would have seen in that portion of his stress tests.  Fourth, the evidence cited by Plaintiff in its Proposed Finding of Fact No. 94 points only to the size of potential losses under the McCrary Model, not in OptionVue, and as discussed above, the two do not yield identical numbers.  McCrary Report at 22 ex. 6A (graph of exposures calculated using McCrary Model, not OptionVue); *id.* app'x 4 (calculations based on McCrary Model, not OptionVue); *see also* Defendant's Response to Plaintiff's Proposed Findings of Fact Nos. 87-89 (noting various differences between the McCrary Model and OptionVue).

95.      A stress test of a 10% increase in the S&P Futures would have shown a loss to the Fund of more than 60% on all but three trading days from June 1, 2016, through August 1, 2016.(*Id.* at 22 ex.6A; *id.* app'x 4, at 13–18.)

**RESPONSE:**  Disputed.  First, Plaintiff has not specified which of myriad possible "stress test" methodologies is presumed in Plaintiff's Proposed Finding of Fact No. 95, and Defendant accordingly objects to that term as ill-defined and not admitting determination of the Proposed Finding's truth or falsity.  Second, to the extent that this Proposed Finding of Fact implicitly posits Defendant's own method of conducting stress tests, Plaintiff has not established how Defendant ran stress tests, having addressed only the component of such tests that Defendant conducted in OptionVue, and hence Plaintiff has not established what Defendant's stress tests would have shown on any given date.  Third, even looking only at OptionVue, Plaintiff has not established which OptionVue volatility mode Defendant used in his stress tests

(*see* Ex. 39 (OptionVue Help) at 5), so that Plaintiff cannot establish even what Defendant would have seen in that portion of his stress tests. Fourth, the evidence cited by Plaintiff in its Proposed Finding of Fact No. 95 points only to the size of potential losses under the McCrary Model, not in OptionVue, and as discussed above, the two do not yield identical numbers. McCrary Report at 22 ex. 6A (graph of exposures calculated using McCrary Model, not OptionVue); *id.* app'x 4 (calculations based on McCrary Model, not OptionVue); *see also* Defendant's Response to Plaintiff's Proposed Findings of Fact Nos. 87-89 (noting various differences between the McCrary Model and OptionVue).

96.     A stress test of a 10% increase in the S&P Futures would have shown a loss to theFund of greater than 60% on all but three trading days from June 1, 2016, through August 1, 2016, even if the 10% increase in the S&P 500 futures contract occurred over the course of two weeks. (*Id.* at 22 ex.6A; *id.* app'x 4, at 14–15.)

**RESPONSE:**  Disputed.  First, Plaintiff has not specified which of myriad possible "stress test" methodologies is presumed in Plaintiff's Proposed Finding of Fact No. 96, and Defendant accordingly objects to that term as ill-defined and not admitting determination of the Proposed Finding's truth or falsity.  Second, to the extent that this Proposed Finding of Fact implicitly posits Defendant's own method of conducting stress tests, Plaintiff has not established how Defendant ran stress tests, having addressed only the component of such tests that Defendant conducted in OptionVue, and hence Plaintiff has not established what Defendant's stress tests would have shown on any given date.  Third, even looking only at OptionVue, Plaintiff has not established which OptionVue volatility mode Defendant used in his stress tests (*see* Ex. 39 (OptionVue Help) at 5), so that Plaintiff cannot establish even what Defendant would have seen in that portion of his stress tests.  Fourth, the evidence cited by Plaintiff in its Proposed

Finding of Fact No. 96 points only to the size of potential losses under the McCrary Model, not in OptionVue, and as discussed above, the two do not yield identical numbers. McCrary Report at 22 ex. 6A (graph of exposures calculated using McCrary Model, not OptionVue); *id.* app'x 4 (calculations based on McCrary Model, not OptionVue); *see also* Defendant's Response to Plaintiff's Proposed Findings of Fact Nos. 87-89 (noting various differences between the McCrary Model and OptionVue).

97.     A stress test simulating a 5% increase in the S&P Futures at the end of trading on October 31, 2014, would have predicted a loss in value to the fund of roughly 33%. (*Id.* at ¶ 52;*id.* at 24 ex.6B; *id.* app'x 4, at 6.)

**RESPONSE:**  Disputed.  First, Plaintiff has not specified which of myriad possible "stress test" methodologies is presumed in Plaintiff's Proposed Finding of Fact No. 97, and Defendant accordingly objects to that term as ill-defined and not admitting determination of the Proposed Finding's truth or falsity.  Second, to the extent that this Proposed Finding of Fact implicitly posits Defendant's own method of conducting stress tests, Plaintiff has not established how Defendant ran stress tests, having addressed only the component of such tests that Defendant conducted in OptionVue, and hence Plaintiff has not established what Defendant's stress tests would have shown on any given date.  Third, even looking only at OptionVue, Plaintiff has not established which OptionVue volatility mode Defendant used in his stress tests (*see* Ex. 39 (OptionVue Help) at 5), so that Plaintiff cannot establish even what Defendant would have seen in that portion of his stress tests.  Fourth, the evidence cited by Plaintiff in its Proposed Finding of Fact No. 97 points only to the size of potential losses under the McCrary Model, not in OptionVue, and as discussed above, the two do not yield identical numbers.  McCrary Report at 24 ex. 6B (graph of predicted returns calculated using McCrary Model, not OptionVue); *id.*

app'x 4 (calculations based on McCrary Model, not OptionVue); *see also* Defendant's Response to Plaintiff's Proposed Findings of Fact Nos. 87-89 (noting various differences between the McCrary Model and OptionVue). Fifth, this Proposed Finding of Fact does not indicate the period over which the 5% rise would be permitted to occur, and Mr. McCrary's Appendix 4 points to a different percentage loss for each holding period, with only the same-day change implying a loss of about 33%. *See* Dkt. 24 (McCrary Report) app'x 4.

