UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

U.S. COMMODITY FUTURES TRADING ) 
COMMISSION, )
 )
        Plaintiff, )
 )    No. 20 Civ. 75
        v. )
 )    ECF Case
EDWARD S. WALCZAK, )
 )
        Defendant. )
 )
 )
 )

# MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION TO EXCLUDE THE REPORT AND TESTIMONY OF MICHAEL DE LAVAL

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................... 1

REPORT BACKGROUND ........................................................................................... 1

ANALYSIS ..................................................................................................................... 2

    I.      Legal Standard ................................................................................................. 2

    II.     De Laval's Report and Testimony Should Be Excluded under *Daubert* ............... 4

        A.     De Laval Does Not Opine on the Central Issue of the Case ............................. 4

        B.     De Laval's Actual Opinions Are Irrelevant to the Issues in the Case, Unreliable, and Unhelpful to the Finder of Fact ......................................................... 4

        C.     Other Portions of Mr. De Laval's Report Are Not Expert Opinion ................ 12

CONCLUSION ............................................................................................................. 13

# TABLE OF AUTHORITIES

**Cases**

*Amari Co. v. Burgess*, No. 07 C 01425, 2012 WL 5389787 (N.D. Ill. Nov. 2, 2012)................ 2, 3

*Autotech Tech. Ltd. P'ship v. Automation-direct.com*, 471 F.3d 745 (7th Cir. 2006).................... 3

*Black and Decker v. Bosch Tools*, No. 04 C 7955, 2006 WL 5156873 (N.D. Ill. Sept. 8, 2006). 13

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)....................................... 2, 3

*Klaczac v. Consol. Med. Transp.*, 458 F. Supp. 2d 622 (N.D. Ill. 2006)........................................ 3

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) ..................................................................... 3

*Salgado v. Gen. Motors Corp.*, 150 F.3d 735 (7th Cir. 1998) ......................................................... 3

*SEC v. Lipson*, 46 F. Supp. 2d 758 (N.D. Ill. 1998) ....................................................................... 3

**Rules**

Federal Rule of Evidence 702............................................................................................. 2, 3

Federal Rule of Evidence 703................................................................................................. 13

# INTRODUCTION

For the reasons stated below, the CFTC respectfully requests that this Court exclude the report and testimony of Defendant's expert Michael De Laval.

In this case, the CFTC alleges, and the evidence shows, that Defendant Edward Walczak misled investment advisors. Specifically, Defendant described to investment advisors a risk management process that differed materially from his actual risk management process, giving investment advisors the misimpression that the Fund was a safer investment than it actually was. The opinions expressed in the report of Defendant's expert, Michael De Laval, do not relate to the veracity, materiality, or intent of Defendant's statements to investors and investment advisors. Rather, Mr. De Laval opines on other issues, such as the utility of Defendant's risk management software and the "probabilities" of certain S&P 500 market moves. Mr. De Laval did not analyze whether Defendant acted to limit losses in a manner consistent with the risk management process he communicated to investment advisors. Under these circumstances, Mr. De Laval's report and testimony are irrelevant and should be excluded. Even if the Court were to deem the report's subject matter relevant, Mr. De Laval's methods are unreliable, and likewise should be excluded for that reason.

# REPORT BACKGROUND

Mr. De Laval's opinions can be summarized as follows:

1. OptionVue stress tests (i.e., "risk slides") are of limited utility. They are quickly rendered stale and are "useless" if they are "calibrated with unrealistic moves . . . such as a one-day 25% market move." (Dkt. 41 (Ziliak Decl.), Ex. 35 (hereafter, "De Laval Report" or "Report") ¶¶ 15–19.)

2. A portfolio manager is not expected "[t]o act on low probability information," nor "to act just because an undesirable number . . . appears on the slide," but rather to

act "if he deems prudent" as the market approaches the stress-tested levels. (*Id.* ¶¶ 21, 25.)

