IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

COMMODITY FUTURES
TRADING COMMISSION,

              Plaintiff,              OPINION AND ORDER

v.

                                            20-cv-075-wmc

EDWARD WALCZAK,

              Defendant.

---

Commodity Futures Trading Commission ("CFTC") brought suit against investment fund manager Edward Walczak, alleging that he defrauded investors under the Commodity Futures Trading Commission Act. 7 U.S.C. §4a. The CFTC now moves for summary judgment, arguing that Walczak's actual trading strategy was contrary to what he told investors as a matter of law. For the reasons below, this motion will be denied.

UNDISPUTED FACTS

Defendant Edward Walczak has held the role of Portfolio Manager for Catalyst Hedged Futures Strategy Fund (the "Fund") since its creation. (Def.'s Resp. to Pl.'s PFOF (dkt. 39) ¶ 3.) He also registered with the CFTC as the Associated Person for Catalyst Capital Advisors LLC ("Catalyst") and Harbor Financial LLC ("Harbor"). (*Id*. at ¶¶ 4-6.) The Fund traded in futures, with Walczak responsible for making investment decisions. (*Id*. at ¶ 26.)

While Walczak's complete investment strategy is disputed, the parties agree that he did enter into "call ratio spreads," which involved purchasing a certain number of call options while simultaneously selling even more call options than were bought. (*Id*. at ¶ 27-

28.) For example, the buyer of a call option on contract for purchase of shares of stock trading on the Standard & Poor's Index obtains the right to purchase these shares at some point in the future at a predetermined price that the original contract seller must honor, regardless of the price paid for the option or the actual price of the shares at the contract's maturity. As a result, the original seller of the contract or anyone standing in its shoes is thus exposed to potential losses up to the full value of the shares. (Def.'s Resp. to Pl.'s PFOF (dkt. 39) ¶ 16, 21.) In making his purchases and sales of call options, Walczak used a complicated software program called "OptionVue," which purports to model options price behavior and forecast portfolio performance given different volatility models. (*Id*. at ¶ 38-40.) The exact usage and functionality of OptionVue is also in dispute, but Walczak at the very least consistently used this software as a tool to predict how the portfolio might perform in the future. (*Id*. at ¶ 55.) He also spoke about his use of OptionVue as a tool to manage risk at "open house" calls ("House Calls") with investment advisors. (*Id*. at ¶ 55.)

The CFTC characterizes Walczak's use of OptionVue as a strategy to 'stress test' the Fund's portfolio, which would prompt him to reduce "risk *when* one of his stress tests showed that an increase in the S&P of up to 10% would cause a *greater than 8% loss* to the Fund." (Pl.'s Mot. (dkt. #28) 2) (emphasis added.) Walczak allegedly also represented this as his strategy when talking to investment advisors. (*Id*.) "[C]ontrary to what he said he would do in such situations, however, the CFTC represents that Walczak actually chose not to reduce risk at all" in many situations where OptionVue showed a greater than 8% loss could occur. (*Id*.) Ultimately, the Fund's share price itself dropped by over 17% or

approximately $680 million dollars due to an increase in the S&P Index from February 8 to February 28, 2017. (Def.'s Resp. to Pl.'s PFOF (dkt. 36) ¶ 121.) Walczak's failure to manage risk as he represented is the basis for the CFTC's claim of liability under the Commodity Futures Trading Commission Act. (*Id*.)

In response, defendant Walczak disputes plaintiff's characterization of his trading strategy *and* representations, instead saying that his strategy was much more nuanced than adopting an 8% hard limit for drawdowns of risk in the Fund's call ratio spreads as calculated using the OptionVue software program. (Def.'s Opp. (dkt. #35) 3.) Additionally, defendant notes that his calls with investment advisors repeatedly contained the caveat that (1) losses could not be predicted and (2) the success of his strategy was not assured. (*Id*. at 7.)

OPINION

Since plaintiff CFTC is moving for summary judgment on claims for which it bears the burden of proof, plaintiff "must lay out the elements of the claim, cite the facts [that] it believes satisfies these elements, and demonstrate why the record is so one-sided as to rule out the prospect of a finding in favor of the non-movant on the claim." *Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 601 (7th Cir. 2015); *see also Reserve Supply Corp. v. Owens-Corning Fiberglas Corp.*, 971 F.2d 37, 42 (7th Cir. 1992) ("[B]ecause Owens-Corning and CertainTeed also have the burden at trial of establishing good faith, they must establish affirmatively the lack of 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986))). "If the movant has failed to make this initial showing, the court is

3

obligated to deny the motion." *Hotel 71 Mezz Lender LLC*, 778 F.3d at 601; *see also Johnson v. Hix Wrecker Serv., Inc.*, 651 F.3d 658, 662 (7th Cir. 2011) ("A party opposing summary judgment does not have to rebut factual propositions on which the movant bears the burden of proof and that the movant has not properly supported in the first instance."). Given this high burden, it is perhaps unsurprising that plaintiff's motion must be denied in light of the current, disputed material facts.

