IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

COMMODITY FUTURES TRADING
COMMISSION and U.S. SECURITIES AND
EXCHANGE COMMISSION,

                           Plaintiffs,

      v.

EDWARD S. WALCZAK,

                        Defendant.

OPINION & ORDER

20-cv-75-wmc & 20-cv-76-wmc,
Consolidated[1]

      In separate lawsuits in this court, plaintiffs Commodity Futures Trading Commission ("CFTC") and U.S. Securities and Exchange Commission ("SEC") sued defendant Edward Walczak for violations of various federal commodities and securities laws and related regulations governing the operation of a publicly traded mutual fund that he had managed, called the "Catalyst Hedged Futures Strategy Fund" ("Fund").  Those cases were consolidated for trial, and a jury found Walczak liable for:  (1) negligently making untrue statements of material fact or omitting a material fact and adopting a practice or course of business as a fraud or deceit upon the purchaser in violation of Sections 17(a)(2) & (3) of the Securities Act, Sections 206(2) & (4) of the Advisors Act and Section 4o(1)(B) of the Commodity Exchange Act; and (2) engaging in conduct that was inconsistent with his fiduciary duty as an advisor to the Fund in violation of Sections 206(1) & 206(2) of the Advisors Act.  At the same time, the jury rejected plaintiffs'

---

[1] Except where otherwise noted, all docket citations in this opinion are to the docket in case number 20-cv-75.

arguments that Walczak did any of those things knowingly or recklessly as prohibited by other sections of the applicable securities and commodities laws.

In light of the jury's findings, this court is charged with the responsibility to determine appropriate remedies for defendant's violation of these laws. Before deciding that question, the court will summarize the essential facts giving rise to the jury's answers to the special verdict questions.

FACTS[2]

**A. Background**

Edward Walczak was born in Holyoke, Massachusetts, as was his father before him. Walczak grew up in both Massachusetts and Wisconsin, where his mother had been raised. Graduating with a bachelor's degree from Middlebury College in physics and economics on an ROTC scholarship, Walczak spent the next four years in the United States Army, entering as a second lieutenant in 1977 and exiting as a captain in 1981. From there, he went on to earn an MBA from Harvard Business School with a concentration in operations management. In particular, Walczak was influenced by the development of quality control manufacturing techniques now famously first applied in Japan using theories developed by American engineer, statistician, and author W. Edwards Deming, and later adopted by the

---

[2] These background facts are based on the undisputed facts from the parties' summary judgment briefing, the evidence presented at trial, and judicially noticeable court and government documents.

U.S. auto industry, then still later across much of the manufacturing sector generally under such programs as "Total Quality Control," "Lean Manufacturing," and "Six Sigma."[3]

After graduating from Harvard, Walczak held various positions with a series of manufacturers of consumer retail products, the most impactful of which depended on efficient processing techniques and stable supply chains.  Of particular note, Walczak had responsibility for operating manufacturing at Brach's Candy, where he began to work closely with a futures trader to acquire a reliable supply of core commodities, including corn and cocoa.  Having already dabbled in stock options himself, Walczak became particularly interested in the futures market for commodities, and he began trading successfully in equity index futures.[4]

When friends and family learned of his early trading success, they began to ask if he would be willing to trade on their account as well.  Resisting at first, Walczak eventually set up his own, registered mutual fund, "Harbor Assets," around the turn of the century using a futures options hedging system that generally did well in a countercyclical fashion to the Standard & Poor's 500 Index ("S&P 500").[5]  The early years of this fund were particularly successful for all concerned, earning annual gains of 30% to 50%.  In February

---

[3] John Holusha, *W. Edwards Deming, Expert on Business Management, Dies at 93*, N.Y. TIMES, Dec. 21, 1993, at B7.

[4] To assist the jury at trial, the parties and the court created a short tutorial on trading options for equity index futures (dkt. #171), which is attached as Appendix A to this opinion and referenced by some in the industry as "picking up nickels in front of a steamroller" because of the relatively small gains and potential for nearly unlimited losses.

[5] The S&P 500 is an index of stocks in roughly 500 leading U.S. companies that reflects the average of the market value of their shares and is generally understood to reflect the state of American equities markets overall.  Will Kenton, *S&P 500 Index: What It's for and Why It's Important in Investing*, INVESTOPEDIA, June 12, 2024, https://www.investopedia.com/terms/s/sp500.asp.

of 2007, however, the Harbor Assets Fund experienced its first big loss, a nearly 20% drop in the value of the fund's holdings.

Scarred by this experience, Walczak went back over the period leading up to this precipitous loss in the fund's value, trying to understand what had happened and what he might do differently in the future to avoid such losses.  In particular, Walczak began to apply what he believed to be statistical controls inspired by the quality control and improvement techniques that proved so valuable in manufacturing to develop strategies for trading futures options.  Already using "OptionVue," a software modeling product that was developed to help track multiple trades and project possible future losses based on the maturation date of each option, Walczak looked for causal changes in the underlying market.  Among the mistakes he identified in his past trading practices, Walczak noted his failure to recognize spikes in the volatility rate of the S&P 500 index during the period leading up to a significant spike in the index itself, as well as his taking on too many positions without carefully tracking the spreads between them and the importance of never having more than 9 to 10% of the fund value in futures options.

Up to that point, Walczak had largely been self-taught in options trading, but beginning in 2008, he began attending seminars on options trading and adopting strategies using stock volatility rates, determined both on an historic and implied basis, as a guide in trading.  From 2008 to 2012, the Harbor Assets Fund enjoyed another run of substantial success and growth in value, so much so that it not only grew through word of mouth, but eventually came to the attention of "Catalyst Funds," a Huntington, New York-based group of much larger mutual funds run by its founders Benjamin Reid, Frank Ferrara,

4

Marcus Rowe and Scott Price.  Indeed, in 2012 or 2013, Catalyst's Director of Business Development, George Amrhein, called Walczak at his home in Madison, Wisconsin, where he managed the Harbor Assets Fund with the assistance of his wife.  Impressed with the fund's four-year performance against the S&P 500 and seeing the potential for growth, Amrhein explained that Catalyst was looking to add to its portfolio mutual funds that were countercyclical (that is, did not move in correlation with the S&P 500), which its investors could use as a hedge against downturns in the market.  Although Walczak was initially resistant to a proposed acquisition by Catalyst, Amrhein convinced him over time that by allowing Catalyst to acquire the Harbor Assets Fund, he could focus on the trading side of the business, while Catalyst handled all the other aspects of his growing fund, particularly the management and marketing details.  Ultimately, Walczak entered into a portfolio management agreement with Catalyst that provided for him to receive half of Catalyst's net advisory fees charged to the fund's investors once its assets under management exceeded $20 million, something both Catalyst and he fully expected once the fund was offered as part of Catalyst's portfolio of funds to its much larger client base.

**B.  Creation of Catalyst Hedged Futures Strategy Fund**

After its acquisition by Catalyst, Walczak accepted the formal title of portfolio manager of the fund, which was renamed the "Catalyst Hedged Futures Strategy Fund" and publicly launched in September 2013.  From that point on, Walczak claims to have essentially continued to engage in the same basic trading practices that he had in the past, including what he now believed were his improved "process controls."  In Catalyst's introduction of the newly-renamed Fund to investors, a formal offering prospectus was

prepared, which among other things included strong disclaimers regarding its inability to predict market direction and the potential for market volatility that might cause sufficient movement in the market to create conditions for nearly unlimited losses.

Nevertheless, the Fund also purported to create windows of opportunity through the purchase of call and put options on a 1-by-2 or 1-by-3 ratio basis, depending upon volatility rates in the market. Based on its history and purported ability to hedge against sizable losses based on market conditions, the Fund offered investors a fund with limited, reverse correlation to movements in the price of the S&P index. As expected, the Fund was attractive to Catalyst's current and new investors looking for a hedge against a downturn in the market, while still allowing for positive earnings with a slowly rising S&P 500. The Fund further emphasized that its ratio spreads were chosen to allow for profitability while conserving capital in the Fund to manage the downside risk. In particular, the Fund represented that its trading based on various metrics would allow it to carefully monitor and adjust near- and longer-term ratio spreads to avoid losses.

Performance in the Fund was mixed in 2013, but from 2014 through much of 2016, its returns and assets under management took off. During this period, Catalyst arranged for Walczak to speak on weekly "house calls" with investment advisors, some of whom included on the calls (or were themselves) direct investors in the Fund. Although Catalyst managed those calls, Walczak principally spoke about the Fund's performance, holdings and expected returns, regularly emphasizing his own daily stress-testing of the Fund for 5% to 10% upward movements of the S&P 500 and assuring listeners that he was actively managing to avoid more than an 8% drawdown in the Fund's value as a worst-case scenario.

In particular, Walczak explained that whenever his stress testing indicated "a risk of an 8% drawdown," he would step in to rebalance the Fund's option ratios and holdings to ensure that an 8% drawdown would be a "worst-case scenario." In particular, Walczak would at least occasionally assure listeners during those weekly calls that depending upon the results of his stress tests, he would: buy back risky positions and replace them with more stable options with longer expiration dates; or close out those positions altogether. Alternatively, when stress testing suggested the Fund was facing a potential 8% loss, Walczak insisted that he could take the entire Fund "to cash" to avoid a greater loss, although obviously having the entire Fund held in cash meant no possibility of appreciation. Just such an eventuality occurred in mid-2016, around the time of the Democratic and Republican presidential conventions, and in discussions with Catalyst's CEO, Jerry Szilagyi, Walczak brought the options positions way down.

### C. Precipitous Loss in Fund Value

Because the historic market volatility index for the S&P 500 market as a whole was extremely low, however, Walczak moved to an almost 1-by-3 ratio in the Fund holdings by early 2017, increasingly believing that this was a conservative approach given how quiet the market had been in the fall of 2016. In reality, therefore, the Fund was already facing losses of 8% or more for most of 2016 using the promised 5% to 10% upward market movement for stress testing. Despite his repeated assurances to investors to the contrary, because Walczak had concluded that even a more than 1% to 2% movement in the S&P 500 market was unlikely using a general volatility index, he continued to run options spreads almost entirely comprised of 1-to-3 ratios. Worse, by mid-December 2016, portfolio manager Kimberly Rios, who had been an assistant to Walczak since December

2014, pointed out the growing risk of a substantial loss should the market make even a 1% to 2% move upward.  Nevertheless, Walczak chose to stand pat, causing what was described inside Catalyst as an "all hands-on deck" situation for the Fund by the end of 2016.

At that time, Catalyst appointed Michael Schoonover to monitor the risk of loss in the Fund.  Using a similar form of stress testing software as OptionVue made available through Bloomberg, Schoonover independently determined that even a 1% rise in the S&P 500 would result in a 3.5% drop in the value of the overall Fund.  Still, Walczak believed that, since the entire month of January and early February 2017 had not experienced a whole month movement of 1 to 2 standard deviations from the then historically low, volatility rate of less than 1%, the risk of a significant market movement remained small. As a result, for some 3½ months, Walczak chose not to liquidate positions or adjust near- and longer-term ratio spreads to avoid unprecedented losses, much less bring the Fund's risk of loss below 8% as repeatedly promised.

Thus, when the S&P 500 instead rose by 2.5% within a single week in early February -- what Walczak characterized as a "Six Sigma move" -- the value of the Fund plummeted by some 17%.  Moreover, the Fund experienced a total loss of approximately $700 million when 98% of its options came due in February and March 2017 as a result of Walczak's decision not to rebalance its options to spread out due dates to hedge against sudden market movements up.  As a result, the Fund was never able to recover. Nonetheless, over the first three months of 2017, both Catalyst and Walczak each earned

nearly $8 million in management fees from the Fund, and in 2016 as a whole, each had earned $24 million in fees from the Fund.

### D. CFTC and SEC Enforcement Actions

The Fund's February 2017 losses garnered national news coverage.[6]  Two months later, a group of investors in the Fund filed a putative class action complaint for violations of federal securities laws in the U.S. District Court for the Eastern District of New York against Catalyst, Szilagyi, Walczak, and other individuals and entities associated with Catalyst, though Walczak was later voluntarily dismissed as a defendant.  *See generally, Emerson v. Mut. Fund Series Tr.*, 393 F. Supp. 3d 220 (E.D.N.Y. 2019) (dismissing plaintiffs' claims with prejudice for failure to state a claim).  At roughly the same time this class action suit was filed, the CFTC and SEC began their investigations into the Fund, during which Walczak -- who cooperated with the regulators' inquiries -- remained its portfolio manager.

On January 27, 2020, the SEC and CFTC both announced civil settlements with Catalyst and Szilagyi.[7]  Without admitting or denying the regulators' findings that the Fund violated the anti-fraud provisions of the federal securities and commodities laws, Catalyst and Szilagyi paid civil penalties of $1.3 million and $300,000, respectively.

---

[6] Chris Dieterich and Gunjan Banerji, *Fund's $600 Million Lost Week Captivates Traders*, THE WALL STREET JOURNAL, February 16, 2017, https://www.wsj.com/articles/funds-600-million-lost-week-captivates-traders-1487292045.

[7] Press Release, U.S. Securities & Exchange Commission, *SEC Charges Portfolio Manager and Advisory Firm with Misrepresenting Risk in Mutual Fund* (Jan. 27, 2020), https://www.sec.gov/newsroom/press-releases/2020-21; Press Release, Commodity Futures Trading Commission, *CFTC Orders Commodity Pool Operator, CEO to Pay More Than $10 Million for Misleading Statements, Supervision Failures* (Jan. 27, 2020), https://www.cftc.gov/PressRoom/PressReleases/8109-20.

Catalyst was also ordered to pay $8,908,481 in disgorgement and pre-judgment interest. The SEC then established a Fair Fund for the benefit of affected Fund investors.

On the same day as the announcement of their settlements with Catalyst and Szilagyi, the SEC and CFTC each filed civil complaints against Walczak in this court for violations of federal securities and commodities laws, respectively. (No. 20-cv-76, Dkt. #1 and No. 20-cv-75, Dkt #1.) After the parties filed and the court ruled on dispositive motions, the two cases were consolidated for a jury trial on liability. (Dkt. #75.)

### E.  Jury Verdict

A five-day trial began on April 11, 2022, with the jury finding Walczak liable for negligence-based securities and commodities fraud, though not for any claims requiring proof of scienter. (Dkt. #175.) Specifically, the jury found defendant's failure to manage for a maximum 8% downside risk by daily stress testing for much of 2016, and particularly in early 2017, violated the anti-fraud provisions of Section 17(a)(2) and (3) of the Securities Act, which prohibit the offer or sale of securities where such use is:

> 2)  to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; *or*

> 3)  to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a). Neither of these counts required the SEC to prove scienter. *Aaron v. S.E.C.*, 446 U.S. 680, 695-97 (1980). Indeed, the jury did *not* find him liable for violating

Section 17(a)(1) of the Securities Act, which does require proof of scienter.[8]  *Id.* at 697.

Similarly, the jury found that defendant's conduct violated Sections 206(2) and (4) of the Advisers Act, 15 U.S.C. § 80b-6(2) and (4).[9]  Under those provisions, it is unlawful for an investment adviser, either directly or indirectly, "(2) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client" or "(4) to engage in any act, practice, or course of business which is fraudulent, deceptive, or manipulative[,]" as defined in rules promulgated by the SEC. Neither Section 206(2) nor Section 206(4) carry a scienter requirement.  *S.E.C. v. Cap. Gains. Rsch. Bureau, Inc.*, 375 U.S. 180, 195 (1963); *S.E.C. v. Steadman*, 967 F.2d 636, 643 n.5 (D.C. Cir. 1992).   ,And, again, the jury did *not* find defendant liable for violating Section 206(1) of the Advisers Act, which carries a scienter requirement, including recklessness.  15 U.S.C. § 80b-6(1); *Steadman*, 967 F.2d at 641-42 (defining recklessness as an "extreme departure from the standards of ordinary care . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it") (internal citations omitted).

Finally, the jury found defendant's conduct violated one provision of the Commodity Exchange Act, Section 4o(1)(B), which prohibits commodity pool operators

---

[8] Scienter may be satisfied by proof that the defendant either "knew the statement was false" or "was reckless in disregarding a substantial risk that it was false."  *Makor Issues* & *Rts., Ltd. v. Tellabs Inc.*, 513 F.3d 702, 704 (7th Cir. 2008).  Here, the jury found only negligence.

[9] Section 202(a)(11) of the Advisers Act, 15 U.S.C. § 80b-2(a)(11), defines "investment adviser" as any person who, for compensation, "engages in the business of advising others, either directly or through publications and writings" as to the value of securities or the advisability of investing in securities or who, for compensation, "issues or promulgates analyses or reports concerning securities."  The court concluded that Walczak was an "investment adviser" for purposes of this case and instructed the jury accordingly.

or their associates from "engag[ing] in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant." 7 U.S.C. § 6o(1)(B). Violations of Section 4o(1)(B) also do not require a showing of scienter; rather, proof of negligence can suffice. *Commodity Trend Serv., Inc. v. CFTC*, 233 F.3d 981, 993-94 (7th Cir. 2000). Once more, the jury did not find defendant liable for violating Section 4o(1)(A) or Section 6(c)(1) of the Commodity Exchange Act and its implementing regulations, both requiring showings of scienter. 7 U.S.C. § 6o(1)(A); 7 U.S.C. § 9(1). *Commodity Trend Serv.*, 233 F.3d at 993; *CFTC v. Ehrlich*, 2024 WL 4008205, at *3 (S.D.N.Y. Aug. 29, 2024).

## OPINION

Before the court is the SEC's and CFTC's joint, post-trial motion for remedies, seeking entry of an order against defendant Walczak that provides for disgorgement, civil penalties, and injunctive relief. (Dkt. #188.) Defendant opposes plaintiffs' requests either in part or in full. (Dkt. #194.)

Congress has authorized the SEC to enforce the Securities Act and the Advisers Act and to punish securities fraud through enforcement actions in federal district court and administrative proceedings. *Liu v. S.E.C.*, 591 U.S. 71, 75 (2020). The CFTC, in turn, is empowered to punish fraud in futures markets under the Commodity Exchange Act. *United States v. Walsh*, 723 F.3d 802, 804 n.2 (7th Cir. 2013); 7 U.S.C. § 13a-1(a), (d). Once a district court finds that violations of those laws have occurred, it has broad discretion to fashion appropriate remedies. *S.E.C. v. Frohling*, 851 F.3d 132, 138 (2d Cir. 2016); *CFTC v. Lake Shore Asset Mgmt. Ltd.*, 496 F.3d 769, 772 (7th Cir. 2007). Appropriate remedies

12

include injunctive relief and monetary remedies, which as plaintiffs point out, typically involves some combination of disgorgement, prejudgment interest, or civil penalties.[10]  The court does not abuse its discretion as long as its factual findings with respect to remedies do not "conflict with the jury's findings."  *S.E.C. v. Cap. Sols. Monthly Income Fund, L.P.*, 818 F.3d 346, 354-55 (8th Cir. 2016).  The court explains the basis for its award of the remedies by category below.

### A. Disgorgement and Prejudgment Interest

Sections 21(d)(3), 21(d)(5), and 21(d)(7) of the Exchange Act, 15 U.S.C. § 78u(d)(3), (d)(5), and (d)(7), permit the court to order disgorgement in an SEC enforcement action.  The court may also do so in a CFTC enforcement action under 7 U.S.C. § 13a-1(d)(3)(B).  Disgorgement is "unlike an award of damages."  *S.E.C. v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1475 (2d Cir. 1996).  In considering an SEC enforcement action in 2020, the U.S. Supreme Court held that "a disgorgement award that does not exceed a wrongdoer's net profits and is awarded for victims is *equitable* relief."  *Liu*, 591 U.S. at 75 (emphasis added).  Moreover, the "primary purpose" of disgorgement is deterrence, by preventing unjust enrichment on the part of the violator.  *First Jersey*, 101

---

[10] The CFTC also sought an order for restitution in its amended complaint.  (Dkt. #11, at 29.) However, plaintiffs' motion now disclaims any intention to seek restitution "because the dollar figures are so large[,]" despite the CFTC's statutory authority to do so.  (Dkt. #188, at 9 n.1.) Because plaintiffs have waived any right to pursue restitution -- notwithstanding a brief, two-page argument at the end of their combined brief asking the court to "consider its availability" -- the court will not address it further here.  (*Id.* at 36-37.)  Regardless, the court agrees that a restitution award even for half of the investors' losses of $350 million dollars would be out of proportion to defendant's negligent acts, particularly since his equally culpable, more sophisticated co-actor, Catalyst, was allowed to settle out the same claims for less than 5% of that figure.

F.3d at 1474-75; *Kokesh v. S.E.C.*, 581 U.S. 455, 464 (2017). In that same spirit, the court may order a defendant to pay prejudgment interest on the amount to be disgorged. *First Jersey,* 101 F.3d at 1476.

Courts have "broad discretion not only in determining whether or not to order disgorgement but also in calculating the amount to be disgorged." *First Jersey*, 101 F.3d at 1474-75 (internal citations omitted). The amount of disgorgement ordered "need only be a reasonable approximation of profits causally connected to the violation." *Id*. Once that showing is made, the burden shifts to the defendant to show that the amount sought is *not* a reasonable approximation. *S.E.C. v. Merchant Cap. LLC*, 486 F. App'x 93, 96 (11th Cir. 2012). Defendants disputing that amount face a high burden, *S.E.C. v. Fowler*, 440 F. Supp. 3d 284, 296 (S.D.N.Y. 2020), and the risk of any uncertainty in calculating it falls on the defendant whose unlawful conduct created that uncertainty. *Merchant Cap.*, 486 F. App'x at 96. Finally, a defendant's ability or inability to repay the amount to be disgorged is not a consideration in determining the amount he owes. *S.E.C. v. Warren*, 534 F.3d 1368, 1370 (11th Cir. 2008).

Plaintiffs ask that disgorgement be imposed here against defendant in the amount of $7,765,105, with $1,868,158.50 in prejudgment interest, totaling $9,633,263.50. (Dkt. #188, at 25, 28.) According to plaintiffs, that disgorgement figure only represents the net advisory fees that defendant received during the period of his illegal conduct between December 2016 and February 2017. (*Id*. at 28.) It also has the merit of focusing on the period when defendant abandoned altogether any pretense that he was managing for an 8% downside risk in the event of a market movement of 5% to 10% as promised

investors, and instead relied on a predictive, daily volatility rate for the S&P 500 market, when under the law of probabilities this left a 10% chance of a 5% market movement and a 25% chance of a 2½% percent movement over the next month.

In turn, defendant responds that plaintiffs: (1) only seek disgorgement as a punitive sanction, failing to identify any particular victims; (2) never made an effort to distinguish between "legally and illegally derived profits[;]" (3) improperly calculate plaintiff's pecuniary gain; (4) impermissibly look to the scienter-based claims for which he was not found liable; and (5) use the wrong period of illegal conduct to calculate their proposed disgorgement. (Dkt. #194, at 23-27.) By defendant's lights, therefore, the proper disgorgement and interest amount is far smaller: $465,379.05 of disgorgement, and $112,917.02 in prejudgment interest, totaling $578,296.07.

The court agrees with plaintiffs: $7,765,105 is an appropriate amount of disgorgement in this case. That figure is a fair approximation of the *net* fees that defendant received for negligently managing the Fund for only the three, most egregious months, as opposed to an arguably far longer period during which he negligently managed the Fund in a manner inconsistent with his representations to investors and for which he received over $37 million in fees after expenses.[11]

---

[11] Plaintiffs' calculation is based on the gross advisory fees paid to defendant during that period, *less* the $33,203.91 that Rios was paid for her work on the Fund, the $183,557.25 representing defendant's share of the Fund's marketing and sales expenses, and $900 paid to the Fund's intern. (Dkt. #198 and Dkt. #199, at 7.) Despite insisting that plaintiffs "have made no attempt to determine his actual profit," defendant has provided no evidence of *any* additional expenses beyond those identified by plaintiffs that would support reducing the disgorgement amount any further. (Dkt. #194, at 25-26.)

Defendant argues that plaintiffs have "bypass[ed] their burden of proof" on the disgorgement figure by "merging multiple questions into one" at the liability phase of trial and using a "procedural sleight of hand" to shift that burden onto defendant now.  (*Id.*) However, all the law requires from plaintiffs is a *reasonable approximation* of the amounts causally connected to the violation -- not an exact, statement-by-statement figure.  Here, the evidence adduced at trial amply supports a conclusion that defendant's earnings were causally connected to his negligent misrepresentations about the Fund's risk management for which he was found liable.  Indeed, in the initial Fund's investor presentation, Catalyst and Walczak both represented that his risk management processes were a "key reason to invest" in the Fund (PX 297 (dkt. #190-13, at 12)), a representation negligently made repeatedly by Walczak in subsequent, weekly house calls orchestrated by Catalyst with investment brokers and investors, all certainly contributing to and maintaining rapid growth of the Fund, and thereby the size of the 2½% in management fees that Catalyst and Walczak split.

This award is *not* intended in any way as a punitive sanction.  Despite defendant's insistence otherwise, "[d]isgorgement is not dependent on scienter, but is tied instead to the idea of unjust enrichment[,]" meaning its goal "is that persons not profit" from violating the law.  *S.E.C. v. Merchant Cap. LLC*, 397 F. App'x 593, 595 (11th Cir. 2010). The fact that the jury found him not liable for any of the scienter-based claims is of little to no relevance in calculating the disgorgement amount; what matters for purposes of ordering disgorgement is that plaintiff's gains, which resulted from the wrongful conduct for which he *was* found liable, were ill-gotten due to defendant's growing negligence, even

hubris, in believing, contrary to his repeated representations, that he could manage investors' nearly unlimited downside risk inherent in trading in options futures by no more than an 8% loss based solely on a daily S&P 500 market volatility rate and his gut.  In light of plaintiffs' representations that they will distribute any disgorgement award paid by defendant to the victims in this case, it is more than appropriate to order this relief, if not more, under *Liu*, 591 U.S. at 75.

Finally, the court will order defendant to pay prejudgment interest on the amount to be disgorged.  See *West Virginia v. United States*, 479 U.S. 305, 310-11 (1987) (prejudgment interest is "an element of complete compensation"); *Rivera v. Benefit Tr. Life Ins. Co.*, 921 F.2d 692, 696 (7th Cir. 1991) (explaining that "[t]he award of prejudgment interest for a federal law violation is governed by federal common law").  Imposing prejudgment interest "puts [defendant] in the same position as if he had not received any ill-got gains" during the period of his unlawful conduct.  *S.E.C. v. Koenig*, 557 F.3d 736, 745 (7th Cir. 2009).

While neither the Security Exchange nor the Commodity Exchange Acts prescribe a method for calculating prejudgment interest, the Seventh Circuit affirmed a district court's prejudgment interest award in a securities enforcement action based on the rate provided in 26 U.S.C. § 6621 for tax underpayments.  *Koenig*, 557 F.3d at 745.  Here, plaintiffs propose using that rate, which defendant does not oppose.  (Dkt. #188, at 30; Dkt. #194, at 28 n.12.)  Where the parties diverge is on the appropriate amount of interest.  Given the court's agreement with plaintiffs on the appropriate amount of disgorgement, however, it will award their proposed amount of prejudgment interest:

$1,868,158.50, which reflects the interest accrued through the date their motion was filed. (Dkt. #190-9.)  Taken together, therefore, the amount plaintiff must pay in disgorgement and prejudgment interest is $9,633,263.50.

## B.  Civil Penalties

Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d)(2), Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3), and Section 209(e) of the Advisers Act, 15 U.S.C. § 80b-9(e), authorize the court to impose civil penalties against any person who has violated those Acts.  Section 6c of the Commodity Exchange Act also allows the court to impose a civil penalty on "any person found in the action to have committed any violation" of that law.  7 U.S.C. § 13a-1(d)(1).  Civil penalties punish and deter wrongdoers, because disgorgement alone "does not result in any actual economic penalty or act as a financial disincentive to engage in securities fraud."  *S.E.C. v. Moran*, 944 F. Supp. 286, 296 (S.D.N.Y. 1996) (quoting H.R. Rep. No. 101-616 (1990)); *see also CFTC v. Hall*, 49 F. Supp. 3d 444, 454-55 (M.D.N.C. 2014) (same).

The federal securities and commodities laws set different civil penalty ranges, though the considerations that the court must take into account when assessing them are similar, including the consequences of the violation, whether scienter was involved, financial benefits to defendant, and harm to customers or the market.  *S.E.C. v. Williky*, 942 F.3d 389, 393 (7th Cir. 2019); *Monieson v. CFTC*, 996 F.2d 852, 862 (7th Cir. 1993). The pertinent provisions of federal securities law provide for three tiers of monetary penalties.  The third tier, which is the highest, allows for imposition of a civil penalty in an amount up to the greater of $230,464 per violation or of "the gross amount of pecuniary

gain to such defendant" if the violation "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" and "such violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." 15 U.S.C. §§ 77t(d)(2)(C), 78u(d)(3)(B), 80b-9(e)(2). The first and second tiers provide for lower per-violation penalties and also permit the court to assess a fine not exceeding the defendant's gross amount of pecuniary gain "in light of the facts and circumstances" of the case, consistent with the jury's finding of liability. *Id*.; *S.E.C. v. Lipson*, 278 F.3d 656, 662 (7th Cir. 2002). The framework for assessing penalties under the Commodity Exchange Act is simpler, permitting fines of "not more than the greater of $100,000 or triple the monetary gain to such person" for each violation. 7 U.S.C. § 13a-1(d)(1); *see also* 17 C.F.R. § 143.8 (2024) (inflationary adjustment of statutory penalties).

Plaintiffs seek a $4,000,000 civil penalty for plaintiff's conduct, arguing that some courts have imposed a single penalty equal to the amount of disgorgement under similar circumstances. (Dkt. #188, at 33.) Though plaintiffs contend "third tier" penalties would be appropriate here for defendant's securities law violations, they argue that the court is entitled to assess penalties not exceeding defendant's gross amount of pecuniary gain regardless of the penalty "tier" that applies *or*, in any case, for his violation of the Commodity Exchange Act. (*Id*. at 32-33.) Defendant, in turn, argues that: (1) only a first-tier penalty is merited here; (2) the totality of his misrepresentations only constituted a single violation, rather than discrete violations for each statement; (3) he should not be fined more than Catalyst as the official investment adviser for the Fund, who was required to pay a $1,300,000 fine; (4) the jury did not find him liable for any scienter-based claims;

and (5) his approximate net worth of $10,250,000 would be wiped out by such large disgorgement and penalty amounts.  (Dkt. #194, at 29-36.)  Consequently, defendant suggests that the appropriate civil penalty amount should be $243,243.02, which he somewhat confusingly backs into by pointing to his own, lower proposed disgorgement amount combined "with the fraction of [p]laintiffs' proposed disgorgement that [p]laintiffs recommended as a civil penalty."  (*Id.* at 36.)

With respect to the federal securities laws, the court has little trouble concluding that defendant's violations should give rise to second-tier penalties.  The jury found that defendant's repeated misrepresentations regarding his use of the OptionVue software operated as a "fraud or deceit" upon investors (dkt. #175, at 1) as contemplated by Section 17(a)(3) of the Securities Act, albeit negligent in nature.   15 U.S.C. § 77q(a)(3).  Testimony at trial made clear that investors incurred substantial losses as a result; indeed, those losses, for the brief period between December 2016 and February 2017 alone ended up totaling roughly $1 billion.   Defendant's insistence that his lack of scienter in connection with each statement challenged by plaintiffs should result in a lower tier penalty for a *single* securities violation overlooks the inescapable reality that the applicable statutory language permits the court to award a penalty equivalent to his gross pecuniary gain as a result of that violation.   Meanwhile, as to defendant's violation of the Commodity Exchange Act, the court is authorized in its discretion to award damages of *triple* the monetary gain that he obtained from that violation without regard to intent.   Plaintiffs contend -- and the court agrees -- that a single penalty equal to the amount of disgorgement

20

could be supported by the law.  *S.E.C. v. Cook*, 2015 WL 5022152, at *28 (S.D. Ind. Aug. 24, 2015) (citing *S.E.C. v. Graulich*, 2013 WL 3146862, at *7 (D.N.J. June 19, 2013)).

Nevertheless, the court finds that a civil penalty of $1,600,000 is appropriate here. That amount reflects the jury's finding of liability against defendant, as well as the nature of defendant's conduct and the substantial losses that investors incurred.  Catalyst was assessed a $1,300,000 fine in connection with its no-admit, no-deny settlement with plaintiffs, while Szilagyi, as Catalyst's CEO, was only required to pay $300,000 as a result of his settlement.  It would be wholly inappropriate for defendant to pay a *smaller* fine after a jury found him liable for conduct involving that same set of facts, especially as the manage of the Fund in the best position to know of his departures from promised risk management. Nor can the court conclude that defendant's present financial position somehow precludes him from paying a $1,600,000 fine, since his attorneys' representations about his "net worth of approximately $10,250,000" lack any evidentiary basis in the record and are irrelevant for purposes of crafting an appropriate civil penalty.  *Warren*, 534 F.3d at 1370 (a defendant's ability to pay "does not merit significant weight in comparison to the other equities"); *S.E.C. v. Berrettini*, 218 F. Supp. 3d 754, 765-66 (N.D. Ill. 2016) (refusing to reduce penalty because of defendant's "incomplete presentation of his financial condition").  In fact, the court could justify levying a far larger penalty against defendant, but doing so would be unlikely to provide greater deterrent value given the balance of all the relief it is ordering here.

## C. Injunctive Relief

Finally, Section 20(b) of the Securities Act, 15 U.S.C. § 77t(b), Section 21(d) of

the Exchange Act, 15 U.S.C. § 78u(d)(1), and Section 209(d) of the Advisers Act, 15 U.S.C. § 80b-9(d), authorize the SEC to seek injunctive relief against anyone who "is engaged or is about to engage" in actions or practices violating those Acts.  The Commodity Exchange Act permits the CFTC to seek a "permanent or temporary injunction or restraining order" upon a similar showing as to the commodities laws.  7 U.S.C. § 13a-1(b).

When imposing a permanent injunction for violations of securities or commodities laws, the key question is whether there is a "reasonable likelihood of future violations." *S.E.C. v. Holschuh*, 694 F.2d 130, 144 (7th Cir. 1982) (internal citations omitted); *see also CFTC v. Hunt*, 591 F.2d 1211, 1220 (7th Cir. 1979).  To assess whether there is a reasonable likelihood of future violations, courts must consider the totality of the circumstances, including factors such as:  "(1) the gravity of harm caused by the offense; (2) the extent of defendant's participation; (3) defendant's degree of scienter; (4) the isolated or recurrent nature of the infraction; (5) the likelihood that defendant's customary business activities might again involve him in such transactions; (6) defendant's recognition of his own culpability; and (7) the sincerity of defendant's assurances against future violations." *S.E.C. v. Kimmes*, 799 F. Supp. 852, 860 (N.D. Ill. 1992), *aff'd sub nom. S.E.C. v. Quinn*, 997 F.2d 287 (7th Cir. 1993); *Hunt*, 591 F.2d at 1220.

Plaintiffs ask the court to enter a permanent injunction barring Walczak from violating the anti-fraud provisions of the federal securities and commodities laws.  (Dkt. #188, at 19.)  In the alternative, plaintiffs ask the court to enter a "conduct-based injunction specifically precluding [d]efendant from acting as a portfolio manager or otherwise managing the investments of others."  (*Id*. at 25 n.10.)  On the other hand,

22

defendant suggests that *any* injunction would be inappropriate because: (1) plaintiffs have failed to prove loss causation; (2) none of the violations he committed involved scienter; (3) his violations were not recurrent; (4) he has no plans to work with a public fund again; (5) he cooperated with the investigations into his conduct; (6) he acknowledges the jury's findings against him; and (7) it would be unfair for him to be barred from the industry when Jerry Szilagyi and Catalyst were not. (Dkt. #194, at 37-44.) In fashioning an appropriate remedy, the court is guided by rules of equity requiring relief to "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *East Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 779 (9th Cir. 2018) (quoting *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994)).

The court concludes that some injunctive relief is warranted to protect investors from future violations. In so finding, the court acknowledges the facts of this case and the significant, monetary elements of the relief defendant is being ordered to pay. First, plaintiff is a first-time offender, whose violations lacked scienter. Moreover, as defendant points out, neither Catalyst nor Szilagyi were subject to a court-ordered injunction as a result of similar conduct arising out of the same set of operative facts.[12] The court also notes that defendant disclaims any interest in continuing to manage public funds, so the odds of him repeating the same mistakes he made with the Fund seem relatively remote.[13]

---

[12] However, as part of their settlement with the SEC, Catalyst and Szilagyi agreed to be censured, to cease and desist from any future violations of securities laws, and to other related undertakings.

[13] Defendant's brief notes that as of 2022, he was "managing his own money along with that of some friends and family." (Dkt. #194, at 40.) However, he does not indicate how many friends or family members that includes, nor what amount of money he was managing for them. Though plaintiffs identify a series of Wisconsin-based legal entities that Walczak has registered and could

Though the court agrees with plaintiffs that defendant has been largely unwilling to admit that his conduct was wrongful -- perhaps in anticipation of an eventual appeal.  However, he largely cooperated with plaintiffs' investigation and now acknowledges the jury's verdict against him.  (Dkt. #194, at 42.)  Ultimately, the court believes that the monetary penalties and disgorgement it is ordering today will effectively incentivize him to *not* repeat the kind of conduct for which he was found liable here, which in the end amounted to ill-advised assurances that at least some investors unquestionably relied upon in putting and keeping their money in the Fund, which Catalyst should itself have nipped in the bud as the more sophisticated seller who expressly took on responsibility for investor communications.

That leaves the question of what kind of injunction is appropriate here.  Plaintiffs' request for an injunction barring future violations of the anti-fraud provisions of the securities and commodities laws is an "obey-the-law" injunction that is increasingly disfavored in this circuit.  *S.E.C. v. Goulding*, 40 F.4th 558, 563 (7th Cir. 2022), *cert. denied*, 143 S. Ct. 2582 (2023).  As a result, the court's injunction will not merely "repeat[] the statutory language," but instead "forbid[] with greater specificity what [defendant] must not do."  *Id*. at 562-63.  Plaintiffs' proposal -- that defendant be barred from acting as a portfolio manager or otherwise managing the investments of others -- fits that bill.  The court finds that a five-year ban on such conduct, beginning on the date of the jury's verdict,

---

conceivably use for fund advisory purposes, their argument is purely speculative, since plaintiffs have *not* proffered *any* evidence suggesting that those entities have, in fact, managed others' funds or commodities pools.  (Dkt. #188, at 18.)

April 18, 2022, is appropriate here.[14]   Accordingly, defendant will be enjoined from managing or advising on investments in securities or commodity futures for any third parties, except for his wife or children, until April 18, 2027.  To the extent defendant is currently managing such investments for third parties aside from his wife or children, he must stop doing so within 30 days after entry of this order.

ORDER

IT IS ORDERED that Plaintiffs' Joint Motion in Support of Remedies (Dkt. #188) is GRANTED IN PART as follows:

1) Defendant Edward Walczak SHALL PAY the U.S. Securities and Exchange Commission and Commodity Futures Trading Commission, jointly and severally, the total amount of **$11,233.263.50**, consisting of **$7,765,105.00** in disgorgement; **$1,868,158.50** in prejudgment interest; and **$1,600,000** in civil penalties.

2) Walczak is ENJOINED from managing or advising on investments in securities or commodity futures for any third parties, except for his wife or children, until April 18, 2027.

3) The clerk of court is directed to enter final judgment and close this case.

Entered this 15th day of November, 2024.

BY THE COURT:
/s/

_____
WILLIAM M. CONLEY
District Judge

---

[14] Absent conduct that substantially exceeds plaintiff's representation that he would only trade for family and friends, the court will presume general compliance with this ban from April 18, 2020, to today's date.  If deemed appropriate, the court takes no position on plaintiffs' ability to pursue further injunctive relief, including but not limited to an industry bar, through any follow-on, administrative proceedings that may be available in their respective administrative tribunals.  15 U.S.C. § 80b-3(e)(4), (f); 7 U.S.C. § 12a(2)-(3).