98. A stress test simulating a 2.5% increase in the S&P Futures that day would have shown a predicted loss of roughly 11%. (*Id.* at ¶ 52; *id.* at 24 ex.6B; *id.* app'x 4, at 6.)

**RESPONSE:** Disputed. First, Plaintiff has not specified which of myriad possible "stress test" methodologies is presumed in Plaintiff's Proposed Finding of Fact No. 98, and Defendant accordingly objects to that term as ill-defined and not admitting determination of the Proposed Finding's truth or falsity. Second, to the extent that this Proposed Finding of Fact implicitly posits Defendant's own method of conducting stress tests, Plaintiff has not established how Defendant ran stress tests, having addressed only the component of such tests that Defendant conducted in OptionVue, and hence Plaintiff has not established what Defendant's stress tests would have shown on any given date. Third, even looking only at OptionVue, Plaintiff has not established which OptionVue volatility mode Defendant used in his stress tests (*see* Ex. 39 (OptionVue Help) at 5), so that Plaintiff cannot establish even what Defendant would have seen in that portion of his stress tests. Fourth, the evidence cited by Plaintiff in its Proposed Finding of Fact No. 98 points only to the size of potential losses under the McCrary Model, not in OptionVue, and as discussed above, the two do not yield identical numbers. McCrary Report at 24 ex. 6B (graph of predicted returns calculated using McCrary Model, not OptionVue); *id.* app'x 4 (calculations based on McCrary Model, not OptionVue); *see also* Defendant's Response

49

to Plaintiff's Proposed Findings of Fact Nos. 87-89 (noting various differences between the McCrary Model and OptionVue). Fifth, this Proposed Finding of Fact does not indicate the period over which the 2.5% rise would be permitted to occur, and Mr. McCrary's Appendix 4 points to a different percentage loss for each holding period, with only the same-day change implying a loss of about 11%. *See* Dkt. 24 (McCrary Report) app'x 4.

99.      On November 3, 2014—the next trading day—Walczak did not trade at all. (*Id.* ¶70; *id.* at 35 ex. 7C; *id.* app'x 5, at 3.)

**RESPONSE:** Undisputed.

100.     On each day from November 5, 2014, through November 20, 2014, the Fund was positioned to lose at least 30% of its value upon an increase in the S&P 500 Futures contract of 5%, and would have lost at least 10% of its value upon a 2.5% increase in the S&P 500 Futures. (*Id.* at 24 ex.6B; *id.* app'x 4, at 6–7.)

**RESPONSE:** Disputed.  The numbers set forth in this Proposed Finding of Fact come from the McCrary Model, and Plaintiff has not established that the McCrary Model accurately predicts how the Fund's value would actually have responded to various proposed movements in the S&P Futures price.  Dkt. 24 (McCrary Report) at Ex. 6B (presenting calculations from the McCrary Model); *id.* app'x 4 (same). *See generally* Dkt. 24 (McCrary Report) (presenting no testing of the McCrary Model's predictions against actual observed movements of the Fund's value in response to changes in the price of S&P Futures).  Furthermore, this Proposed Finding of Fact does not indicate the period over which the 5% and 2.5% rises would be permitted to occur, and Mr. McCrary's Appendix 4 supports the statements in this Proposed Finding of Fact only for same-day changes in the S&P Futures price. *See id.* app'x 4.

101.     Even if the 5% S&P price increases were simulated over a seven- or fourteen-

day period, these stress tests still would have shown a breach of Walczak's 8% threshold on each day from October 31, 2014, to November 28, 2014.  (*Id*.)

**RESPONSE:**  Disputed.  First, Plaintiff has not specified which of myriad possible "stress test" methodologies is presumed in Plaintiff's Proposed Finding of Fact No. 101, and Defendant accordingly objects to that term as ill-defined and not admitting determination of the Proposed Finding's truth or falsity.  Second, to the extent that this Proposed Finding of Fact implicitly posits Defendant's own method of conducting stress tests, Plaintiff has not established how Defendant ran stress tests, having addressed only the component of such tests that Defendant conducted in OptionVue, and hence Plaintiff has not established what Defendant's stress tests would have shown on any given date.  Third, even looking only at OptionVue, Plaintiff has not established which OptionVue volatility mode Defendant used in his stress tests (*see* Ex. 39 (OptionVue Help) at 5), so that Plaintiff cannot establish even what Defendant would have seen in that portion of his stress tests.  Fourth, the evidence cited by Plaintiff in its Proposed Finding of Fact No. 101 points only to the size of potential losses under the McCrary Model, not in OptionVue, and as discussed above, the two do not yield identical numbers.  McCrary Report at 24 ex. 6B (graph of predicted returns calculated using McCrary Model, not OptionVue); *id.* app'x 4 (calculations based on McCrary Model, not OptionVue); *see also* Defendant's Response to Plaintiff's Proposed Findings of Fact Nos. 87-89 (noting various differences between the McCrary Model and OptionVue).

102.     On each day from June 1 to June 23, 2016, a stress test would have shown that a 5% increase in the S&P Futures contract would have caused the Fund to lose well over 10% of its value, even if the increase occurred over the course of one week. (*Id.* at ¶ 55; *id.* at 27 ex.6E; *id.* app'x 4, at 14–15.)

**RESPONSE:** Disputed.  First, Plaintiff has not specified which of myriad possible "stress test" methodologies is presumed in Plaintiff's Proposed Finding of Fact No. 102, and Defendant accordingly objects to that term as ill-defined and not admitting determination of the Proposed Finding's truth or falsity.  Second, to the extent that this Proposed Finding of Fact implicitly posits Defendant's own method of conducting stress tests, Plaintiff has not established how Defendant ran stress tests, having addressed only the component of such tests that Defendant conducted in OptionVue, and hence Plaintiff has not established what Defendant's stress tests would have shown on any given date.  Third, even looking only at OptionVue, Plaintiff has not established which OptionVue volatility mode Defendant used in his stress tests (*see* Ex. 39 (OptionVue Help) at 5), so that Plaintiff cannot establish even what Defendant would have seen in that portion of his stress tests.  Fourth, the evidence cited by Plaintiff in its Proposed Finding of Fact No. 102 points only to the size of potential losses under the McCrary Model, not in OptionVue, and as discussed above, the two do not yield identical numbers.  McCrary Report at 27 ex. 6E (graph of predicted returns calculated using McCrary Model, not OptionVue); *id.* app'x 4 (calculations based on McCrary Model, not OptionVue); *see also* Defendant's Response to Plaintiff's Proposed Findings of Fact Nos. 87-89 (noting various differences between the McCrary Model and OptionVue).  In addition, Defendant objects to the term "well over 10%" as ambiguous, and to the extent that the phrase is instead deemed to be clear, Defendant states that the 10.54% loss described in McCrary Report Appendix 4 for a 5% increase in the S&P Futures price over one week on June 17, 2016 should not qualify as "well over 10%."  *See* Dkt. 24 (McCrary Report) app'x 4.

103.    On each day from June 1 to June 8, 2016, Walczak's trading actually increased the Fund's potential exposure to a rising market, despite the fact that stress tests during that

period would have shown a persistent risk of the fund losing more than 10% of its value.  (*Id.* at ¶ 71; *id.* at 37 ex.7D; *id.* app'x 5, at 6.)

  **RESPONSE:**  Disputed.  First, Plaintiff has not specified which of myriad possible "stress test" methodologies is presumed in Plaintiff's Proposed Finding of Fact No. 103, and Defendant accordingly objects to that term as ill-defined and not admitting determination of the Proposed Finding's truth or falsity.  Second, to the extent that this Proposed Finding of Fact implicitly posits Defendant's own method of conducting stress tests, Plaintiff has not established how Defendant ran stress tests, having addressed only the component of such tests that Defendant conducted in OptionVue, and hence Plaintiff has not established what Defendant's stress tests would have shown on any given date.  Third, even looking only at OptionVue, Plaintiff has not established which OptionVue volatility mode Defendant used in his stress tests (*see* Ex. 39 (OptionVue Help) at 5), so that Plaintiff cannot establish even what Defendant would have seen in that portion of his stress tests.  Fourth, the evidence cited by Plaintiff in its Proposed Finding of Fact No. 103 points only to the size of potential losses under the McCrary Model, not in OptionVue, and as discussed above, the two do not yield identical numbers. Dkt. 24 (McCrary Report) at 37 ex. 7D (graph of potential losses calculated using McCrary Model, not OptionVue); *id.* app'x 5 (calculations based on McCrary Model, not OptionVue); *see also* Defendant's Response to Plaintiff's Proposed Findings of Fact Nos. 87-89 (noting various differences between the McCrary Model and OptionVue).  Fifth, the numbers set forth in this Proposed Finding of Fact come from the McCrary Model, and Plaintiff has not established that the McCrary Model accurately predicts how the Fund's value would actually have responded to various proposed movements in the S&P Futures price.  Dkt. 24 (McCrary Report) at 37 ex. 7D (presenting calculations from the McCrary Model); *id.* app'x 5 (same).  *See generally* Dkt. 24

(McCrary Report) (presenting no testing of the McCrary Model's predictions against actual observed movements of the Fund's value in response to changes in the price of S&P Futures). Sixth, Mr. McCrary's Exhibit 7D merely checks the size of losses under his model for *one set size of increase in S&P Futures prices* over *one fixed time period*, not "the Fund's potential exposure to a rising market," which would necessarily consider moves of multiple sizes and durations; accordingly, the evidence Plaintiff cites here does not support Plaintiff's contention that "Walczak's trading actually increased the Fund's potential exposure to a rising market" on the indicated dates. Seventh, the Fund's short call ratio spreads already exposed the Fund to *unlimited* losses before the trades entered on the indicated dates, and thus no trades could further "increase[] the Fund's potential exposure to a rising market." *See* Ex. 35 (De Laval Report) ¶ 27 (quoting the Fund's registration statement, which notes that "[t]he Fund's losses are potentially large in a sold put transaction and potentially unlimited in a sold call transaction").

104.     On each day from June 14 through June 30, 2016, Walczak either did not make any trades for the Fund or entered trades that increased the risk to the Fund of loss resulting from modest increases in the S&P futures contract. (*Id.* at ¶ 71; *id.* at 37 ex.7D; *id.* app'x 5, at 6.)

**RESPONSE:**  Disputed.  First, the numbers set forth in this Proposed Finding of Fact come from the McCrary Model, and Plaintiff has not established that the McCrary Model accurately predicts how the Fund's value would actually have responded to various proposed movements in the S&P Futures price. Dkt. 24 (McCrary Report at 37 ex. 7D) (presenting calculations from the McCrary Model); *id.* app'x 5 (same). *See generally* McCrary Report (presenting no testing of the McCrary Model's predictions against actual observed movements of the Fund's value in response to changes in the price of S&P Futures). Second, Defendant objects to the term "modest increases" as ambiguous. Third, Mr. McCrary's Exhibit 7D merely checks

the size of losses under his model for *one set size of increase in S&P Futures prices* over *one fixed time period*, not "the risk to the Fund of loss resulting from modest increases in the S&P Futures contract," which would necessarily consider moves of multiple sizes and durations; accordingly, the evidence Plaintiff cites here does not support Plaintiff's contention that "Walczak either did not make any trades for the Fund or entered trades that increased the risk to the Fund of loss resulting from modest increases in the S&P futures contract" on the indicated dates.

105.     On most days in July 2016, the Fund's positions were such that if the S&P 500 futures contract increased 10%, the value of the Fund would have been wiped out completely.(*Id.* at 22 ex.6A; *id.* app'x 4, at 15.)

**RESPONSE:**  Disputed.  First, Defendant objects to the phrase "most days" as ambiguous so as not to permit determination of the truth or falsity of this Proposed Finding of Fact.  Second, the assertion set forth in this Proposed Finding of Fact is based on calculations performed within the McCrary Model, and Plaintiff has not established that the McCrary Model accurately predicts how the Fund's value would actually have responded to various proposed movements in the S&P Futures price.  Dkt. 24 (McCrary Report) at 22 ex. 6A (presenting calculations from the McCrary Model); *id.* app'x 4 (same).  *See generally* Dkt. 24 (McCrary Report) (presenting no testing of the McCrary Model's against actual observed movements of the Fund's value to changes in the price of S&P Futures).  Third, this Proposed Finding of Fact does not indicate the period over which the 10% rise would be permitted to occur, and on several days in July 2016, Mr. McCrary's Appendix 4 points to a loss of 100% or more only for same-day rises of 10% in the S&P Futures price.  *See id.* app'x 4.

106.     A stress test of a mere 2.5% increase in the market conducted any day from July

12 to July 29, 2016, would have shown predicted losses in the Fund's value ranging from 16% to 22%. (*Id.* at ¶ 55; *id.* at 27 ex. 6E; *id.* app'x 4, at 15.)

  **RESPONSE:**  Disputed.  First, Plaintiff has not specified which of myriad possible "stress test" methodologies is presumed in Plaintiff's Proposed Finding of Fact No. 106, and Defendant accordingly objects to that term as ill-defined and not admitting determination of the Proposed Finding's truth or falsity.  Second, to the extent that this Proposed Finding of Fact implicitly posits Defendant's own method of conducting stress tests, Plaintiff has not established how Defendant ran stress tests, having addressed only the component of such tests that Defendant conducted in OptionVue, and hence Plaintiff has not established what Defendant's stress tests would have shown on any given date.  Third, even looking only at OptionVue, Plaintiff has not established which OptionVue volatility mode Defendant used in his stress tests (*see* Ex. 39 (OptionVue Help) at 5), so that Plaintiff cannot establish even what Defendant would have seen in that portion of his stress tests.  Fourth, the evidence cited by Plaintiff in its Proposed Finding of Fact No. 106 points only to the size of potential losses under the McCrary Model, not in OptionVue, and as discussed above, the two do not yield identical numbers. Dkt. 24 (McCrary Report) at 19 ex. 6E (graph of predicted returns calculated using McCrary Model, not OptionVue); *id.* app'x 4 (calculations based on McCrary Model, not OptionVue); *see also* Defendant's Response to Plaintiff's Proposed Findings of Fact Nos. 87-89 (noting various differences between the McCrary Model and OptionVue).  Fifth, the numbers set forth in this Proposed Finding of Fact come from the McCrary Model, and Plaintiff has not established that the McCrary Model accurately predicts how the Fund's value would actually have responded to various proposed movements in the S&P Futures price. Dkt. 24 (McCrary Report) at 37 ex. 7D (presenting calculations from the McCrary Model); *id.* app'x 5 (same).  *See generally* Dkt. 24

(McCrary Report) (presenting no testing of the McCrary Model's predictions against actual observed movements of the Fund's value in response to changes in the price of S&P Futures). Sixth, this Proposed Finding of Fact does not indicate the period over which the 2.5% rise would be permitted to occur, and Mr. McCrary's Appendix 4 mirrors the claimed range of potential losses only for same-day changes in the S&P Futures price. *See id.* app'x 4.

107.    On some days in July 2016, Walczak's trades increased risk; on other days, his trades reduced risk, but not meaningfully.  (*Id.* at 39 ex.7E; *id.* app'x 3, at 15; *id.* app'x 5, at 6.)

**RESPONSE:**  Disputed.  First, Defendant objects to the phrase term "meaningfully" as ambiguous so as not to permit determination of the truth or falsity of this Proposed Finding of Fact.  Second, a position's "risk" is not calculated just based on the size of a loss resulting from an instantaneous increase in the S&P by 5% accompanied by no change in volatility.  *See, e.g.*, CFTC Ex. 29 (displaying wide range of potential spot moves, not just a single point); CFTC Ex. 18 at 20:18-22 (discussing change in volatility as most important component of options risk management); Ex. 38 (Catalyst_005_0194342) (tabulating exposure to various risk measures of the Fund, aiming to describe the local dependency of Fund value on small changes to various inputs).  Accordingly, Mr. McCrary's Exhibit 7E and Appendix 5 do not suffice to determine whether trades increased the Fund's overall risk, and indeed Plaintiff has established no well-defined ordering for risk in the Fund given the multiple dimensions of risk relevant to options portfolios.  *See* Dkt. 24 (McCrary Report) app'x 5 (displaying the change, starting from the Fund's observed portfolio on a given date and then adding in the chosen day's trades, in the size of loss that the McCrary Model indicates would result if spot rose by 5% while volatility, time, and interest rates remained unchanged); *id.* at 39 ex. 7E (graphing some of those same results).  Third, the assertion set forth in this Proposed Finding of Fact is based on calculations performed

within the McCrary Model, and Plaintiff has not established that the McCrary Model accurately predicts how the Fund's value would actually have responded to various proposed movements in the S&P Futures price. *Id.* (presenting calculations from the McCrary Model); *id.* app'x 5 (same). *See generally* Dkt. 24 (McCrary Report) (presenting no testing of the McCrary Model's predictions against actual observed movements of the Fund's value in response to changes in the price of S&P Futures). Fourth, Plaintiff's Proposed Finding of Fact No. 107, with its passing acknowledgment that Mr. McCrary's numbers imply an increase in risk on some days in July 2016 and a decrease on other such days, improperly obscures the fact that Mr. McCrary's Appendix 5 actually shows more days in July 2016 when Defendant's trading reportedly *decreased* risk (as measured by Mr. McCrary) than days in July 2016 when Defendant's trading *increased* such risk. *See id.* app'x 5 (listing for July 2016 nine days of increased risk, ten days of decreased risk, and one day with no change). Sixth, contrary to the assertion in this Proposed Finding that Defendant's trades did not "meaningfully" reduce risk, Mr. McCrary's Appendix 5 shows that, even by his own numbers, the increase in his measure of risk in July 2017 never exceeded 0.75%, while the *decrease* in risk grew as large as 8.44% (more than eleven times as large). *Id.* Indeed, seven of the ten days when Defendant's trades reportedly decreased risk in July 2016 displayed a magnitude of change in excess of the largest increase observed at any time in that month, and an eighth matched that largest increase in risk in size. *Id.*; *see also id.* at 39 ex. 7E (displaying much larger green bars for reductions in risk than red bars for increases in risk).

108.    On July 15, 2016, in an email exchange with Walczak, Walczak's assistant portfolio manager said: "[w]e got lucky today with a down market." (Ex. 23 (7/14/2016 email), at 1.)

**RESPONSE:** Undisputed.

109.     On July 14, a stress test simulating a 2.5% increase in the S&P Futures would have predicted losses to the Fund of over 20%. (Dkt. 24 (McCrary Rep.), at ¶ 55; *id.* at 27 ex.6E; *id.* app'x 4 at 15.)

**RESPONSE:** Disputed.  First, Plaintiff has not specified which of myriad possible "stress test" methodologies is presumed in Plaintiff's Proposed Finding of Fact No. 109, and Defendant accordingly objects to that term as ill-defined and not admitting determination of the Proposed Finding's truth or falsity.  Second, to the extent that this Proposed Finding of Fact implicitly posits Defendant's own method of conducting stress tests, Plaintiff has not established how Defendant ran stress tests, having addressed only the component of such tests that Defendant conducted in OptionVue, and hence Plaintiff has not established what Defendant's stress tests would have shown on any given date.  Third, even looking only at OptionVue, Plaintiff has not established which OptionVue volatility mode Defendant used in his stress tests (*see* Ex. 39 (OptionVue Help) at 5), so that Plaintiff cannot establish even what Defendant would have seen in that portion of his stress tests.  Fourth, the evidence cited by Plaintiff in its Proposed Finding of Fact No. 109 points only to the size of potential losses under the McCrary Model, not in OptionVue, and as discussed above, the two do not yield identical numbers.  McCrary Report at 19 ex. 6E (graph of predicted returns calculated using McCrary Model, not OptionVue); *id.* app'x 4 (calculations based on McCrary Model, not OptionVue); *see also* Defendant's Response to Plaintiff's Proposed Findings of Fact Nos. 87-89 (noting various differences between the McCrary Model and OptionVue).  Fifth, this Proposed Finding of Fact does not indicate the period over which the 2.5% rise would be permitted to occur, and Mr. McCrary's Appendix 4 points to percentage losses that vary according to the holding period.  *See* Dkt. 24 (McCrary

Report) app'x 4.  Sixth, Defendant objects to this Proposed Finding of Fact on the grounds that "July 14," without specification of a year, does not adequately describe the time when stress tests would allegedly have revealed the kinds of risk exposure that Plaintiff describes, thus frustrating any determination of whether the evidence cited by Plaintiff actually supports the allegation.

110.     On July 15, 2016, Walczak made no trades to affect the risk the Fund faced from an increase in the S&P Futures market.  (Dkt. 24 (McCrary Rep.), at 39 ex.7E; *id.* app'x 5, at 6.)

**RESPONSE:**  Undisputed.

111.     On Friday, July 22, 2016, Walczak was asked by one of the Fund's Futures Commission Merchants what a 10% rise in the price of the S&P 500 Futures contracts would do to the value of the Fund, and Walczak responded the following Monday that a stress test he had run on the options expiring that Friday showed a loss of $1.22 billion. (Ex. 24 (7/27/2016 email), at 1.)

**RESPONSE:**  Disputed.  In the e-mail cited by Plaintiff, Stephen Hood asked Defendant "what *liquidity* you have above the 10% move up."  CFTC Ex. 24 at 3 (emphasis added). Contrary to Plaintiff's suggestion here, Mr. Hood did not ask what such a 10% rise in the price of the S&P 500 Futures contracts "would do to the value of the Fund."  Defendant responded, "$1.22 billion."  *Id.* at 1.  Contrary to Plaintiff's suggestion here, Defendant never referenced a "stress test" in his response; nor did he indicate that the $1.22 billion represented a loss for the Fund.  In short, Plaintiff misstates both the question and the answer in this e-mail.

112.     At the time, $1.22 billion was approximately 35% of the Fund's assets under management.  (*See* Ex. 28 (Fund historical daily assets under management).)

**RESPONSE:**  Defendant objects that both "At the time" and "approximately" are

ambiguous, so as to prevent any determination of the truth or falsity of this Proposed Finding of Fact.

113.     On every day of January 2017, stress testing a 10% increase in the price of the S&P would have shown the Fund losing far in excess of 8%, even if the 10% increase in the S&P 500 futures contract occurred over seven or fourteen days. (*Id.* at 22 ex.6A; *id.* app'x 4, at 17–18.)

**RESPONSE:**  Disputed.  First, Plaintiff has not specified which of myriad possible "stress test" methodologies is presumed in Plaintiff's Proposed Finding of Fact No. 113, and Defendant accordingly objects to that term as ill-defined and not admitting determination of the Proposed Finding's truth or falsity.  Second, to the extent that this Proposed Finding of Fact implicitly posits Defendant's own method of conducting stress tests, Plaintiff has not established how Defendant ran stress tests, having addressed only the component of such tests that Defendant conducted in OptionVue, and hence Plaintiff has not established what Defendant's stress tests would have shown on any given date.  Third, even looking only at OptionVue, Plaintiff has not established which OptionVue volatility mode Defendant used in his stress tests (*see* Ex. 39 (OptionVue Help) at 5), so that Plaintiff cannot establish even what Defendant would have seen in that portion of his stress tests.  Fourth, the evidence cited by Plaintiff in its Proposed Finding of Fact No. 113 points only to the size of potential losses under the McCrary Model, not in OptionVue, and as discussed above, the two do not yield identical numbers. Dkt. 24 (McCrary Report) at 14 ex. 6A (graph of exposures calculated using McCrary Model, not OptionVue); *id.* app'x 4 (calculations based on McCrary Model, not OptionVue); *see also* Defendant's Response to Plaintiff's Proposed Findings of Fact Nos. 87-89 (noting various differences between the McCrary Model and OptionVue).  Defendant also objects to the term "far in excess" as

ambiguous.

114.    On every day of January 2017, a stress test simulating a 2.5% rise in the S&P 500 futures contracts over 7 days would have predicted a loss to the Fund of greater than 8%. (Dkt. 24 (McCrary Rep.), at ¶ 56; *id.* at 28 ex.6F; *id.* app'x 4, at 17–18.)

**RESPONSE:** Disputed. First, Plaintiff has not specified which of myriad possible "stress test" methodologies is presumed in Plaintiff's Proposed Finding of Fact No. 114, and Defendant accordingly objects to that term as ill-defined and not admitting determination of the Proposed Finding's truth or falsity. Second, to the extent that this Proposed Finding of Fact implicitly posits Defendant's own method of conducting stress tests, Plaintiff has not established how Defendant ran stress tests, having addressed only the component of such tests that Defendant conducted in OptionVue, and hence Plaintiff has not established what Defendant's stress tests would have shown on any given date. Third, even looking only at OptionVue, Plaintiff has not established which OptionVue volatility mode Defendant used in his stress tests (*see* Ex. 39 (OptionVue Help) at 5), so that Plaintiff cannot establish even what Defendant would have seen in that portion of his stress tests. Fourth, the evidence cited by Plaintiff in its Proposed Finding of Fact No. 114 points only to the size of potential losses under the McCrary Model, not in OptionVue, and as discussed above, the two do not yield identical numbers. McCrary Report at 28 ex. 6F (graph of predicted returns calculated using McCrary Model, not OptionVue); *id.* app'x 4 (calculations based on McCrary Model, not OptionVue); *see also* Defendant's Response to Plaintiff's Proposed Findings of Fact Nos. 87-89 (noting various differences between the McCrary Model and OptionVue).

115.    On not a single day from January 3 to January 25, 2017, did Walczak's trading serve to reduce the risk to the Fund of an increase in the S&P 500 futures market. (*Id.* at ¶ 74; *id.*

at 41 ex.7G; *id.* app'x 5, at 7.)

**RESPONSE:** Disputed.  First, the evidence Plaintiff cites in support of this Proposed Finding of Fact comes from calculations using the McCrary Model, and Plaintiff has not established that the McCrary Model accurately predicts how the Fund's value would actually have responded to various proposed movements in the S&P Futures price.  McCrary Report at 41 ex. 7G (presenting calculations from the McCrary Model); *id.* app'x 5 (same).  *See generally* McCrary Report (presenting no testing of the McCrary Model's predictions against actual observed movements of the Fund's value in response to changes in the price of S&P Futures).  Second, Defendant objects to the phrase "the risk to the Fund of an increase in the S&P 500 futures market" as ambiguous; specifically, this would appear to indicate the risk (likelihood) that the S&P futures market would see prices increase, a measure that would remain essentially unchanged regardless of any trades the Fund might make.  Third, to the extent that "the risk to the Fund of an increase in the S&P 500 futures market" instead means the magnitude of loss that the Fund stood to incur as a result of various potential rises in the S&P Futures contract price, Mr. McCrary's Exhibit 7G merely checks the size of losses under his model for *one set size of increase in S&P Futures prices* over *one fixed time period*, not the variety of move sizes and durations that would need to be examined to determine "the risk to the Fund of an increase in the S&P 500 futures market" by that definition.   Accordingly, the evidence Plaintiff cites here does not support Plaintiff's contention in this Proposed Finding of Fact.

116.      From February 1 through February 8, 2017, stress tests of as little as a 2.5% increase in the S&P Futures would have shown the Fund losing over 11% of its value.  (*Id.* at ¶ 56; *id.* at 28 ex.6F; *id.* app'x 4, at 18.)

**RESPONSE:** Disputed.  First, Plaintiff has not specified which of myriad possible

"stress test" methodologies is presumed in Plaintiff's Proposed Finding of Fact No. 116, and Defendant accordingly objects to that term as ill-defined and not admitting determination of the Proposed Finding's truth or falsity. Second, to the extent that this Proposed Finding of Fact implicitly posits Defendant's own method of conducting stress tests, Plaintiff has not established how Defendant ran stress tests, having addressed only the component of such tests that Defendant conducted in OptionVue, and hence Plaintiff has not established what Defendant's stress tests would have shown on any given date. Third, even looking only at OptionVue, Plaintiff has not established which OptionVue volatility mode Defendant used in his stress tests (*see* Ex. 39 (OptionVue Help) at 5), so that Plaintiff cannot establish even what Defendant would have seen in that portion of his stress tests. Fourth, the evidence cited by Plaintiff in its Proposed Finding of Fact No. 116 points only to the size of potential losses under the McCrary Model, not in OptionVue, and as discussed above, the two do not yield identical numbers. Dkt. 24 (McCrary Report) at 28 ex. 6F (graph of predicted returns calculated using McCrary Model, not OptionVue); *id.* app'x 4 (calculations based on McCrary Model, not OptionVue); *see also* Defendant's Response to Plaintiff's Proposed Findings of Fact Nos. 87-89 (noting various differences between the McCrary Model and OptionVue). Fifth, this Proposed Finding of Fact does not specify the time period over which the 2.5% increase in the S&P Futures contract price would be allowed to occur, and Mr. McCrary's Appendix 4 does not support Plaintiff's allegation for a time period of fourteen days. *See* Dkt. 24 (McCrary Report) app'x 4.

117.    On February 6, 2017, for example, a stress test of an increase of 2.5% in the S&P500 futures contract would have shown a predicted loss of approximately 14% to the Fund, even if that increase occurred over the course of seven days. (*Id.* at 28 ex.6F; *id.* app'x 4, at 18.)

**RESPONSE:**  Disputed.  First, Plaintiff has not specified which of myriad possible

"stress test" methodologies is presumed in Plaintiff's Proposed Finding of Fact No. 117, and Defendant accordingly objects to that term as ill-defined and not admitting determination of the Proposed Finding's truth or falsity. Second, to the extent that this Proposed Finding of Fact implicitly posits Defendant's own method of conducting stress tests, Plaintiff has not established how Defendant ran stress tests, having addressed only the component of such tests that Defendant conducted in OptionVue, and hence Plaintiff has not established what Defendant's stress tests would have shown on any given date. Third, even looking only at OptionVue, Plaintiff has not established which OptionVue volatility mode Defendant used in his stress tests (*see* Ex. 39 (OptionVue Help) at 5), so that Plaintiff cannot establish even what Defendant would have seen in that portion of his stress tests. Fourth, the evidence cited by Plaintiff in its Proposed Finding of Fact No. 117 points only to the size of potential losses under the McCrary Model, not in OptionVue, and as discussed above, the two do not yield identical numbers. McCrary Report at 28 ex. 6F (graph of predicted returns calculated using McCrary Model, not OptionVue); *id.* app'x 4 (calculations based on McCrary Model, not OptionVue); *see also* Defendant's Response to Plaintiff's Proposed Findings of Fact Nos. 87-89 (noting various differences between the McCrary Model and OptionVue). Fifth, Defendant objects to the term "approximately" as ambiguous.

118.    Catalyst's own internal analysis was showing similar levels of risk. (Ex. 26 (Fund exposure summary), at 1 (indicating "deltas" of between -300% and -500%)); *see also* Ex. 3 (Walczak April 4, 2018 Testimony), at 612:17 ("Q: And your understanding is that a delta of negative 355 percent means that for every one percent movement in the S&P, the fund is going to move three and a half percent in the other direction? A: Yes.").)

**RESPONSE:** Disputed. Defendant admits that the quotation from CFTC Exhibit 3 was

accurately transcribed but otherwise denies the allegations in this Proposed Finding of Fact. In particular, Plaintiff has not shown that CFTC Exhibit 26 represents "similar levels of risk" to those set forth in Proposed Findings of Fact Nos. 116 and 117 (which cover the same time period) and McCrary Report Appendix 4 (which provides the numbers quoted in those two proposed findings). The same-day moves in McCrary Report Appendix 4 suggest a Delta of –464% on February 1 to –614% on February 9 (not –330% on February 1 and –497% on February 9, as in CFTC Exhibit 26). Moreover, the risk metrics in Exhibit 26 points to gains over time from Theta (absent in Mr. McCrary's analysis) and a chance to make money through Vega if volatility were to fall, such as would be expected if the spot market rose. *See* CFTC Ex. 18 at 20:23 to 21:6 ("So fortunately, within our options software not only does the software automatically anticipate based on past behavior what will happen to volatility -- in other words, the software knows that if the market's down 10 percent volatility is going to be higher, and it uses historical data to project how much higher it will be, and that's reflected in the portfolio value of these options that we look at. And similarly to the upside we know that volatility is likely to decline."). Finally, both Mr. McCrary's numbers and the risk metrics from CFTC Exhibit 26 assume that all other variables remain unchanged, including volatility (which would in reality be informed by the large, quick spot moves under consideration) and time to expiration (which would in reality drop during the time it takes for the S&P Futures price to move to the extent contemplated). This makes both of them unreliable as measures of risk exposure.

119.     Walczak did not execute a single trade from February 1 through February 8, 2017. (Dkt. 24 (McCrary Rep.), at ¶ 74; *id.* at 41 ex.7G; *id.* app'x 5, at 7.)

**RESPONSE:** Undisputed.

120.     Over the rest of February 2017, the S&P 500 rose approximately 3%. (Ex. 30

(S&P historical prices), at 21 (showing the S&P 500 opening at 2,296.70 on February 9, 2017, and closing at 2,363.64 on February 28, 2017, an increase of 2.91%).)

    **RESPONSE:** Undisputed.

    121.    From February 8 to February 28, 2017, the Fund lost over 17% of its value per share, amounting to a loss to investors of approximately $680 million. (*See* Ex. 31 (Fund historical net asset value), at 19–20 (showing a Fund NAV per share of 10.46 on February 8, 2017, and 8.61 on February 28, 2017); Ex. 28 (Fund historical assets under management) (showing Assets Under Management of over $4 billion on February 8, 2017).)

    **RESPONSE:** Objection: "loss" is undefined. Defendant admits that the Fund's share price dropped by over 17% in the indicated period. Defendant however disputes the claimed loss calculation, on the ground that Plaintiff has provided no showing that the claimed losses were in fact realized by investors.

Dated: October 5, 2021                  Respectfully submitted,

By: /s/ James L. Kopecky
James L. Kopecky (ILBar#6225359)
KOPECKY SCHUMACHER ROSENBURG LLC
120 N. LaSalle, Street, Suite 2000
Chicago, IL 60602
Tel. 312-380-6552
jkopecky@ksrlaw.com
*Counsel for Defendant*

By: /s/ Zachary J. Ziliak
Zachary J. Ziliak
ZILIAK LAW LLC
141 W. Jackson Blvd., Suite 4048
Chicago, IL 60604
Tel. 312-462-3350
zachary@ziliak.com
docket@ziliak.com
*Counsel for Defendant*

**CERTIFICATE OF SERVICE**

The undersigned, an attorney, hereby certifies that he caused true and correct copies of the foregoing document to be served upon all counsel of record via ECFl on October 5, 2021.

/s/Zachary J. Ziliak