3. Defendant used shifts in implied volatilities as an influential factor in stress testing the portfolio. (*Id.* ¶¶ 23–25.) Those shifts "may result in very different outputs . . . displayed on the risk slides." (*Id.* ¶ 29.) And "may convert what was once a potentially large drawdown to something much more muted and maybe even negligible or positive." (*Id.*)

4. Defendant received a "Manamu report" daily from July 2016 through February 2017, which indicated whether certain "risk metrics"—separate and distinct from OptionVue—had been triggered. Defendant "traded in response to those risk metrics being triggered" 21 out of 23 times. (*Id.* ¶ 42.)

## ANALYSIS

### I. Legal Standard

Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), govern the admissibility of expert testimony. *Amari Co. v. Burgess*, No. 07 C 01425, 2012 WL 5389787, at *5 (N.D. Ill. Nov. 2, 2012).

FRE 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

2

The principles set forth in *Daubert* also apply to non-scientific testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147–49 (1999) (extending *Daubert* analysis to engineers and other non-scientific experts). *Daubert* interpreted Rule 702 to require that any evidence admitted not only be relevant, but reliable. *Klaczac v. Consol. Med. Transp.*, 458 F. Supp. 2d 622, 655 (N.D. Ill. 2006); *see also Autotech Tech. Ltd. P'ship v. Automation-direct.com*, 471 F.3d 745, 749 (7th Cir. 2006) (explaining that the district court is to act as a gatekeeper who determines whether proffered expert testimony is both reliable and relevant before accepting a witness as an expert).

"As interpreted by the Seventh Circuit, *Daubert* requires a two-step analysis: first, the District Court must determine whether the testimony is reliable, and second the Court must determine whether the expert testimony would assist the trier of fact in understanding the evidence or in determining a fact in issue." *SEC v. Lipson*, 46 F. Supp. 2d 758, 762 (N.D. Ill. 1998). "In considering the reliability prong of the *Daubert* analysis, the Court must consider whether the principles and methodology underlining the testimony are valid." *Id.*; *see also Amari*, 2012 WL 5389787, at *6 ("[An] expert's opinion must be reasoned and founded on data [and] must also utilize the methods of the relevant discipline.") (quoting *Kumho Tire*, 526 U.S. at 152). "In order to satisfy the requirement of 'helpfulness,' the expert testimony must . . . relate to a fact in issue [and] . . . must assist the jury in understanding what otherwise might be outside its grasp." *Lipson*, 46 F. Supp. 2d at 762–63; *see also Kumho Tire*, 526 U.S. at 151–53.

Importantly, expert testimony must be based on more than "subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590. "Expert reports must include 'how' and 'why' the expert reached a particular result, not merely the expert's conclusory opinions." *Salgado v. Gen. Motors Corp.*, 150 F.3d 735, 741 n.6 (7th Cir. 1998).

**II. De Laval's Report and Testimony Should Be Excluded under *Daubert***

    A.    <u>De Laval Does Not Opine on the Central Issue of the Case</u>

The Commission's case against Defendant has a single, straightforward issue: whether Defendant's actual risk management process was consistent with the risk management process he represented to investment advisors. Defendant repeatedly told investment advisors that in order to manage the risks in the Fund he would regularly use OptionVue to model the impact on the Fund of a rise in the price of the S&P 500 of up to 10%, and then remove risk when the model showed that the fund would suffer a greater-than-8% drawdown. Plaintiff maintains—and the evidence shows—that it was not actually his practice to do so.

Mr. De Laval's report does not address these facts. He does not analyze Defendant's portfolio or otherwise assess its risk. Nor does he purport to evaluate whether Defendant acted to remove risk as he promised investment advisors he would when the Fund faced risk of a greater-than-8% drawdown upon a 5 or 10 percent increase in the S&P 500. Mr. De Laval has not has not done any portfolio-level analysis of Walczak's risk management and, therefore, cannot possibly opine on the central issue of the case.

    B.    <u>De Laval's Opinions Are Irrelevant to the Issues in the Case, Unreliable, and Unhelpful to the Finder of Fact</u>

Instead of analyzing the actual facts of this case, Mr. De Laval manufactures a series of red-herring "opinions" that are irrelevant to the CFTC's allegations and, in any event, unsupported.

>     1.    *Opinion 1: OptionVue stress tests (i.e., "risk slides") are of limited utility. They are quickly rendered stale and are "useless" if they are "calibrated with unrealistic moves . . . such as a one-day 25% market move."*

Mr. De Laval has not used OptionVue. (Dkt. 44 (De Laval Dep.), at 79:15–16.) Nevertheless, he offers his opinion on "risk slides," which, according to his testimony, is

something analogous to the OptionVue graphs Walczak purported to use. (*Id.* at 78:21.) Specifically, Mr. De Laval opines that "risk slides" are rendered "stale and not particularly accurate" when market conditions change. (De Laval Report at ¶¶ 16–17.)

Whether or not OptionVue graphs (or "risk slides") are quickly rendered stale, however, is of no import to this case. What matters is what Defendant *said* about OptionVue's utility and how he used it to manage risk. It is undisputed that Walczak repeatedly told investment advisors that OptionVue was the critical part of his risk management process. (*See generally* Dkt. 11 (Amended Complaint); Dkt. 30 (Plaintiff's Memorandum in Support of Summary Judgment).) For example, on June 7, 2016, Walczak stated that there was "no chance . . . of understanding how [the] portfolio will behave under different market conditions, unless you have fairly sophisticated options modeling software, which, of course, we do." (Dkt. 29 (Plaintiff's Statement of Fact in Support of Summary Judgment ("Stmt. of Fact") ¶ 71.) On that same call, Walczak explained that the OptionVue software allowed him to "see a curve that says here's how the portfolio is going to behave as the market moves back and forth in price." (*Id.*) Plaintiff's statement of facts in support of summary judgment is replete with examples of Defendant explaining how he used OptionVue to manage risk. (Stmt. of Fact ¶¶ 62–78.) Under the circumstances, Mr. De Laval's opinion that OptionVue graphs are of *little* value only undermines Defendant's credibility. If, as Mr. De Laval suggests, OptionVue was a flawed tool, then why did Mr. Walczak repeatedly tell investment advisors that it was the key to his ability to manage risk?

Mr. De Laval's opinion that OptionVue is "useless" if "calibrated with unrealistic" market moves (such as a "one-day 25% market move") is similarly irrelevant. Again, what matters here is what Defendant said: that he stress tested the portfolio against S&P price

increases of up to 10%. (*See, e.g.*, Stmt. of Fact ¶ 63.) Whether such moves are "realistic" or not is beside the point. Those are market increases that Defendant said he would stress the portfolio against as part of his risk management process.

> 2. *Opinion 2: A portfolio manager is not expected "[t]o act on low probability information . . . .," nor "to act just because an undesirable number . . . appears on the slide," but rather to take action if he deems prudent as the market approaches the stress-tested levels.*

        i.        Industry "standard" and "expectation"

Mr. De Laval's opinion about what a portfolio manager is "expected" to do in response to his or her stress tests is irrelevant and unsubstantiated. It is irrelevant because, again, it is divorced from the reality of what Defendant *said* to investment advisors. Defendant repeatedly represented that he *did* and *would* act when his OptionVue stress tests showed that an S&P price increase of up to 10% would lead to a greater-than-8% loss to the Fund. (*See* Stmt. of Facts ¶¶ 63, 64, 67, 69, 71–73.) The issue here is whether Mr. Walczak's statements were true. Mr. De Laval's opinion does not speak to the veracity of the Defendant's statements and is, therefore, not helpful to the fact finder.

Mr. De Laval's attempt to address directly the CFTC's allegations illuminates this disconnect. He states: "[I]f a 5% move in the underlying correlates to an 8% loss in the portfolio on the risk slide, the manager is not expected to hedge, cover, or reverse his position merely because the slide indicates a possibility." (Report ¶ 21.) Yet, hedging—or, mitigating risk—is exactly what Defendant represented that he did in this very scenario. (*See supra*; *see also, e.g.*, Stmt. of Fact ¶ 64 ("[T]he specific scenarios we stress the portfolio value against are +5% and +10% price movement in the S&P . . . looking for portfolio values that will exceed our 8% drawdown limit. And when we find that that happens, then we go in and make position adjustments to bring that potential drawdown back into line with our 8% guideline . . . .").)

Consider the following analogy: A car company falsely advertises that its vehicles have unique safety features. The car company cannot avoid liability for its misstatements simply because those advanced safety features are not industry standard or because other brands are not "expected" to have them. Indeed, through his statements, Defendant created the false impression that he employed a particular risk management process—that he acted to reduce risk when his stress tests showed that a 5% increase in the S&P 500 would yield a greater-than-8% loss to the Fund. Even if Mr. De Laval is correct that the risk management process Defendant described to investment advisors on Open House calls is not standard in the industry, Defendant still misrepresented the process. (If anything, Mr. De Laval's opinion highlights the materiality of Defendant's misstatements: Defendant purported to go above and beyond what Mr. De Laval claims is standard industry practice to manage risk.)

Moreover, Mr. De Laval's opinion in this regard is unsubstantiated. While he refers generally to "industry standard operating procedure," he does not specify what the standard procedure is or who abides by it. (Report ¶ 21.) When asked at his deposition what industry "standard" he was referring to, he conceded that there was "no written industry standard" and referred vaguely to his experience. (De Laval Dep. at 85:10–19.) While he argues that "act[ing] on low probability information mechanically" is inappropriate (*see* Report ¶ 21), he does not define, either in his report or at his deposition, what "low probability" means. When asked at his deposition "how likely" something would have to be in order for it to be appropriate to hedge against, he did not pinpoint a particular degree of likelihood, but rather conceded that such an assessment would require a lot of subjective inputs. (De Laval Dep. at 86:4–21.) In short, Mr. De Laval's opinion in this regard lacks any substance or definition. In the absence of any

articulable industry standard or guiding principle, a fact finder could not find Mr. De Laval's opinion reliable or helpful.

    ii.  "Low Probability"

Relatedly, Mr. De Laval argues that the probability of 5% and 10% price movements in the S&P—movements that Defendant purported to stress test the Fund's portfolio against using OptionVue—"are minimal." (*See* Report ¶ 22.) It bears repeating, however, that the likelihood of any particular market move is irrelevant to the issue at hand. Defendant said that if his OptionVue graph showed that any S&P price increase up to 10% would result in the Fund losing more than 8% of its value, he would hedge to remove that risk. (*See supra.*) He did *not* say that he would only do so if he viewed such an S&P price increase as probable. And, again, Mr. De Laval did not describe in his report or testimony what probability of that size market increase would qualify as "probable."

Moreover, Mr. De Laval is not qualified to opine on statistical calculations such as the probability of increases in the market. Mr. De Laval is not a statistician, and has no formal training or expertise in statistics or mathematics. His experience is as an energy commodity trader (*see* Report at Appendix A), and he has not established how he is qualified to testify about the probability of certain market moves.

Commensurate with Mr. De Laval's lack of expertise, his methodology of calculating probability is highly flawed, even from a lay person's standpoint, rendering his calculations unreliable and thus inadmissible. (Report at Table 1, ¶ 14.) Specifically, he equates the theoretical likelihood of certain market movements over a certain number of days with the calculations in his Table 1, which simply charts how often the market historically made those market movements. (*Id.* ¶ 22.) But this is not how statistics can be used to assess the likelihood

8

of future events: this method is no different from observing tails coming up 7 times out of 10 coin flips and concluding that the probability of getting tails on the next coin flip is 70%.

In his deposition, Mr. De Laval equivocated when asked whether his method of calculating probabilities was best. (De Laval Dep., at 73:6–16 (stating that he is "not sure" looking at past performance "would be the best").) And, he was unable to explain why he used historical occurrences to calculate probabilities rather than the VIX, a widely-used volatility index that reflects the market's view of the probability of certain ranges of S&P 500 price movements on any given day. (*Id.* at 73:17–74:9; *see also* Report ¶ 19 ("[A] 1 standard deviation move in an implied or historical low volatility environment may be much different than a 1 standard deviation move in an implied or historical high volatility market . . . .").) Mr. De Laval acknowledged that the percentage of time an event occurred over a defined period does "not necessarily" equal the chance of that event occurring on any given day. (De Laval Dep. at 71:6.) To use a slightly different analogy, ignoring VIX and using Mr. De Laval's method is equivalent to predicting the chance of rain tomorrow by looking at how often it rained in the past while ignoring meteorological modeling of current weather conditions. In short, Mr. De Laval has failed to demonstrate any expertise in statistics and failed to establish that his method of calculating probabilities is a reliable one.

> 3. *Opinion 3: Defendant used shifts in implied volatilities as an influential factor in stress testing the portfolio. Those shifts "may result in very different outputs . . . displayed on the risk slides." And "may convert what was once a potentially large drawdown to something much more muted and maybe even negligible or positive."*

Mr. De Laval's argument here, generously construed, is that, while he does not dispute that stress testing certain S&P 500 price increases alone would have predicted a greater-than-8% loss to the Fund, stress tests simulating those S&P price increases *in conjunction with* a volatility change may not have predicted a greater-than-8% loss. First, this opinion is unreliable because

9

Mr. De Laval has not substantiated it—it is inadmissible conjecture. *See Daubert*, 509 U.S. at 590. Mr. De Laval did not analyze whether any volatility stress test would have converted an OptionVue graph that otherwise showed a greater-than-8% loss into one that showed a less-than-8% loss. (*See* De Laval Dep., at 112:16–116:20 (acknowledging that he did not conduct his own stress tests and could not, for example, identify any instance in which even a 1% volatility shift would have negated a greater-than-8% loss); *see also* Report ¶¶ 23, 29 (speaking in hypotheticals only).) Mr. De Laval's threadbare insinuations, without further analysis, are of no value to the trier of fact and would only serve to confuse.

Second, Mr. De Laval's hypothetical and unsupported assertion that certain *additional* stress tests that incorporated volatility movement *may not have* predicted greater-than-8% losses is irrelevant. Specifically, the assertion is irrelevant because, even if credited, it does not render Defendant's misleading statements true. Indeed, that certain *other* stress tests incorporating changes in volatility *might* have predicted more modest losses does not negate the fact that Walczak's stress testing of S&P price increases *did* frequently predict greater-than-8% losses, nor does it negate that Walczak failed to neutralize this risk in the manner he told investment advisors he would.

> 4. *Opinion 4: Defendant received a "Manamu report" daily from July 2016 through February 2017, which indicated whether certain "risk metrics"— separate and distinct from OptionVue—had been triggered. Defendant "traded in response to those risk metrics being triggered" 21 out of 23 times*.

Likewise, Mr. De Laval's review of the daily "risk reports" and conclusion that Defendant almost always responded to breaches of the risk parameters therein are irrelevant because they have no bearing on the truth of Defendant's statements on the Open House calls. The "risk reports" referenced in Mr. De Laval's report do not relate to OptionVue and Defendant did not mention them to investment advisors when describing the way he used OptionVue to

limit losses to 8% of the Fund's value.  (*See* Report Exhibit 1; *see also* Dkt. 49 (Wasserman Reply Decl.) Exs. 99, 109–116; Stmt. of Fact ¶¶ 62–78.)  Moreover, Mr. De Laval's methodology is critically flawed because he both omitted certain risk reports from his analysis and failed to analyze whether Defendant's trades in response to the risk reports *actually served to reduce risk*.

While Mr. De Laval's analysis purports to include every date on which the "risk report" showed a breach of one of the parameters, he omits—at the very least—a series of reports showing a violation of the "position limit" parameter in the first half of July 2016.  (*See* Dkt. 49 (Wasserman Reply Decl.), at Exs. 99, 109–16.)  Indeed, the "risk report" on each trading day from June 29 through July 12, 2016, showed that the number of Fund positions was above the limit set in the report.  (*Id.*)  These breaches are conspicuously missing from De Laval's chart, *despite the fact that at least some of the underlying reports are listed in his appendix of documents reviewed*.  (*Compare* Report at Ex. A (wherein the first entry is dated December 5, 2016), *with* Report at Appendix B (listing, for example, ARB_SEC_04_0264292 and ARB_SEC_04_0264725, which are the July 7, 2016, and July 11, 2016 reports, respectively).)  Such an omission is particularly confounding given the simplicity of Mr. De Laval's analysis.  He does not perform any complicated calculations; his analysis purports only to review the risk spreadsheets and *count* the number of times one of the metrics was out of bounds.  Mr. De Laval has either failed to perform this simple counting exercise correctly, or inexplicably ignored the July Reports all together, making it seem as if the risk metrics were out of bounds less often than they actually were.  These omissions undermine De Laval's conclusions.  In early July 2016, Defendant failed to remedy the breach of the position limit metric for *nine* consecutive trading

days. Therefore, at best, Defendant remedied the violation of the risk report 22 out of 33 times—or 66% of the time—far below the 91% number that Mr. De Laval notes in his report.

Moreover, Mr. De Laval's conclusions regarding how often Defendant "traded in response to" the risk metric breaches are of no value. Indeed, while the report counts the number of times Defendant traded the day after a breach was noted on a risk report, Mr. De Laval did not determine whether those trades served to remedy or exacerbate the breach. Trading the day after the breach of a risk metric does nothing to limit risk if those trades do not address the reason the metric was breached in the first place. Neither De Laval's report nor his testimony would help the trier of fact evaluate this issue, even if it were relevant.

        C.        <u>Other Portions of Mr. De Laval's Report Are Not Expert Opinion</u>

In other parts of his report, Mr. De Laval restates certain disclosures that were made in public documents. For example, he restates or describes certain disclosures that were made in the Fund prospectus, registration statement, and the Form N-CSR. (*See* De Laval Rep. at ¶¶ 26–28, 32–33.) He suggests that certain disclosures in the public filings should have put investors on notice "to inquire further," (*see id.* ¶ 33), and "that drawdowns more than 8% were, indeed possible," (*see, id.* ¶ 28). Mr. De Laval is in no better position to evaluate such disclosures than any lay witness.

Additionally, Mr. De Laval does not explain how these statements are relevant to the CFTC's claim that Defendant did not manage risk consistent with his statements to investment advisors.

Otherwise, Mr. De Laval's report serves only as a mouthpiece for arguments Defendant could make (or has made) in his own testimony. For example, in paragraph 31, Mr. De Laval purports to state what Defendant would do upon seeing a graph showing a greater-than-8% loss. (*Id.* ("He would then evaluate the likelihood of this occurring and decide whether or how he may

12

hedge to that variable.").) Similarly, paragraphs 37 and 39 of the Report seek to explain Defendant's trading strategy and the "tools" Defendant used "to assess the likelihood" of market moves. Moreover, Mr. De Laval states that Defendant's "overall opinion was that, over time, the market would revert to mean price and volatility." (*Id.*). This is not expert analysis; it is a parroting of Defendant's factual arguments, which is inappropriate in an expert report or testimony. *See Black and Decker v. Bosch Tools*, No. 04 C 7955, 2006 WL 5156873, at *1 (N.D. Ill. Sept. 8, 2006) (stating that FRE 703 does not allow an expert to become "the mouthpiece of the witness on whose statements or opinions the expert purports to base his opinion").

## CONCLUSION

Under the circumstances, Mr. De Laval's testimony would not assist a trier of fact in resolving the issues in this case. Indeed, Mr. De Laval does not opine on the veracity of any of the misstatements that form the basis of the CFTC's claims. For the reasons explained above, his opinions are unsubstantiated or flawed and, therefore, unreliable. Accordingly, the Court should strike his report and exclude his testimony.

Dated: November 19, 2021　　　　　　Respectfully submitted,

COMMODITY FUTURES TRADING
COMMISSION

Manal M. Sultan
Deputy Director

By:　__/s/ Samuel Wasserman__
　　　Samuel Wasserman
　　　Peter Janowski
　　　David Acevedo

Division of Enforcement
140 Broadway, 19th Floor
New York, New York, 10005
(646) 746-9700
*Attorneys for Plaintiff*