For a claim of fraud under Section 4o(1)(B), the CFTC must show that Walczak made a material misrepresentation or omission. (Pl.'s Mot. (dkt. #28) 8.) For fraud under Section 4o(1)(A) and 6o(1)(A), the same elements are present with the added requirement of scienter. (Pl.'s Mot. (dkt. #28) 21.) Here, plaintiffs have provided insufficient evidence to establish a lack of genuine disputes of material facts that a misrepresentation was made, much less that such representation was made with scienter. As such, the court will deny plaintiff's motion.

Plaintiff's main evidence in support of summary judgment is an assortment of statements defendant unquestionably made to investment advisors. For instance, on a September 15 House Call, Walczak stated the following:

> What we do with the fund on a daily basis is . . . we stress, we aggregate all those [positions] in the models we use to predict what will happen to the portfolio value under different scenarios. And the specific scenarios we stress the portfolio value against are +5%, +10% price movement in the S&P [among other scenarios] . . . looking for portfolio values that will exceed our 8% drawdown limit. And when we find that that happens, then we go in and make position adjustments to bring that potential drawdown back into line with our 8% guideline, which is what we try to hold a drawdown to.

(Def.'s Resp. to Pl.'s PFOF (dkt. #39.) ¶ 64.)  Similar statements can be found in many of Walczak's House Calls.

Plaintiff argues that "[o]n all of these occasions, Walczak communicated an unequivocal "if-then" relationship between what he saw in OptionVue and his risk-mitigating trades . . . He did not say 'we might' or 'I might' or indicate that any other factors went into his decision to mitigate risk other than what the OptionVue stress test." (Pl.'s Mot. (dkt. #28) 12.)  According to plaintiff, Walczak represented that, *if* he saw that an 8% drawdown was possible, he *then* made risk-mitigating trades.  Plaintiff then represents that data modeling what OptionVue graphs looked like on different days, shows that Walczak did *not* in fact make trades to mitigate risk when an 8% drawdown was possible, constituting a departure from how he described his risk management procedures to investors.  (*Id*. at 15.)

As defendant responds, however, many of his statements lack context.  Looking at the same House Calls quoted by CFTC, defendant cites evidence of caveats to his statements of risk management practices.  For example, the following statements made by Walczak on House Calls are undisputed:

> Again, this does not mean there's a hard stop or a guarantee of an 8 percent loss containment . . . There's no guarantees in the world, especially in markets, but that's our goal in everything we do is to keep our drawdown to 8 percent . . . There's obviously no guarantees in the business . . . The risk is that it goes up too far. The positions will make money if the market advances at a moderate rate. They'll lose money if the market advances at a very rapid rate both in time and in price . . . we certainly aren't able to take all of that upside risk away; that's a part of our strategy.

(Pl.'s Resp. to Def.'s PFOF (dkt. #48) ¶ 85-86.)

Perhaps these statements can be interpreted by a reasonable investor as a commitment to the 8% ratio strategy, while acknowledging only the actual *risk* may be greater, as the CFTC does, but a jury will have to decide if these statements disclosed, as Walczak claims, that his 8% drawdown strategy was not a strict "if-then" relationship. Instead, Walczak maintains his statements comport more with a characterization of his strategy, which is that an 8% potential drawdown would push Walczak and his team to look more closely at the fund and assess whether the move instigating the drawdown is likely enough to happen that trading is necessary. (Pl.'s Resp. to Def.'s PFOF (dkt. #48) ¶ 48.) Thus, Walczak maintains that this process was not only more discretionary in practice but also as he described it to investors. (*Id*.) Moreover, there is evidence that at least some investment advisors understood Walczak's strategy that way, with one advisor acknowledging in writing to Walczak that, "I know you *shoot* for not going over the 8% drawdown." (Pl.'s Resp. to Def.'s PFOF (dkt. #48) ¶ 82) (emphasis added).

In its reply brief, plaintiff argues that "defendant has not put forward any evidence to contradict [its] evidence that he did not actually manage risk in the manner he told investment advisors he did." (Pl.'s Rep. (dkt. #46) 2.) However, Walczak arguably did just that by providing evidence that his strategy, as represented to investment advisors, did *not* include a hard cutoff at 8%. Without an unequivocal commitment to using this hard cutoff in practice, Walczak's choice at times to not make trades when an 8% drawdown risk was present is entirely, or at least arguably, consistent with his representations. Even some of the statements that plaintiff relies upon to establish that 8% was unambiguously

a hard cutoff refers to "our 8% guideline, which is what we *try* to hold a drawdown to." (Def.'s Resp. to Pl.'s PFOF (dkt. #39.) ¶ 64.) (emphasis added.)

To the extent that plaintiff believes reasonable investors were, indeed, misled into believing that Walczak would affirmatively act to rebalance the Fund's portfolio *every time* the OptionVue software showed that an 8% drawdown was possible, it must so prove to a jury. Said another way, defendant has introduced doubt about his commitment to a completely inflexible trading strategy *and* how investment advisors understood his statements about that commitment, and even more to plaintiff's *scienter* in both speaking about and acting on those statements. Thus, nothing in plaintiff's materials establishes that "the record is so one-sided as to rule out the prospect of a finding in favor of the non-movant" at trial. *Hotel 71*, 778 F.3d at 601. Having failed to meet its burden, plaintiff's motion for summary judgment must be denied.

ORDER

IT IS ORDERED that plaintiff Commodity Futures Trading Commission's motion for summary judgment is DENIED.

Entered this 22nd day of November, 2021.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge